1   MARC M. SELTZER (54534)
    mseltzer@susmangodfrey.com
2   STEVEN G. SKLAVER (237612)
    ssklaver@susmangodfrey.com
3   AMANDA BONN (270891)
    abonn@susmangodfrey.com
4   SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
5   Los Angeles, CA 90067
    Telephone:  (310) 789-3100
6   Fax:  (310) 789-3150

7   Attorneys for Defendants Dean Transportation, Inc.;
    Dean Foods of Southern California, LLC
8   (dba Heartland Farms)

9                   UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12                        WESTERN DIVISION

13   SCOTT PARKER, on behalf of himself      Case No. CV 13-02621 BRO (VBKx)
14   and those similarly situated,

15                  Plaintiff,              **CLASS ACTION**

16        v.                                **REQUEST FOR JUDICIAL
                                            NOTICE IN SUPPORT OF
17   DEAN TRANSPORTATION, INC., an           DEFENDANTS DEAN FOODS OF
     Ohio Corporation; DEAN FOODS OF         SOUTHERN CALIFORNIA,
18   SOUTHERN CALIFORNIA, LLC (dba           LLC'S AND DEAN
     HEARTLAND FARMS), a Delaware            TRANSPORTATION INC.'S
19   Limited Liability Company; SBM          MOTIONS TO DISMISS
     DAIRIES, INC., a California             PLAINTIFF'S COMPLAINT
20   Corporation; ALTA-DENA CERTIFIED        PURSUANT TO FED. R. CIV. P.
     DAIRY, LLC, a Delaware Limited          12(b)(6) OR TO STRIKE
21   Liability Company, and DOES 1 through   PURSUANT TO FED. R. CIV. P.
     10, inclusive,                          12(f)**
22                  Defendants.

23                                          Date:  July 15, 2013

24                                          Time:  9:00 a.m.

25                                          Place:  Courtroom of the
                                                   Hon. Beverly Reid O'Connell
26                                                 Courtroom 14

27

28

2765975v1/013684

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rule of Evidence 201 and supporting case law, defendants Dean Transportation, Inc. ("DTI") and Dean Foods of Southern California, LLC (dba Heartland Farms) ("Heartland"), together "Defendants," by and through their attorneys of record, hereby request that the Court take judicial notice of the below-listed documents in connection with its consideration of Defendants' independent Motions To Dismiss Plaintiff's Complaint Pursuant To Fed. R. Civ. P. 12(b)(6).

The documents that are the subject of this Request for Judicial Notice were either (1) filed in a related action brought by the same counsel for current Plaintiff on behalf of Miguel de la Cueva against Alta-Dena Certified Dairy, LLC in the U.S. District Court for the Central District of California, captioned *Miguel de la Cueva v. Alta-Dena Certified Dairy, Inc., et al.*, Case No. 12-CV-1804-GHK-CW (C.D. Cal.), or (2) are publicly available filings with state or federal agencies not subject to reasonable dispute. Accordingly, Defendants request that the Court take judicial notice of the following documents as part of this Request:

1.  Attached hereto as Exhibit 1 is a true and correct copy of the Certificate of Merger of Dean Foods of Southern California, LLC and Alta-Dena Certified Dairy, LLC, effective January l, 2013.

2.  Attached hereto as Exhibit 2 is a true and correct copy of the Certificate of Amendment and First Amendment to Limited Liability Agreement of HF Acquisition, LLC dated April 27, 2009, changing the name of the company to Dean Foods of Southern California, LLC. Attached to the Amendment is the Limited Liability Agreement of HF Acquisition, LLC dated March 27, 2009.

3.  Attached hereto as Exhibit 3 is a true and correct copy of the Articles of Incorporation for Dean Transportation, Inc.

1    4.    Attached hereto as Exhibit 4 is a true and correct copy of Plaintiff's *Ex*

2  *Parte* Application for Leave to File First Amended Complaint or, in the Alternative,

3  for Leave to File on Shortened Time Motion for Leave to File First Amended

4  Complaint filed on February 5, 2013, in the related action, *Miguel de la Cueva v.*

5  *Alta-Dena Certified Dairy, Inc., et al.*, Case No. 12-CV-1804-GHK-CW (C.D.

6  Cal.) (Dkt. 41).

7    5.    Attached hereto as Exhibit 5 is a true and correct copy of the

8  Declaration of Marjorie Ball filed on February 6, 2013, in the related action, *Miguel*

9  *de la Cueva v. Alta-Dena Certified Dairy, Inc., et al.*, Case No. 12-CV-1804-GHK-

10  CW (C.D. Cal.) in support of Alta-Dena Certified Dairy LLC's Opposition to an *ex*

11  *parte* motion by the plaintiff Miguel de la Cueva to add Scott Parker as a named

12  plaintiff in that action (Dkt. 43-1).

13    6.    Attached hereto as Exhibit 6 is a true and correct copy of Chief Judge

14  King's Order denying the request to add Mr. Parker as a plaintiff in Case No. 12-

15  CV-1804-GHK-CW (Dkt. 48).

16    7.    Attached hereto as Exhibit 7 is a true and correct copy of Chief Judge

17  King's Order denying Plaintiff's Motion to Certify Class in Case No. 12-CV-1804-

18  GHK-CW (Dkt. 61).

19    8.    Attached hereto as Exhibit 8 is a true and correct copy of a printout

20  from the FMSCA website titled "SAFER Web – Company Snapshot DEAN

21  TRANSPORTATION INC.") identifying the FMCSA's registration information for

22  Dean Transportation, Inc., which is publicly available by going to

23  http://safer.fmcsa.dot.gov/query.asp and submitting a query for Dean

24  Transportation, Inc.

25    9.    Attached hereto as Exhibit 9 is a true and correct copy of a printout

26  from the website for the U.S. Department of Transportation's Federal Motor Carrier

27

28

2765975v1/013684

Safety Administration ("FMCSA") titled "SAFER WEB - Help," which is publicly available at http://safer.fmcsa.dot.gov/saferhelp.aspx.

10.     Judicial notice of the foregoing exhibits is appropriate under the Federal Rules of Evidence, which require that judicial notice be taken of facts not subject to reasonable dispute and that are "capable of accurate and ready determination by reference to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under Evidence Rule 201, the Court may "take judicial notice of the records of state agencies and other undisputed matters of public record." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (granting judicial notice of licensing agreement because it was a public record of a state university); *see also Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (taking judicial notice of policies within the handbook of a federal agency). The Court may also take judicial notice of records of state and federal agencies. *See, e.g.*, *Bowes v. Christian Record Servs.*, No. CV 11-799-CAS, 2011 WL 3682766, at *1 (C.D. Cal. Aug. 22, 2011) (taking judicial notice of California Secretary of State's webpage registration and articles of incorporation for defendant); *Orosa v. Therakos, Inc.*, No. CV 11-2143-EMC, 2011 WL 3667485, at *8 (N.D. Cal. Aug. 22, 2011) (taking judicial notice of defendant's articles of incorporation because they were "available from the Florida Department of State" and from a source "whose accuracy cannot reasonably be questioned"); *Global BTG LLC v. Nat'l Air Cargo, Inc.*, No. CV 11-1657 RSWL, 2011 WL 2672337, at *1 (C.D. Cal. June 29, 2011) (taking judicial notice on motion to dismiss of defendant's articles of organization and "the print-out of an internet search for business entities on the California Secretary of State website").

1         11.    The documents listed above were all publicly filed either as part of a

2    related action in this District or with a government agency and are not subject to

3    reasonable dispute. As a result, all are appropriate for judicial notice.

4

5

6    Dated:  June 17, 2013                    MARC M. SELTZER
                                              STEVEN G. SKLAVER
7                                             AMANDA BONN
                                              SUSMAN GODFREY L.L.P.
8

9

10                                           By:  /s/ Marc M. Seltzer
                                                  Marc M. Seltzer
11                                           Attorneys for Defendants Dean
                                             Transportation, Inc. and Dean Foods of
12                                           Southern California, LLC (dba Heartland
                                             Farms)
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit 1



# Delaware

*PAGE 1*

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"DEAN FOODS OF SOUTHERN CALIFORNIA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "ALTA-DENA CERTIFIED DAIRY, LLC" UNDER THE NAME OF "ALTA-DENA CERTIFIED DAIRY, LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2012, AT 8:48 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE FIRST DAY OF JANUARY, A.D. 2013.

2964500  8100M

121406054

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0110659

DATE: 01-02-13

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:40 AM 12/31/2012*
*FILED 08:48 AM 12/31/2012*
*SRV 121406054 - 2964500 FILE*

## CERTIFICATE OF MERGER

### MERGING

### DEAN FOODS OF SOUTHERN CALIFORNIA, LLC
**a Delaware limited liability company**

### INTO

### ALTA-DENA CERTIFIED DAIRY, LLC
**a Delaware limited liability company**

\* \* \* \* \* \* \*

Pursuant to Title 6, Section 18-209 of the Delaware Limited Liability Company Act, the undersigned limited liability company executed the following Certificate of Merger:

**FIRST:** The names of the merging limited liability companies are **Alta-Dena Certified Dairy, LLC**, a Delaware limited liability company formed on November 9, 1998, and **Dean Foods of Southern California, LLC**, a Delaware limited liability company organized on March 27, 2009.

**SECOND:** The Agreement of Merger has been approved, adopted, certified, executed and acknowledged by the surviving limited liability company and the merging limited liability company in accordance with Section 18-209 of the Delaware Limited Liability Company Act.

**THIRD:** The name of the surviving limited liability company is **Alta-Dena Certified Dairy, LLC.**

**FOURTH:** The Agreement of Merger is on file at 2711 North Haskell Avenue, Suite 3400, Dallas, Texas 75204, the place of business of the surviving limited liability company.

**FIFTH:** The surviving limited liability company on request, without cost, will furnish a copy of the Agreement of Merger to any member of any constituent limited liability company.

**IN WITNESS WHEREOF** said limited liability company has caused this Certificate to be signed, this 19th day of December, 2012, to be effective as of the 1st day of January, 2013.

**ALTA-DENA CERTIFIED DAIRY, LLC**

By _____

Rachel A. Gonzalez
Senior Vice President and Secretary

I:\ADM (Administrative)\Connell#2012 LER:5 - Cert of Merger-DFSC into Alta-Dena.docx

# Exhibit 2

# Delaware

PAGE   1

### *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "HF ACQUISITION, LLC", CHANGING ITS NAME FROM "HF ACQUISITION, LLC" TO "DEAN FOODS OF SOUTHERN CALIFORNIA, LLC", FILED IN THIS OFFICE ON THE TWENTY-SEVENTH DAY OF APRIL, A.D. 2009, AT 11:59 O'CLOCK A.M.

4670263   8100

090399428

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION:  7266761

DATE:  04-27-09

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:13 PM 04/27/2009*
*FILED 11:59 AM 04/27/2009*
*SRV 090399428 - 4670263 FILE*

## CERTIFICATE OF AMENDMENT

### TO

## CERTIFICATE OF FORMATION

### OF

## HF ACQUISITION, LLC

It is hereby certified that:

1.    The name of the limited liability company (the "Limited Liability Company") is **HF Acquisition, LLC.**

2.    The certificate of formation of the Limited Liability Company is hereby amended by striking out Article 1 thereof and by substituting in lieu of said Article the following new Article 1:

> **FIRST:** The name of the limited liability company (hereinafter called the "Limited Liability Company") is **Dean Foods of Southern California, LLC.**

Executed on April 27, 2009.

**HF ACQUISITION, LLC**

By: _____

Rachel A. Gonzalez
Authorized Person

# FIRST AMENDMENT
## TO
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## HF ACQUISITION, LLC

This First Amendment (this "Amendment") to the Limited Liability Company Agreement of HF Acquisition, LLC, a Delaware limited liability company (the "Company"), is entered into on April 27, 2009 (the "Effective Date"), by Suiza Dairy Group, LLC, a Delaware limited liability company and the sole member of the Company ("Suiza").

## R E C I T A L S

**WHEREAS**, Suiza executed the Limited Liability Company Agreement of the Company, dated March 27, 2009 (the "LLC Agreement");

**WHEREAS**, Suiza has determined it to be in the best interest of the Company to change its name from "HF Acquisition, LLC" to "Dean Foods of Southern California, LLC" (the "Name Change"); and

**WHEREAS**, in connection with the Name Change, Suiza, as the sole member of the Company, desires to amend and replace certain sections of the LLC Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the LLC Agreement is changed as follows:

1.      Amendment to the LLC Agreement.  Except where it clearly does not apply because of events that occurred prior to the effective date of this Amendment, all references to "HF Acquisition, LLC" in the LLC Agreement are hereby amended and replaced in their entirety to "Dean Foods of Southern California, LLC."

2.      Successors and Assigns.  This Amendment shall be binding upon, and shall inure to the benefit of the signatories hereof and their respective heirs, legal representatives, successors, and permitted assigns.

3.      Counterparts.  This Amendment may be executed, including by facsimile transmission, in counterparts, all of which together shall constitute one and the same Amendment.

4.      Definitions.  All terms not otherwise defined in this Amendment shall have the meanings set forth in the LLC Agreement.

5.    <u>Applicable Law</u>.  This Amendment shall be construed in accordance with and governed by the laws of the State of Delaware without regard to the principles of conflicts of law.

**IN WITNESS WHEREOF**, the undersigned has executed this Amendment as of the Effective Date.

SUIZA DAIRY GROUP, LLC

By: _____

Rachel A. Gonzalez
Vice President, Secretary and Sole Manager

I:\COR (Corporate)\Subsidiary Consents, Resolutions & Organizational Docs\Dean Foods of Southern California, LLC\Amendment 1 to LLC Agreement.doc

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HF ACQUISITION, LLC

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HF ACQUISITION, LLC

## TABLE OF CONTENTS

**Page**

ARTICLE I ....................................................................................................................1
  1.1 Formation ..........................................................................................................1
  1.2 Name .................................................................................................................1
  1.3 Registered Office and Principal Office of Company .......................................1
  1.4 Term ..................................................................................................................1
  1.5 Assumed Name Certificate ...............................................................................1
  1.6 Limits of Company ...........................................................................................1

ARTICLE II ..................................................................................................................1

ARTICLE III .................................................................................................................4
  3.1 Purposes and Scope ..........................................................................................4
  3.2 Sole Member .....................................................................................................4
  3.3 Restrictions on the Disposition of a Membership Interest ...............................4

ARTICLE IV .................................................................................................................4
  4.1 Initial Capital Contributions ............................................................................4
  4.2 Additional Contributions ..................................................................................4
  4.3 Maintenance of Capital Account ......................................................................4
  4.4 Limited Liability of Sole Member ....................................................................4

ARTICLE V ..................................................................................................................5
  5.1 Allocation of Profits and Losses ......................................................................5
  5.2 Interim Distributions ........................................................................................5
  5.3 Distributions on Termination ...........................................................................5
  5.4 Limitation on Distributions ..............................................................................5
  5.5 Distributions in Kind ........................................................................................5

ARTICLE VI .................................................................................................................5
  6.1 Management by Manager ..................................................................................5
  6.2 Appointment of Manager and Tenure ..............................................................5
  6.3 Removal ............................................................................................................6
  6.4 Duties of Manager ............................................................................................6
  6.5 Officers .............................................................................................................6
  6.6 Indemnification .................................................................................................6

ARTICLE VII ....................................................................................................................7
   7.1 Certificates Representing Units .............................................................................7
   7.2 Registration, Registration of Transfer and Exchange ..........................................7
   7.3 Mutilated, Destroyed, Lost or Stolen Certificates ...............................................8
   7.4 Record Holder .......................................................................................................9
   7.5 Legend ...................................................................................................................9

ARTICLE VIII ..................................................................................................................9
   8.1 Books and Records ...............................................................................................9
   8.2 Nonentity for Federal Income Tax Purposes .......................................................9

ARTICLE IX .....................................................................................................................9
   9.1 Dissolution ............................................................................................................9
   9.2 Effect of Dissolution ..........................................................................................10
   9.3 Winding Up Procedures ......................................................................................10
   9.4 Distribution of Assets Upon Dissolution ...........................................................10
   9.5 Distributions in Kind ..........................................................................................10
   9.6 Articles of Dissolution ........................................................................................10

ARTICLE X .....................................................................................................................11
   10.1 Captions and Headings .....................................................................................11
   10.2 Amendment of Certificate of Formation ..........................................................11
   10.3 Amendment of this Agreement .........................................................................11
   10.4 Number and Gender ..........................................................................................11
   10.5 Binding Effect ...................................................................................................11
   10.6 Severability .......................................................................................................11
   10.7 Counterparts ......................................................................................................11
   10.8 Governing Law ..................................................................................................11

Exhibit A

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HF ACQUISITION, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (as amended, the "Agreement") of HF Acquisition, LLC (the "Company") is made as of March 3٩ , 2009, by Suiza Dairy Group, LLC, a Delaware limited liability company (the "Sole Member").

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1    Formation. On March ___, 2009, the Company was formed as a Delaware limited liability company under and pursuant to the Delaware Limited Liability Company Act (the "Delaware Act") and the Sole Member agrees that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Sole Member and the administration and termination of the Company shall be governed by the Delaware Act.

1.2    Name. The name of the Company shall be, and the business of the Company shall be conducted under the name of, **HF Acquisition, LLC**. The Company's business may be conducted under any other name or names approved by the Manager.

1.3    Registered Office and Principal Office of Company. The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware. The Company may maintain offices at such locations as the Manager deems advisable.

1.4    Term. The Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article IX hereof.

1.5    Assumed Name Certificate. The Sole Member shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Company.

1.6    Limits of Company. The Sole Member intends that the Company shall be treated as a limited liability company in accordance with the Delaware Act for all purposes under state law and this Agreement shall not be construed to provide otherwise.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"Accounting Year" means the accounting year of the Company for accounting and tax purposes, which will initially be the calendar year.

"Additional Contribution" means any Capital Contribution in excess of the Sole Member's Initial Contribution made to the Company pursuant to Section 4.2 hereof.

"Agreed Contribution" means the sum of the Sole Member's Initial Contribution and any Additional Contributions that the Sole Member has made or is obligated to make to the Company.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Business Day" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States or the State of Texas shall not be regarded as a Business Day.

"Capital Account" means the capital account maintained for the Sole Member pursuant to Section 4.3.

"Capital Contribution" means any Initial Contribution or Additional Contribution to the capital of the Company in cash or property when and as such contribution is actually made to the Company by the Sole Member.

"Certificate" means a certificate issued by the Company evidencing ownership of one or more Units.

"Certificate of Amendment" means a Certificate of Amendment of the Company filed with the Secretary of State of Delaware to make certain changes to the Certificate of Formation.

"Certificate of Formation'' means the Certificate of Formation of the Company filed with the Secretary of State of Delaware, as it may be amended or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"Company" shall have the meaning set forth in the preamble hereto.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, et. seq., as amended from time to time.

"Dissolution Event" has the meaning set forth in Section 9.1.

"Distributable Cash" means the amount by which the aggregate amount of all cash and cash equivalents from time to time held by the Company on hand or in bank accounts or other

temporary investments pending distribution, exceeds the aggregate of all amounts to be paid or set aside by the Company for: (i) when due, all principal and interest payments on indebtedness of the Company and all other sums payable to lenders; (ii) all cash expenditures to be incurred in the normal operations of the business of the Company; and (iii) such cash reserves as the Sole Member may mutually deem reasonably necessary for the proper operation of the business of the Company.

"Fair Market Value" means the price in cash, or its equivalent, that an asset would bring considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"Initial Contribution" means the initial Capital Contribution to the Company made by the Sole Member as set forth in Exhibit "A" hereto.

"Losses" mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the Method of Accounting of the Company.

"Manager" has the meaning set forth in Section 6.2.

"Membership Interest" means the interest of the Sole Member in the Company, including, without limitation, the right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; (b) to a distributive share of the assets of the Company; and (c) to participate in the management and operation of the Company as provided in this Agreement.

"Method of Accounting" means the accrual basis method of accounting unless another method of accounting is agreed upon by the Sole Member or is required to be used by the Code.

"Officers" has the meaning set forth in Section 6.5.

"Person" means any individual or entity, public or private.

"Profits" means the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the Company's Method of Accounting.

"Record Holder" means the Person in whose name a Unit is registered on the books of the Company as of the opening of business on a particular Business Day.

"Sole Member" shall have the meaning set forth in the preamble hereto.

"Treasury Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

"Unit" means the interest of a Member or an assignee in the Company, including, without limitation, such Member's or assignee's right:  (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; and (b) to distributions from the Company of the assets of the Company.  No fractional Units will be issued, but, instead, any fractional Unit that would otherwise be issuable will be rounded to the nearest whole Unit.  Each Unit shall be equivalent to a Membership Interest of one percent (1%).

"Unit Register" has the meaning specified in Section 7.2 hereof.

## ARTICLE III

## PURPOSE, SOLE MEMBER AND MEMBERSHIP INTEREST

3.1     Purposes and Scope.  The Company is organized to transact any and all lawful business for which limited liability companies may be organized under the Delaware Act.

3.2     Sole Member.  The Sole Member of the Company is Suiza Dairy Group, LLC, a Delaware limited liability company, which has, subject to the provisions of Section 4.1 hereof, the entire Membership Interest and the entire initial Capital Account balance of the Company as shown on Exhibit "A" of this Agreement.

3.3     Restrictions on the Disposition of a Membership Interest.  Except as expressly set forth herein, the Sole Member will have the right to sell, transfer, encumber or assign all or any portion of its Membership Interest in the Company.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1     Initial Capital Contributions.  Concurrently with the adoption of this Agreement, the Sole Member will contribute to the capital of the Company the Initial Contribution and will receive the Membership Interest set forth on Exhibit "A" of this Agreement.

4.2     Additional Contributions.  The Sole Member may, in its sole and absolute discretion, make Additional Contributions in such amounts as it deems appropriate.

4.3     Maintenance of Capital Account.  A Capital Account will be established and maintained for the Sole Member.

4.4     Limited Liability of Sole Member.  The Sole Member will not be liable for the debts, obligations, or liabilities of the Company beyond such Sole Member's Agreed Contribution to the Company.  The Sole Member will not be required to make any Capital Contribution or loan to the Company beyond the amount of such Sole Member's Agreed Contribution.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1 <u>Allocation of Profits and Losses</u>. All Profits and Losses of the Company for each fiscal quarter and each Accounting Year (or portion thereof) will be allocated entirely to the Sole Member as provided in this Agreement. Any credit available for federal income tax purposes will be allocated entirely to the Sole Member in the same manner.

5.2 <u>Interim Distributions</u>. Interim distributions of Distributable Cash will be made not less often than each fiscal quarter, or at such other times as the Manager may approve, and will be made by the Company to the Sole Member in accordance with this Article V.

5.3 <u>Distributions on Termination</u>. Upon the dissolution and winding-up of the Company, its assets will be distributed in the manner prescribed in Article IX of this Agreement.

5.4 <u>Limitation on Distributions</u>. Any other provision of this Agreement to the contrary notwithstanding, no interim distribution or distribution on termination to the Sole Member will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Sole Member on account of its Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company.

5.5 <u>Distributions in Kind</u>. The Sole Member is entitled to demand and receive a distribution from the Company in the form of cash or any other property.

## ARTICLE VI

## MANAGEMENT OF THE COMPANY

6.1 <u>Management by Manager</u>.

(a) The Manager of the Company shall have full and complete discretion to manage and control the business and affairs of the Company in accordance with the terms and provisions of this Agreement.

(b) Any action required by the Delaware Act to be taken at any management meeting, or any action that may be taken at any management meeting, may be taken without a meeting, without prior notice, and without a vote, if a written consent, setting forth the action so taken, is signed by the Sole Member or the Manager.

6.2 <u>Appointment of Manager and Tenure</u>. The Manager of the Company (the "Manager") will be a Person designated from time to time by the Sole Member. As of the date hereof, the Manager of the Company will be Rachel A. Gonzalez. The Manager will hold the office of Manager for such term and shall have the authority to exercise such powers and perform such duties as will be determined from time to time by the Sole Member. The salary or

other compensation, if any, of the Manager of the Company will be fixed from time to time by the Sole Member.

      6.3    <u>Removal</u>.  The Manager may be removed as such at any time by the Sole Member, either with or without cause, in the discretion of the Sole Member.  Designation of the Manager shall not of itself create contract rights.

      6.4    <u>Duties of Manager</u>.  The Manager shall have general and active management of the day-to-day business and affairs of the Company and shall be authorized and directed to implement all orders, resolutions and business plans adopted by the Sole Member that do not violate applicable laws.

      6.5    <u>Officers</u>.  The Manager may designate such officers of the Company as it deems necessary or appropriate from time to time, including a President, one or more Vice Presidents and a Secretary, and such other officers as the Manager shall deem desirable (the "<u>Officers</u>"). The Manager hereby delegates to each Officer the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

    As of the date hereof, the Officers shall be as follows:

| Name | Title |
| --- | --- |
| Harrald F. K. Kroeker | President |
| Rachel P. Cullen | SVP and COO-Ice Cream |
| Rick Fehr | SVP-Productivity and Optimization |
| Bradley J. Holcomb | SVP and Chief Procurement Officer, Dairy Group |
| William A. Swanston | Chief Financial Officer |
| Rick Zuroweste | SVP-Marketing and Chief Marketing Officer |
| Michael L. Ahart | Vice President – Transportation |
| Thomas J. Arcand | Vice President – Sales |
| James C. Aust | Vice President – Sales, Eastern Region |
| H. Shepard Bailey | Vice President – Taxation |
| Clay K. Boatright | Vice President – Marketing |
| John F. Callahan, Jr. | Vice President |
| Burton H. Calvert, Jr. | Vice President – Information Technology |
| Melinda S. Conley | Vice President – Human Resources |
| Greg L. Cooper | Vice President – Sales |
| Kristen N. Cunningham | Vice President and Assistant Secretary |
| Nancy F. Duessel | Vice President and Assistant Secretary |
| Lee A. Falk | Vice President – Distribution & Logistics |
| Rachel A. Gonzalez | Vice President and Secretary |
| Brett A. Johnson | Vice President – Operations |
| Thomas Johnson | Vice President – Sales |
| Steven J. Kemps | Vice President and Secretary |
| Ray S. McCoy | Vice President – Quality Assurance |
| Ronald L. McCrummen | Vice President |

| Dennis J. McKinney | Vice President – Procurement |
| Patrick E. Panko | Vice President – Financial Planning & Analysis |
| Randy B. Proctor | Vice President – Wal-Mart |
| Timothy A. Smith | Vice President and Treasurer |
| Eddie K. Tollison | Vice President and Dairy Group Controller |
| Michael Touhey | Vice President – Field Marketing |
| Michael Walsh | Vice President – Special Projects |
| Ernest W. Yates | Vice President – Dairy Procurement |
| Shaun Young | Vice President – Operations |
| Katherine K. Connell | Assistant Secretary |
| Angela B. Miro | Assistant Secretary |

6.6     Indemnification.

(a)     The Company shall indemnify present and former Managers and present and former Members to the same extent and on the same basis that a corporation is allowed to indemnify its present and former directors.  The Company shall have the power to indemnify its officers, employees and agents to the same extent and on the same basis as a corporation is allowed to indemnify its officers, employees and agents.

(b)     The Company shall advance reasonable expenses incurred by a present or former Manager or a present or former Member in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its directors.  The Company shall have the power to advance reasonable expenses incurred by a present or former officer in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its present or former officers.  The Company shall indemnify its officers against expenses incurred by a present or former officer in connection with any action, suit or proceeding to the same extent and on the same basis as a corporation is required to so indemnify its present and former officers.

(c)     The Company shall have the power to purchase and maintain insurance on behalf of any person who is a member, manager, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any liability to the same extent and on the same basis as a corporation would have the power to purchase and maintain such insurance on behalf of its directors, officers, employees or agents.

**ARTICLE VII**

**UNIT CERTIFICATES**

7.1     Certificates Representing Units.  Upon the Company's issuance of Units to any Person, the Company shall have the power to issue one or more Certificates in the name of such

Person evidencing the number of Units being so issued.  Certificates shall be executed on behalf of the Company by the Manager.

      7.2      <u>Registration, Registration of Transfer and Exchange</u>.

      (a)      The Manager shall cause to be kept on behalf of the Company a register (the "<u>Unit Register</u>") in which, subject to such reasonable regulations as it may prescribe and subject to the provisions of <u>Section 7.2(b)</u>, the Manager will provide for the registration and the transfer of the Units.  The Company shall not recognize transfers of Certificates representing Units unless the same are effected in the manner described in this <u>Section 7.2</u>, and provided the transfer is in accordance with the provisions of <u>Article VII</u>.  Upon surrender for registration of transfer of any Units evidenced by a Certificate, and subject to the provisions of <u>Section 7.2(b)</u>, the Manager on behalf of the Company will execute and deliver, in the name of:

      (i)      the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are to be so transferred; and

      (ii)      the designated transferor, if pursuant to such transfer the transferor has not thereby transferred all of its Units held by it that are evidenced by such Certificate, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are not to be so transferred.

      (b)      The Company shall not recognize any transfer of Units until the Certificates evidencing such Units are surrendered for registration of transfer duly executed by the transferor (or the transferor's attorney-in-fact duly authorized in writing).  No charge shall be imposed by the Company for such transfer, <u>provided</u>, that, as a condition to the issuance of any new Certificate under this <u>Section 7.2</u>, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed with respect thereto.

      7.3      <u>Mutilated, Destroyed, Lost or Stolen Certificates</u>.

      (a)      If any mutilated Certificate is surrendered to the Manager, the Manager on behalf of the Company shall execute and deliver in exchange therefor, a new Certificate evidencing the same number of Units as the Certificate so surrendered.

      (b)      The Manager on behalf of the Company shall execute and deliver a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate:

      (i)      makes proof by affidavit, in form and substance satisfactory to the Manager, that a previously issued Certificate has been lost, destroyed or stolen;

(ii)     requests the issuance of a new Certificate before the Company has received notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(iii)     if requested by the Manager, delivers to the Company such security and indemnity as may be required by the Manager, in form and substance satisfactory to the Manager, with surety or sureties and with fixed or open penalty as the Manager may direct, in its sole discretion, to indemnify the Company and the Manager against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and

(iv)     satisfies any other reasonable requirement imposed by the Manager.

If the Sole Member or Assignee fails to notify the Company within a reasonable time after it has notice of the loss, destruction or theft of a Certificate, and a transfer of the Units represented by the Certificate is registered before the Company or the Manager receives such notification, the Sole Member shall be precluded from making any claim against the Company or the Manager for such transfer or for a new Certificate.

(c)     As a condition to the issuance of any Certificate under this Section 7.3, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

7.4     Record Holder.  In accordance with Section 7.2(b), the Company shall be entitled to recognize the Record Holder as the Sole Member with respect to the Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by applicable law.  Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring or holding Units, as between the Company on the one hand and such other Persons on the other hand, such representative Person:

(a)     shall be the Sole Member of record and beneficially; and

(b)     shall be bound by this Agreement and shall have the rights and obligations of a Member or Assignee (as the case may be) hereunder and as provided for herein.

7.5     Legend.  The Certificates evidencing the number of Units shall be legended as follows:

THE INTERESTS IN THE COMPANY (THE "UNITS") EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE

SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAW OR APPLICABLE EXEMPTIONS THEREFROM.

## ARTICLE VIII

## ACCOUNTING AND TAX MATTERS

8.1     Books and Records.  The Company will maintain such books and records of the operations and expenditures of the Company as the Manager and Officers shall determine.

8.2     Nonentity for Federal Income Tax Purposes.   The Company shall not make elections or file returns for federal income tax purposes.  The Company shall conduct its affairs so as to be disregarded for federal income tax purposes as an entity separate from its Sole Member pursuant to Treasury Regulation § 301.7701-3(b)(1)(ii).

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

9.1     Dissolution.  The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a "Dissolution Event"):

(a)     the expiration of its term as provided in Section 1.4;

(b)     an election to dissolve the Company is approved in writing by the Sole Member; or

(c)     any other event occurs that, under the Delaware Act, would cause the Company's dissolution.

9.2     Effect of Dissolution.  Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

9.3     Winding Up Procedures.  Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Sole Member; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

9.4     Distribution of Assets Upon Dissolution.  In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority:

(a)     First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Sole Member as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves;

(b)     Second, to its Sole Member.

9.5     Distributions in Kind.  If any assets of the Company are distributed in kind, such assets will be distributed in accordance the provisions of Section 9.4 above to the Sole Member.

9.6     Articles of Dissolution.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Sole Member, the Company shall cause the Certificate of Formation to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

## ARTICLE X

## GENERAL PROVISIONS

10.1     Captions and Headings.  The captions and headings used in this Agreement are for convenience of reference only and will not be taken into account in construing the meaning or intent of this Agreement.

10.2     Amendment of Certificate of Formation.  The Certificate of Formation may be amended, supplemented or restated by written consent of the Sole Member.  Upon executing the necessary consent with respect to such amendment, supplement, or restatement of the Certificate of Formation, the Sole Member will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Delaware Act.

10.3     Amendment of this Agreement.  This Agreement may be amended, supplemented, or restated by the written consent of the Sole Member.

10.4     Number and Gender.  Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

10.5     Binding Effect.  Except as otherwise expressly provided herein, this Agreement will be binding upon and will inure to the benefit of the Sole Member and its heirs, legal representatives, executors, administrators, distributees, successors, and assigns.

10.6     Severability.  If any one or more of the provisions contained in this Agreement for any reason are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement and this Agreement will be construed as if such invalid, illegal, or unenforceable provisions had never been contained in this Agreement.

10.7     Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Sole Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

10.8     Governing Law.  This Agreement and the construction interpretation will be governed exclusively by the Delaware Act and other applicable laws of the State of Delaware.

*[Remainder of this page intentionally left blank.]*

**IN WITNESS WHEREOF**, the Sole Member has executed this Limited Liability Company Agreement as of the date first set forth above.

<u>**SOLE MEMBER:**</u>

**SUIZA DAIRY GROUP, LLC**

By: _____

Rachel A. Gonzalez
Vice President, Secretary and Sole Manager

I:\ACQ (Acquisitions)\Project Norton (Heartland-StaterBros)\HF Acquisition, LLC-LLC Agreement.DOC

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HF ACQUISITION, LLC

---

## EXHIBIT "A"

## Initial Capital Contributions and Membership Interest.

| Name of Sole Member | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Suiza Dairy Group, LLC | $100 | 100% |

A-14

# Exhibit 3

```
OHIO SECRETARY OF STATE                    CHARTER NUMBER:   995251
PROCESSING STATEMENT                       ROLL AND FRAME: 6042-1412
10/28/97                        06042-1412

CORPORATION:                    DOCUMENT NUMBER    CODE        FEE
                                ---------------    ----        ---
DEAN TRANSPORTATION, INC.          97101428401     ARF       85.00
                                   97101428401     MIS       10.00



          042459

     RETURN TO: DEAN FOODS COMPANY                 TOTAL :    95.00
                ATTN B ZABRATANSKI
                3600 N RIVER RD
                FRANKLIN PARK IL 60131                         0424
```

06042-1413

# The State of Ohio

## Bob Taft

### Secretary of State

995251

## ❧ Certificate ❧

It is hereby certified that the Secretary of State of Ohio has custody of the Records of Incorporation and Miscellaneous

Filings; that said records show the filing and recording of:   ARF MIS

of:

DEAN TRANSPORTATION, INC.

Recorded on Roll 6042 at Frame 1414   of

the Records of Incorporation and Miscellaneous Filings.

United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the Secretary of State at

Columbus, Ohio, this 27TH day of   OCT   ,

A.D. 19 97   .

*Bob Taft*

**Bob Taft**
Secretary of State

06042-1414

**APPROVED**
By KN
Date 10/27/97
Amount $85.00
9710142401 KN

## ARTICLES OF INCORPORATION
(Under Chapter 1701 of the Ohio Revised Code)

OF

DEAN TRANSPORTATION, INC.

The undersigned, desiring to form a corporation, for profit, under Sections 1701.01 et seq. of the Ohio Revised Code, does hereby state the following:

**FIRST.** The name of said Corporation shall be Dean Transportation, Inc.

**SECOND.** The place in Ohio where its principal office is to be located is 1415 West Waterloo Road, Akron, Summit County, Ohio 44314

**THIRD.** The purpose(s) for which this corporation is formed is to provide commercial transportation services as a contract and/or common carrier and to do any and all other things allowed to be performed by Corporations under the Ohio Revised Code.

**FOURTH.** The number of shares which the corporation is authorized to have outstanding is 100 shares of common stock, no par value.

**IN WITNESS WHEREOF,** I have hereunto subscribed my name this 23rd day of October, 1997.

By: _Betty J. Zabrzanski_
Betty J. Zabrzanski,
Incorporator

inc\mtcoh



Prescribed by
Bob Taft, Secretary of State
30 East Broad Street, 14th Floor
Columbus, Ohio 43266-0418
Form AGO (August 1992)

**06042-1415**

# ORIGINAL APPOINTMENT OF STATUTORY AGENT

The undersigned, being at least a majority of the incorporators of _____

_____ Dean Transportation, Inc. _____, hereby appoint
(name of corporation)

_____ C T CORPORATION SYSTEM _____ to be statutory agent upon whom any
(name of agent)

process, notice or demand required or permitted by statute to be served upon the corporation may

be served. The complete address of the agent is:
_____ 815 Superior Avenue, N. E. _____
(street address)

_____ Cleveland _____ . Ohio ____ 44114 ____
(city) (zip code)

NOTE: P.O. Box addresses are not acceptable.

_____*Betty J. Zabratanski*_____
(incorporator)

BETTY J. ZABRATANSKI

_____
(incorporator)

_____
(incorporator)

## ACCEPTANCE OF APPOINTMENT

The undersigned, ____ C T CORPORATION SYSTEM _____, named herein as the statutory agent for

____ Dean Transportation, Inc. _____, hereby acknowledges and accepts the
(name of corporation)

appointment of statutory agent for said corporation.

C T CORPORATION SYSTEM

By: _____*Anne Ed Diamond*_____
Statutory Agent

Anne E. Diamond, Asst. Secy.

## INSTRUCTIONS

1) Profit and non-profit articles of incorporation must be accompanied by an original appointment of agent. R.C. 1701.07(B), 1702.06(B).

2) The statutory agent for a corporation may be (a) a natural person who is a resident of Ohio, or (b) an Ohio corporation or a foreign profit corporation licensed in Ohio which has a business address in this state and is explicitly authorized by its articles of incorporation to act as a statutory agent. R.C. 1701.07(A), 1702.06(A).

3) An original appointment of agent form must be signed by at least a majority of the incorporators of the corporation. R.C. 1701.07(B), 1702.06(B). These signatures must be the same as the signatures on the articles of incorporation.

\* As of October 8, 1992, R.C. 1701.07(B) will be amended to require acknowledgement and acceptance by the appointed statutory agent.

(OHIO - 1932 - 10/9/92)

06042-1416

 **DEAN FOODS COMPANY**

October 23, 1997

**VIA FEDERAL EXPRESS**

Secretary of State
30 East Broad St., 14th Floor
Columbus, OH  43266-0418

Re:    Filing of Articles of Incorporation

Gentlemen:

Enclosed in duplicate for filing with the Secretary of State Recorder's office are the Articles of Incorporation for Dean Transportation, Inc., an Ohio corporation, and Return Slip - New Filings, sent to me October 15, 1997.  Payment for filing and expedited service was sent with the previous filing.

Please return the certified copy of the Certificate of Incorporation to my attention in the Federal Express envelope provided.

Thank you for your assistance in this matter.

Yours very truly,

DEAN FOODS COMPANY

Betty Zabratanski
Legal Department

/bz
Enclosures
cc:    Laura Broderick
       Anne Fyke
       Pat Reith
       Lynn Wisser

CORPORATE OFFICES
DEAN FOODS COMPANY
3600 N. RIVER ROAD
FRANKLIN PARK, IL 60131-2185
(847) 678-1680

# Exhibit 4

1 TIMOTHY B. McCAFFREY, JR. (S.B. #192114)
NATASHA CHESLER (S.B. #227540)
2 THE LAW OFFICES OF TIMOTHY B. McCAFFREY, JR.
A Professional Corporation
3 11377 West Olympic Boulevard, Suite 500
Los Angeles, California 90064-1683
4 Telephone: (310) 882-6407
Facsimile: (310) 882-6359
5 E-Mail: tmccaffrey@tbmlaw.net
E-Mail: nchesler@tbmlaw.net
6
Attorneys for Plaintiff and Class
7 Representative Miguel de la Cueva

8

9                 UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

| | |
|---|---|
| 12 MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated, | CASE NO. CV 12-1804-GHK (CWx) |
| 13 Plaintiff, | **PLAINTIFF'S *EX PARTE* APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE ON SHORTENED TIME MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** |
| 14 vs. | |
| 15 | |
| 16 ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, ALTA-DENA CERTIFIED | |
| 17 DAIRY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive, | |
| 18 Defendants. | Date:           February 5, 2013 |
| 19 | Trial Date:     None Set |

20

21      Pursuant to Local Rule 7-19, Plaintiff and Class Representative Miguel de la

22 Cueva ("Plaintiff") hereby submits the following *ex parte* application seeking

23 modification of the pretrial scheduling order for leave to file a first amended complaint

24 or, in the alternative, leave to file on shortened time a motion for leave to file a first

25 amended complaint. This *ex parte* application is made on the following grounds:

26      First, Plaintiff recently learned at Defendant's FRCP 30(b)(6) deposition (on

27 January 16 and 23, 2013) that Defendant has a uniform policy and/or practice of

28

1 automatically deducting 30 minutes of time (and, thus, pay) from all of its drivers (the

2 putative class) regardless of whether they actually take a 30 minute duty free meal

3 period.  This policy and/or practice is directly related to Plaintiff's current class

4 allegations regarding failure to provide meal and rest breaks in violation of California

5 Labor Code § 512 (first cause of action), failure to pay all wages in a timely manner

6 during and after employment in violation of California Labor Code § 201-204 (second

7 cause of action), failure to provide a complete and accurate paystub under California

8 Labor Code § 226 (defendant does not indicate that any time is being removed from

9 the putative class member's working hours) (third cause of action); and violation of

10 Business & Professions Code § 17200 (return of unpaid wages for alleged unlawful,

11 unfair, or fraudulent business practices) (fourth cause of action).  While the current

12 complaint arguably embodies the unpaid wages related to Defendant's practice of

13 automatically deducting 30 minutes for alleged meal breaks, it does not include the

14 penalties portion, including liquidated damages.  Thus, Plaintiff seeks leave to file a

15 first amended complaint to add a cause of action for California Labor Code violations

16 associated with the above-described policy and/or practice.

17     Second, Plaintiff seeks leave to amend to add an additional class representative,

18 Scott Parker.  The Magistrate ordered the parties to use an opt-out letter so that

19 Plaintiff could obtain putative class members' information, and for Defendant to turn

20 over resulting contact information on January 7, 2013.  As a result of the opt-out letter,

21 Mr. Parker contacted Plaintiff's counsel, retained them, and seeks to pursue his claims

22 in this case.  Thus, Mr. Parker's appropriateness as an additional named representative

23 has only recently become known.

24     Finally, Plaintiff recently learned through discovery that Defendant has made

25 several changes to its corporate structure affecting putative class members.  Most

26 recently, in approximately 2011 (after Plaintiff's discharge), Alta Dena changed the

27 employer of putative class members from defendant Alta Dena Certified Dairy, LLC

28

PLAINTIFF'S *EX PARTE* APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE ON SHORTEN TIME MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

1  ("Defendant" or "Alta Dena") to Dean Transportation, Inc. (Alta Dena and Dean

2  Transportation, Inc. are both subsidiaries of Fresh Dairy Direct So Cal ("FDD So Cal")

3  and Dean Foods.) The putative class members, however, remain at the same locations,

4  perform the same job, and are subject to the same policies/practices and general

5  management. All that changed was the name of the entity that employed them. Thus,

6  these putative class members should all be part of this case and Dean Transportation

7  added as a defendant.

8       In addition, this is not the only corporate "change" that has occurred during the

9  relevant time period. Plaintiff is still trying to get a straight answer from Defendant as

10 to which entities are appropriate defendants. Plaintiff's understanding at this point is

11 as follows: Dean Foods Company and/or Fresh Dairy Direct So Cal are the parent(s)

12 company. From 2008 through approximately 2010, there were three subsidiaries in

13 Southern California – Alta Dena, Swiss II, LLC, and Heartland Farms. (Mr. de la

14 Cueva worked for Alta Dena during this time and Mr. Parker for Heartland Farms.) In

15 approximately 2010, Alta Dena, Swiss II, LLC and Heartland Farms were all rolled up

16 into Alta Dena, which became the successor entity for Swiss II, LLC and Heartland

17 Farms. In approximately 2011, the drivers for these entities were then transferred over

18 to Dean Transportation, Inc. (as noted above).

19      Defendant objects to adding Dean Transportation, Inc. because Mr. de la Cueva

20 never worked for that company. But this is an inequitable result given that Dean

21 Transportation, Inc. is nothing more than a name change. Moreover, if Mr. Parker is

22 joined as a class representative, Defendant's argument is moot given that he was still at

23 Alta Dena when this name "change" occurred. In addition, Mr. de la Cueva seeks to

24 add the corporate parent(s), which he did work under, to avoid any unjust result. This

25 is because Defendant's corporate representatives testified that that the parent company

26 (FDD So Cal/Dean Foods) controlled the subsidiaries (Alta Dena, Swiss, and

27 Heartland Farms) by issuing uniform policies and procedures from 2008 to the present.

28

1    And with respect to Mr. Parker's claim, he seeks to add Heartland Farms as a

2 defendant to cover the time period of 2008-2010.[1] In the absence of a definitive

3 response from Defendant as to who the appropriate defendants are, Plaintiff seeks to

4 add those entities. Defendant should not be able to circumvent liability by moving

5 employees from one affiliated entity to another.

6      The discovery cut-off in this case is not until August 6, 2013. Plaintiff believes

7 he can still adhere to the Court's current Scheduling Order and file his motion for class

8 certification by February 19, 2013. Defendant's opposition is due on March 11, 2013.

9 Defendant has not yet conducted a deposition. Thus, there is no prejudice to

10 Defendant as it still has time to depose both class representatives and discovery

11 conducted to date by Plaintiff has already covered the 30-minute deduction for meals.

12 With respect to Dean Transportation, Inc., and the other entities, Defendant knew or

13 should have known that they were proper parties and the claims against it arise from

14 the same facts already alleged.

15      In addition, the statute of limitations has not run on the claims (or additional

16 parties) Plaintiff seeks to add. Thus, Plaintiff and Mr. Parker could file another

17 separate action, which may or may not be joined with the instant case. That, however,

18 would needlessly waste judicial resources, as evidence produced in any parallel court

19 action would likely be relevant here, and vice-versa.

20      Pursuant to Local Rule 7-19, defense counsel's name, address, phone number,

21 fax number, and email addresses are as follows:

22

23 [1] Notably, another class action, *Ikeda v. Alta Dena Certified Dairy, LLC*, Case No.
CV12-03034, was pending in California Central District Court concurrently with this
24 matter last year. Yet Defendant failed to notify the Court or Plaintiff of this apparently
related matter involving the same Defendant and some of the same allegations (failure
25 to provide meal breaks to drivers) while it was pending. The *Ikeda* matter has since
been dismissed at the pleadings stage. Defendant represented in that case that Alta
26 Dena was the appropriate corporate entity to follow the Swiss subsidiary as it was the
surviving entity after 2010. But Defendant is seemingly taking a different position in
27 this case. Thus, Mr. Parker seeks to add Heartland Farms in an abundance of caution.

28

Marc M. Seltzer
Steven G. Sklaver
Kalpana Srinivasan
Amanda Bonn
Susman Godrey, L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
Tel: 310-789-3100
Fax: 310-789-3150
Email: mseltzer@susmangodrey.com
    ssklaver@susmangodrey.com
    ksrinisvasan@susmangodrey.com
    abonn@susmangodrey.com

This application is made following good faith meet and confer efforts between Plaintiff's counsel and Defendant's counsel concerning the issues raised herein. Based on those communications, Plaintiff believes that Defendant opposes the relief sought herein.

This application is based on this application, the attached memorandum of points and authorities, and the Declaration of Natasha Chesler filed in support thereof.

DATED: February 5, 2013

Respectfully submitted,

THE LAW OFFICES OF
TIMOTHY B. McCAFFREY, JR.

By /s Natasha Chesler
Natasha Chesler

Attorneys for Plaintiff and Class
Representative Miguel de la Cueva

# TABLE OF CONTENTS

**Page**

I.      Introduction ........................................................................................ 6

II.     Factual And Procedural History ........................................................ 6

III.    The Court Should Modify The Scheduling Order Pursuant to FRCP 16
        And Grant Leave Pursuant To FRCP 15(a) ....................................... 11

        A.    Good Cause Exists Under Rule 16 ........................................... 11

              1.    There has been no undue delay. ..................................... 11

              2.    The rights of the parties, the ends of justice, and judicial
                    economy call for modification of the scheduling order. .... 14

        B.    Amendment Is Appropriate Under Rule 15 ............................. 15

IV.     In The Alternative, Plaintiff Seeks Leave To File A Motion For Leave To
        Amend On Shortened Time ................................................................. 17

i                                                   CV 12-1804-GHK (CWx)

PLAINTIFF'S *EX PARTE* APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE
ALTERNATIVE, FOR LEAVE TO FILE ON SHORTEN TIME MOTION FOR LEAVE TO FILE FIRST AMENDED
COMPLAINT

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241 (N.D. Cal. 2012) ..........................14

*Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097 (9th Cir. 2004) ..............................15

*Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876 (9th Cir. 2010) ...........................15

*Crawford v. Delta Sci. Corp.*, 2011 U.S. Dist. LEXIS 47759 (C.D. Cal. 2011) .....11, 13

*Foman v. Davis*, 371 U.S. 178 (1962) ...........................................................................15

*Rios v. Ames True Temper, Inc.*, 2012 U.S. Dist. LEXIS 23112 (C.D. Cal. 2012) .......13

*U.S. v. Dang*, 488 F.3d 1135 (9th Cir. 2007) .................................................................11

**RULES**

Fed. Rules of Civ. Proc. Rule 15(a)(2) ..........................................................................11

Fed. Rules of Civ. Proc. Rule 16(b)(4) ..........................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

By this *ex parte* application, Plaintiff Miguel de la Cueva ("Mr. de la Cueva" or "Plaintiff") hereby seeks modification of the scheduling order to allow leave to file a First Amended Complaint. Specifically, Plaintiff seeks leave to amend the complaint based on information only recently uncovered through discovery as follows: (1) to add California Labor Code claims related to Defendant's uniform policy/practice of automatically deducting 30-minutes of pay from putative class members; (2) to add Scott Parker ("Mr. Parker") as an additional class representative; and (3) to add related entities Dean Transportation, Inc., Dean Foods Company, Fresh Dairy Direct So Cal ("FDD So Cal"), and Heartland Farms as defendants.

As explained more fully below, there is good cause to modify the scheduling order because the information has just come to light through Plaintiff's diligent discovery efforts and granting Plaintiff's application will not delay or otherwise effect the current scheduling order in any other way. Further, allowing leave to amend is consistent with FRCP 15, serves the interest of justice, and promotes judicial economy because the statute of limitations has not yet run on any of these claims, and, thus, Plaintiff and Mr. Parker can simply file a separate lawsuit to pursue these claims against all of these entities. But that would obviously and needlessly waste the parties' and Court's resources. Accordingly, the Court should grant Plaintiff's *ex parte* application.

### II.   Factual And Procedural History

Plaintiff filed the instant action on February 1, 2012 in California Superior Court. (Declaration of Natasha Chesler ("Chesler Decl.") ¶ 2.) Defendant removed the action to Federal Court on March 2, 2012. (Id.) On April 9, 2012, Defendant moved to dismiss the class claims. (Id.) The parties agreed to wait until the Court's ruling on Defendant's motion to dismiss before engaging in the early meeting of

1  counsel (and then conducting discovery). (Id.)[2]

2  On May 7, 2012, the Court denied Defendant's motion to dismiss. (Id. ¶ 2.) On

3  May 22, 2012, the parties held their early meeting of counsel.[3] (Id.) On June 12,

4  2012, the parties exchanged initial disclosures. (Id.) On June 19, 2012, Plaintiff

5  propounded written discovery requests, as well as noticed the depositions of several

6  individuals and Defendant pursuant to FRCP 30(b)(6). (Id.)

7  On August 3, 2012, the Court issued the current Scheduling Order, which

8  included a deadline of September 4, 2012 to amend as to any claims, defenses, and/or

9  parties. (Id. ¶ 3.) At the time the Scheduling Order was issued, Plaintiff anticipated

10  being able to comply. (Id.)

11  Defendant requested two extensions of time to respond to the written discovery

12  and ultimately provided written responses on August 23, 2012. (Id. ¶ 4.) Defendant,

13  however, produced no documents and made numerous objections – including refusing

14  discovery because Plaintiff allegedly was an inadequate class representative for current

15  employees (since he no longer was employed there). (Id.) Thus, Plaintiff's counsel

16  researched the multitude of objections and sent opposing counsel a meet and confer

17  letter on September 18, 2012. (Id.) Defendant did not respond until October 4, 2012.

18  (Id.)

19  On October 5, 2012, Defendant began slowly producing documents on a "rolling

20  basis." (Id. ¶ 5.) The first production was deficient and missing essential items such

21  as Plaintiff's paystubs.[4] (Id.) On October 18, 2012, Plaintiff served an amended

22  FRCP 30(b)(6) deposition notice, setting the deposition for November 13, 2012,

23

24  _____

25  [2] Plaintiff initially served written discovery prior to removal, on February 15, 2012. (Chesler Decl. ¶ 1.)

26  [3] Plaintiff initiated the scheduling of this conference on May 9, 2012, but May 22, was the first day upon which both sides were available. (Chesler Decl. ¶ 2.)

27  [4] In fact, Plaintiff's actual paystubs were not produced until January 2013.

28

1  believing that documents would be produced by then and discovery issues worked out.

2  (Id.)

3      At one point, Defendant claimed documents were late to come because Plaintiff

4  did not timely respond regarding ESI search terms. (Id. ¶ 6.) But the documents that

5  were missing were plainly responsive to requests and did not require an "ESI" search –

6  such as Plaintiff's paystubs and reports regarding hours worked and breaks taken. (Id.)

7      Despite the parties' meet and confer efforts, Plaintiff was forced to file a motion

8  to compel on November 13, 2012. (Id. ¶ 7.) The Court (through the Magistrate Judge)

9  ruled on the motion on December 4, 2012, ordered Defendant to produce further

10 documents post-dating Plaintiff's termination, and ordered the parties to use a third-

11 party administrator to send out opt-out notices, with the putative class members'

12 contact information to be produced to Plaintiff by January 7, 2013. (Id.)

13     Plaintiff thereafter sent a Second Amended Rule 30(b)(6) Deposition Notice,

14 setting the deposition for December 18, 2012. (Id. ¶ 8.) Then, the Friday before the

15 deposition, Defendant produced 10,000 pages of documents. (Id.) The parties then

16 participated in a call with the Magistrate, during which Defendant indicated the

17 document production would be complete by December 31. (Id.) Thus, Plaintiff

18 scheduled the FRCP 30(b)(6) Deposition for January 16, 2013 to allow time to review

19 the documents produced. (Id.)

20     Defendant continued producing documents through December, and indeed, even

21 as recently as January 22, 2013 (producing Plaintiff's paystubs because those

22 previously produced were only summary versions and not the actual paystubs). (Id.

23 ¶ 9.) All told, between <u>October 5, 2012 through January 22, 2013</u>, Defendant

24 produced on a "rolling basis" through 16 separate productions <u>42,296 pages</u> of

25 documents, which Plaintiff has been diligently reviewing. (Id.)

26     The deposition of Defendant's FRCP 30(b)(6) representative regarding meal and

27 rest breaks policies and practices proceeded on January 16, 2013. (Id. ¶ 10.) The

28

CV 12-1804-GHK (CWx)

1  deposition of Defendant's FRCP 30(b)(6) representative regarding payroll policies and

2  practices proceeded on January 23, 2013. (Id.) During these depositions, Plaintiff

3  learned that the putative class members had their "employer" changed approximately

4  two years ago from Alta Dena Certified Dairy, LLC to Dean Transportation, Inc. (Id.,

5  Ex. B at 27:23-28:7.) This appears to be a change in form and not substance as the

6  drivers continue in the same job, at the same locations, same duties, same policies and

7  procedures, just the "name" of the employer has changed.

8      The FRCP 30(b)(6) deponents explained the corporate structure as follows. The

9  parent company is Dean Foods. (Id. ¶ 11, Ex. B at 12:16-18.) Dean Foods'

10  subsidiaries include FDD So Cal. (Id., Ex. B at 26:8-19.) From approximately 2008-

11  2010, FDD So Cal had several subsidiaries, including Alta Dena, Swiss Dairy and

12  Heartland Farms.[5] Swiss Dairy and Heartland Farms merged into Alta Dena in 2010.

13  Then in approximately 2011 (until the present), the drivers at Alta Dena were

14  transferred over to Dean Transportation, Inc. (Id.)

15      But according to the company's FRCP 30(b)(6) witness, notwithstanding these

16  corporate changes, from 2008 until the present, all of the drivers under FDD So Cal

17  were subject to the same policies at issue relating to meal and rest breaks. (Id., Ex. A

18  at 22:13-25; 44:18-45:11; 66:25-67:9, 93:25-94:9; 99:4-20109:7-23; 155:20-156:8.)

19  Indeed, from 2008 until the present the same "Standard Operating Procedures" applied

20  to all drivers in all locations from 2008 to the present. (Id., Ex. A at 163:15-19.) And

21  since at least 2010, they shared the same general manager and the same operations

22

_____

23  [5] In *Ikeda v. Alta Dena Certified Dairy, LLC*, which Defendant failed to notify the
Court of despite simultaneously pending at one point in the same Court, Defendant

24  represented that Swiss II, LLC had merged with and into Alta Dena Certified Dairy,
LLC. (Case No. CV12-03034, Docket No. 1 at 1:27-2:3; Docket No. 9 at 1, fn. 1.)

25  And the plaintiff in that case – based on Defendant's representation, dismissed Swiss
II, LLC from the case. (Docket No. 2-6 at p. 46.) (The *Ikeda* matter was subsequently

26  dismissed.) Plaintiff believes that Alta Dena, similarly, is likely the appropriate
defendant for claims attributable to Heartland Farms. But Defendant to date has failed

27  to provide Plaintiff with an answer to this issue. (Chesler Decl. ¶ 11, Ex. C.)

28

1 | distribution manager. (Id., Ex. A at 32:5-14, 37:7-13.)

2 | Plaintiff further learned at these depositions that all of these entities
3 | automatically deducted 30 minutes of time (that is not reflected on the paystub) and
4 | that Defendant had a consistent policy and practice during the relevant time period of
5 | making such deduction from putative class members wages for a meal break –
6 | regardless of whether a break was actually taken – when an employee worked over
7 | his/her regular shift. (Id. ¶ 12; Ex. A at 22:13-25, 44:18-45:11, 109:7-23, 155:20-
8 | 156:8; Ex. B. at 41:22-25, 42:20-21, 44:9-11, 45:14-23, 135:11-17.)

9 | Finally, while Plaintiff was aware that he may not be an adequate class
10 | representative with respect to <u>penalties</u> under California Labor Code § 226,[6] it was not
11 | until January 31, 2013, that a suitable additional class representative was found. (Id.
12 | ¶ 13.) Scott Parker's identity was revealed in the January 7, 2013 discovery response
13 | for putative class members contact information. (Id.) That list contained over 100
14 | names and, thus, it took Plaintiff some time to interview those on the list. Plaintiff did
15 | not solicit Mr. Parker or anyone else. (Id.) Mr. Parker confirmed his desire and ability
16 | to join as a class representative on January 31, 2013. (Id.)

17 | The discovery cut-off is August 6, 2013. (Id. ¶ 15.) Plaintiff's class
18 | certification motion is due on February 19, 2013. (Id.) Defendant's opposition thereto
19 | is due on March 11, 2013. (Id.) Defendant has not yet taken any depositions. (Id.)
20 | Defendant recently scheduled Plaintiff's deposition for February 15, 2013. (Id.)
21 | Plaintiff believes that both parties can continue to comply with the remainder of the
22 | Court's scheduling order and requests no further modification other than with respect
23 | to filing the amended complaint, attached hereto as Exhibit A. (Id.)

24 |
25 |
26 |
_____
27 | [6] Plaintiff is an adequate class representative with respect to damages, or return of
unpaid wages on all claims plead in the complaint.
28 |

**III.** **The Court Should Modify The Scheduling Order Pursuant to FRCP 16 And Grant Leave Pursuant To FRCP 15(a)**

Plaintiff brings the instant motion pursuant to Rules 15 and 16 of the Federal Rules of Civil Procedure. Rule 15(a)(2) provides that the Court "should freely grant leave when justice so requires." When a party moves to amend his pleadings after a deadline set in a pretrial scheduling order, as is the case here, the schedule may be modified to allow the amendment "for good cause." Fed. Rules of Civ. Proc. 16(b)(4); *see also Crawford v. Delta Sci. Corp.*, 2011 U.S. Dist. LEXIS 47759, at *3 (C.D. Cal. 2011). "The 'good cause' standard 'primarily considers the diligence of the party seeking amendment. . . . Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Crawford*, 2011 U.S. Dist. LEXIS 47759 at *3. In addition, even if the Court finds the moving party was dilatory, the Court may still consider an "overall evaluation of '[t]he rights of the parties, the ends of justice, and judicial economy.'" *U.S. v. Dang*, 488 F.3d 1135, 1142-43 (9th Cir. 2007). If good cause is shown, the Court then turns to whether the amendment is proper under Rule 15, which as noted should be "freely given."

**A.** **Good Cause Exists Under Rule 16**

**1.** **There has been no undue delay.**

It was not until the depositions of defendant's corporate representatives on January 16 and 23, 2013, that Plaintiff's counsel became aware of defendant's uniform policy and/or practice of deducting automatically 30 minutes from the putative class members' work-day if they worked more than their minimum shift. (Id. ¶ 12, Ex. A at 41:22-25; 42:20-21; 45:14-23; 135:11-17; Ex. B. at 22:13-25; 44:18-45:11; 109:7-23; 155:20-156:8.) The deduction does not show up on Plaintiff's or anyone else's paystubs, and Plaintiff did not have any discussions with his co-workers about this

1 policy and/or practice. (Id.; Ex. B at 44:9-11.) Nor does the company communicate

2 this to drivers in writing or obtain written authorization from them. (Id.; Ex. B at

3 44:12-24.) Furthermore, neither Plaintiff nor his counsel obtained the internal XATA,

4 Kronos, and paystub records necessary to ascertain whether or not defendant actually

5 engaged in this policy and/or practice until December 2012 – January 2013. (Id.) In

6 fact, it was not until January 2013 that defendant's production was complete and it

7 consisted of more than 40,000 pages of documents. (Id.) And Defendant did not

8 produce the paystubs until January 22, 2013. (Id.) Moreover, even the records

9 Defendant has been produced thus far are not self-explanatory on this issue, but instead

10 require computation and/or explanation for a clear understanding of Defendant's

11 policies and/or practices. (Id.) Thus, it was not until Defendant's corporate

12 representatives were asked about the 30-minute deduct at deposition on January 16 and

13 23, 2013 respectively, that it was clear that Defendant followed this uniform policy

14 and/or practice with respect to all drivers (*i.e.*, Plaintiff and putative class members).

15 (Id.)

16      Similarly, Plaintiff did not obtain the contact information for putative class

17 members until Defendant produced the information pursuant to Court Order on

18 January 7, 2013. (Id. ¶¶ 7 and 13.) Thus, Plaintiff did not learn of Mr. Parker's

19 identity until recently and only confirmed his desire and ability to join as class

20 representative on January 31, 2013. (Id. ¶ 13.)

21      Finally, it was not until the deposition of Defendant's corporate representatives

22 on January 16 and 23, 2013, respectively, that Plaintiff became aware of the existence

23 of Dean Transportation, Inc. (Chesler Decl. ¶ 10.; Ex. B at 27:23-28:7.) Defendant

24 did not list this entity on its Notice of Interested Parties. (Id.) Nor did Defendant

25 identify Dean Transportation, Inc. in any discovery responses. (Id.) Indeed, Plaintiff's

26 motion to compel was in part focused on refusal to produce information related to

27 policies/practices post-dating Plaintiff's termination. (Id.) Defendant argued only

28

PLAINTIFF'S *EX PARTE* APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE
ALTERNATIVE, FOR LEAVE TO FILE ON SHORTEN TIME MOTION FOR LEAVE TO FILE FIRST AMENDED
COMPLAINT

1 standing to the Magistrate and at no time indicated that the entity no longer existed.

2 (Id.) And the Magistrate ultimately overruled Defendant's objection and ordered it to

3 produce information post-dating Plaintiff's termination. (Id.) But Defendant still did

4 not notify Plaintiff – or produce any documentation showing – that Dean

5 Transportation, Inc. took over after Plaintiff's termination. (Id.)[7] Instead, Defendant

6 apparently lay in wait knowing full well the putative class members' had their

7 employment technically switched to a sister company. (Id.) The Court should not

8 allow Defendant to play such a shell game. Plaintiff has promptly sought to address

9 the issue upon learning of it.

10     Further, Plaintiff only recently learned at these depositions that the Swiss and

11 Heartland Farms locations were subsidiaries of FDD So Cal, which was a subsidiary of

12 Dean Foods. Although they may have been separate subsidiaries at one point, they

13 were all subject to uniform employment policies (including relating to meal and rest

14 breaks) and shared the same "Standard Operating Procedures" that governed Plaintiff's

15 employment. (Id. ¶ 11, Ex. A. at 22:13-25; 44:18-45:11; 66:25-67:9, 93:25-94:9; 99:4-

16 20109:7-23; 155:20-156:8, 163:15-19.) Accordingly, Plaintiff respectfully submits

17 that there has been no undue delay in raising these issues.

18     Courts have permitted leave under similar circumstances. *See, e.g.,* *Crawford*,

19 2011 U.S. Dist. LEXIS 47759 at *5-6 (finding good cause to modify scheduling order

20 and allow leave to amend to add party, noting "it cannot be said that Plaintiffs lacked

21 diligence simply because they chose to seek further discovery before amending their

22 complaint"); *Rios v. Ames True Temper, Inc.*, 2012 U.S. Dist. LEXIS 23112, at *8

23 (C.D. Cal. 2012) (granting modification of scheduling order to allow leave to amend to

24

25 ─────────────

26 [7] Nor does it appear Defendant sent the opt-out letter ordered by the Magistrate to the employees of Swiss and/or Heartland Farms that were merged with Alta Dena in 2010.

27 (Chesler Decl. ¶ 10, fn. 4.)

28
                                                    13                    CV 12-1804-GHK (CWx)

1  add punitive damages because plaintiff did not discover facts until deposition, which

2  was taken after deadline).

### 2. The rights of the parties, the ends of justice, and judicial economy call for modification of the scheduling order.

5  Allowing the amendment is in the interests of justice because: (a) the 30-minute

6  automatic deduction relates to the class claims in Plaintiff's current complaint[8]; (b) the

7  interests of the class are served by having an additional class representative that clearly

8  satisfies the statute of limitations for purposes of California Labor Code § 226 and

9  other statutory and civil penalties; (c) Defendant should not be permitted to limit its

10  liability by playing a shell game.

11  Likewise, allowing the amendment is consistent with principles of judicial

12  economy. Plaintiffs can pursue claims related to the 30-minute policy against Alta

13  Dena, Dean Transportation, Inc., and the other related corporate entities, with or

14  without the amendment because they can file a separate lawsuit. (Chesler Decl. ¶ 16.)

15  But having two lawsuits with similar issues does not make much sense for the parties

16  or the Court. Indeed, that would needlessly waste judicial resources, as evidence

17  produced in any parallel court action would likely be relevant here, and vice-versa.

18  Defendant erroneously claims allowing the amendments would be futile because

19  Plaintiff did not work for Dean Transportation, Inc. But Scott Parker, who plaintiff

20  seeks to add as a class representative did work for Dean Transportation, Inc. (Chesler

21  Decl. ¶ 13.) Moreover, where a parent "employed or exercised control over wages,

22  hours, or working conditions," the parent may be named in a wage and hour class

23  action by a plaintiff who only worked at a particular subsidiary. *Akaosugi v. Benihana*

24  *Nat'l Corp.*, 282 F.R.D. 241, 258-59 (N.D. Cal. 2012). Defendant's corporate

25

---

26  [8] Indeed, the 30-minute deduction for alleged meal breaks is directly related to the
current claims – if not encompassed by them – depending on how liberally the Court

27  construes the operative complaint.

28

1  representatives made clear at deposition that as of at least 2010 the corporate structure
2  included Dean Foods/FDD So Cal as the parent company to both Alta Dena and Dean
3  Transportation Inc. (Chesler Decl, Ex. B at 12:16-18, 26:8-19.) It is clear that from
4  2008 to the present, Defendant's policies at issue here were uniform for all former
5  subsidiaries under Dean Foods/FDD So Cal. (Id., Ex. A at 93:25-94:9; 99:4-20 (meal
6  and rest policy) 22:13-25; 44:18-45:11; 109:7-23; 155:20-156:8 (30-minute automatic
7  deduction)). Indeed, the same "Standard Operating Procedures" applied to all drivers
8  in all locations/subsidiaries from 2008 to the present. (Id., Ex. A at 163:15-19.)
9  Moreover, since at least mid-2010 to the present, all of these subsidiaries shared the
10 same general managers and operations distribution managers. (Id., Ex. A. at 32:5-14
11 and 37:7-13.) Thus, consistent with *Akosugi*, plaintiff Miguel de la Cueva and
12 proposed plaintiff Scott Parker both have standing with respect to Dean Foods and/or
13 FDD So Cal.

14     **B.**   **Amendment Is Appropriate Under Rule 15**

15     Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend
16 should be freely granted. *See, e.g., Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d
17 876, 892 (9th Cir. 2010) (leave to amend shall be freely given when justice so
18 requires," but a "district court may exercise its discretion to deny leave to amend due
19 to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to
20 cure deficiencies by amendments previously allowed, undue prejudice to the opposing
21 party ..., [or] futility of amendment.'); *see also Smith v. Pac. Props. & Dev. Corp.*, 358
22 F.3d 1097, 1101 (9th Cir. 2004) (leave to amend should be freely given in the absence
23 of reasons such as undue delay, bad faith, repeated failure to cure deficiencies by
24 previously allowed amendments or undue prejudice to the opposing party); *see also*
25 *Foman v. Davis*, 371 U.S. 178, 182 (1962) (same).

26     These factors all weigh in favor of permitting the amendment. First, as
27 previously explained, there is no undue delay in addressing these issues, which only
28

1  recently came to light despite reasonable diligence on Plaintiff's part.  Second,

2  Plaintiff is not acting in bad faith in attempting to add these parties and claims.

3  Instead, Plaintiff is merely acting in light of what discovery has revealed and the

4  interest of justice requires.  Nor is Plaintiff seeking any other modification of the

5  scheduling order, such as to obtain more time to file his motion for class certification.

6  Plaintiff believes even with these amendments the parties will still be able to comply

7  with the rest of the Court's scheduling order.[9]  Third, this is the first time Plaintiff has

8  sought to amend the complaint.

9       Finally, there is no undue prejudice to defendant.  As noted, Plaintiff could file a

10  separate lawsuit, which presumably would only increase litigation costs and waste the

11  Court's and parties' resources.  Furthermore, the discovery cut-off in this case is

12  August 6, 2013.  Defendant has not yet taken a deposition.  Plaintiff is willing to

13  provide all documentation that Mr. Parker has within one-week of the amendment, and

14  to produce Mr. Parker for deposition upon Defendant's request.  Despite the addition

15  of the parent companies and/or Dean Transportation, the parties have already

16  conducted discovery on these issues as a result of the fact that the policies are uniform.

17  Thus, allowing leave to file the amended complaint will not unduly prejudice

18  Defendant.

19       For all the foregoing reasons, the Court should grant Plaintiff leave to file the

20  First Amended Complaint attached hereto as Exhibit A.

21

22

23

24

25  [9] Plaintiff's claim for penalties under Cal. Labor Code § 2699 requires notification of such claims to the LWDA and if no response is given within 33 days, then penalties may be sought.  Plaintiff and Mr. Parker sent their notification to the LWDA on

26  February 1, 2013.  Thus, as noted in the FAC, Plaintiff respectfully requests that the scheduling order permit him to file a second amendment on March 7, 2013, solely to

27  confirm whether or not the LWDA seeks to pursue an action.

28

PLAINTIFF'S *EX PARTE* APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE ON SHORTEN TIME MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

## IV. In The Alternative, Plaintiff Seeks Leave To File A Motion For Leave To Amend On Shortened Time

In the alternative, Plaintiff hereby requests that the Court allow Plaintiff leave to file on shortened time a noticed motion for leave to file the first amended complaint. Plaintiff requests this *ex parte* application be deemed his opening papers and that the motion be set for hearing on February 11, 2013 so that the parties may have a ruling on the issue sufficiently in advance of the February 19, 2013 motion for class certification deadline. Plaintiff further proposes that Defendant have until February 7, 2013 to file its opposition and that Plaintiff have until February 8, 2013 to file his reply.

DATED: February 1, 2013                    Respectfully submitted,

THE LAW OFFICES OF
TIMOTHY B. McCAFFREY, JR.

By /s Natasha Chesler
   Natasha Chesler

Attorneys for Plaintiff and Class
Representative Miguel de la Cueva

**EXHIBIT A**

1 | TIMOTHY B. McCAFFREY, JR. (S.B. #192114)
NATASHA CHESLER (S.B. #227540)
2 | THE LAW OFFICES OF TIMOTHY B. McCAFFREY, JR.
A Professional Corporation
3 | 11377 West Olympic Boulevard, Suite 500
Los Angeles, California 90064-1683
4 | Telephone: (310) 882-6407
Facsimile: (310) 882-6359
5
Attorneys for Plaintiffs and Class Representatives
6 | Miguel de la Cueva and Scott Parker

7

8 | **UNITED STATES DISTRICT COURT FOR THE**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

| 10 | MIGUEL DE LA CUEVA, and SCOTT PARKER, on behalf of themselves and those similarly situated, | CASE NO. CV 12-1804-GHK (CWx) |
|---|---|---|
| 11 | | **CLASS ACTION** |
| 12 | Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| 13 | vs. | |
| 14 | ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, DEAN TRANSPORTATION, INC., a Delaware Corporation; HEARTLAND FARMS, an entity unknown; FRESH DAIRY DIRECT OF SO. CAL., an entity unknown; DEAN FOODS COMPANY, a Delaware Corporation; and DOES 1 through 10, inclusive, | **CLASS CLAIMS** |
| 15 | | **ON BEHALF OF PLAINTIFF AND ALL OTHERS SIMILARLY SITUATED:** |
| 16 | | **1) FAILURE TO PROVIDE MEAL AND/OR REST BREAKS IN VIOLATION OF CAL. LABOR CODE §§ 226.7, 512;** |
| 17 | | |
| 18 | | |
| 19 | Defendants. | **2) FAILURE TO PAY ALL WAGES DUE UPON TERMINATION OF EMPLOYMENT IN VIOLATION OF CAL. LABOR CODE §§ 201-204;** |
| 20 | | |
| 21 | | **3) FAILURE TO PAY ALL WAGES EARNED IN VIOLATION OF CALIFORNIA LABOR CODE §§ 221, 223, 224, 510, and 1194;** |
| 22 | | |
| 23 | | |
| 24 | | **4) FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF CALIFORNIA LABOR CODE § 1182.12;** |
| 25 | | |
| 26 | | **5) FAILURE TO PROVIDE ACCURATE PAYSTUB IN VIOLATION OF CAL. LABOR CODE § 226;** |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 1 | **6) UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. &** |
| 2 | **PROF. CODE §§ 17200 *ET SEQ.*;** |
| 3 | |
| 4 | <u>**INDIVIDUAL CLAIMS:**</u> |
| 5 | **7) DISABILITY DISCRIMINATION IN VIOLATION OF FEHA;** |
| 6 | **8) FAILURE TO PROVIDE** |
| 7 | **REASONABLE ACCOMMODATION IN VIOLATION OF FEHA;** |
| 8 | **9) FAILURE TO ENGAGE IN THE** |
| 9 | **INTERACTIVE PROCESS IN VIOLATION OF FEHA;** |
| 10 | **10) RETALIATION IN VIOLATION** |
| 11 | **OF FEHA;** |
| 12 | **11) VIOLATION OF CAL. LABOR CODE § 1102.5;** |
| 13 | **12) WRONGFUL DISCHARGE IN** |
| 14 | **VIOLATION OF PUBLIC POLICY;** |
| 15 | **AND** |
| 16 | **13) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.** |
| 17 | |
| 18 | **DEMAND FOR JURY TRIAL.** |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

FIRST AMENDED COMPLAINT

Plaintiffs Miguel de la Cueva ("Mr. de la Cueva") and Scott Parker ("Mr. Parker") (collectively Plaintiffs) hereby bring this first amended complaint against the above-named defendants and states and alleges as follows:

### General Allegations

1. Plaintiffs are informed and believe and thereupon allege that at all times mentioned herein defendant Alta Dena Certified Dairy LLC ("Alta Dena") is and was a Delaware limited liability company with no members in California. Plaintiffs are further informed and believe and thereupon allege that at all times mentioned herein defendant Dean Transportation, Inc. ("Dean Transportation") is and was a Delaware corporation with its principal place of business in Dallas, Texas. Plaintiff is informed and believes that Dean Foods Company is a Delaware Corporation with its principal place of business in Dallas, Texas. Plaintiff lacks information and belief as to what form of entity Fresh Dairy Direct of So. Cal. ("FDD So. Cal.") and Heartland Farms takes. Plaintiff is informed and believes that Alta Dena is a subsidiary of FDD So. Cal. Plaintiff is further informed and believes both FDD So. Cal. and Dean Transportation, Inc. are subsidiaries of Dean Foods Company. Plaintiff is further informed and believes that all drivers in Southern California employed by FDD So. Cal./Dean Foods and/or subsidiaries thereof are subject to uniform employment policies and practices.

2. At all times mentioned herein, and at the time the causes of action arose, Mr. de la Cueva was an individual and citizen of the County of Los Angeles, State of California, and at all relevant times was employed by Defendants in the County of Los Angeles. The acts giving rise to Mr. de la Cueva's claims occurred in the County of Los Angeles. At all times mentioned herein, and at the time the causes of action arose, Mr. Parker was an individual and citizen of the County of San Bernardino, State of California, and at all relevant times was employed by Defendants in the County of Los Angeles. The acts giving rise to Mr. Parker's claims occurred in the County of Los Angeles.

3. Jurisdiction is proper under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship as detailed above and the amount in controversy exceeds the sum or

1  value of $75,000, exclusive of interest and costs.

2      4.    Plaintiffs are unaware of the true names and capacities of Defendants sued
3  herein as DOES 1-10, inclusive, and for that reason sues said Defendants by such fictitious
4  names. Plaintiffs will file and serve an amendment to this complaint alleging the true names
5  and capacities of said fictitiously named Defendants if and when such true names and
6  capacities become known to Plaintiffs.

7      5.    Plaintiffs are informed and believe, and based thereon allege, that each of the
8  fictitiously named Defendants is responsible in some manner for, and proximately caused, the
9  harm and damages alleged herein below.

10     6.    Plaintiffs are informed and believe, and based thereon allege, that each of the
11  Defendants and individuals named herein acted as the employee, agent, partner, alter-ego
12  and/or joint venturer of each of the other Defendants named herein and, in doing the acts and
13  in carrying out the wrongful conduct alleged herein, each of said Defendants acted within the
14  scope of said relationship and with the permission, consent and ratification of each of the
15  other Defendants named herein.

16     7.    Hereinafter in the complaint, unless otherwise specified, reference to a
17  Defendant or Defendants shall refer to all Defendants, and each of them.

18     8.    Mr. de la Cueva began working as a truck driver for Adohr Farms in
19  approximately 1990. Defendant then acquired Adohr Farms in or about 2004. Mr. de la
20  Cueva continued to work for Defendant thereafter. At all times, Mr. de la Cueva performed
21  his job in an exemplary manner. Indeed, he was repeatedly awarded Certificate of
22  Achievements as an "accident free" driver.

23     9.    Defendant has a progressive discipline policy that provides that upon a first
24  accident an employee receives a written warning, upon a second accident the employee may
25  be placed on probation, and upon a third accident the employee may be discharged. This
26  progressive disciplinary policy covers a twelve-month period (*i.e.*, an accident is only
27  counted for twelve months). In addition, Mr. de la Cueva is informed and believes that
28  Defendant has a practice of not discharging employees when accidents are "minor" (*i.e.*,

1  resulting in no harm to any person and only property damage of less than $500).

2      10.    On or about February 7, 2009, Mr. de la Cueva began suffering from a stomach
3  illness. Specifically, he suffered from what was later diagnosed as diverticulitis, which
4  caused him weakness, nausea, severe stomach pain, fever, sweats, and chills, among other
5  symptoms. In the beginning, Mr. de la Cueva just took a few sick days as needed. But his
6  symptoms progressively worsened.

7      11.    On or about March 30, 2009, Mr. de la Cueva's physician provided Defendant
8  with a note indicating that Mr. de la Cueva was under his care for a medical condition and
9  would be able to return to work on April 6, 2009. Mr. de la Cueva discussed his condition
10  and need for time off with his supervisor, Joe Llamas, and Defendant's HR representative,
11  Susana Correa.

12      12.    Immediately, Defendant gave Mr. de la Cueva push back for his requested
13  leave. Ms. Correa questioned his medical condition. She questioned which doctors he was
14  seeing and why. She made Mr. de la Cueva feel very uncomfortable. Mr. Sanchez also
15  expressed obvious upset with Mr. de la Cueva's request for time off to treat his medical
16  condition. Ultimately, Defendant purported to grant the requested leave and Mr. de la Cueva
17  returned on April 6, 2009, consistent with his physician's plan.

18      13.    On or about April 15, 2009, there was minor damage to the truck Mr. de la
19  Cueva drove. While he was backing up the trailer, one of the trailer doors unlatched from the
20  door holder and came into contact with the building wall. The damage was minor and Mr. de
21  la Cueva believed it to be less than $500. Nevertheless, Mr. de la Cueva reported this
22  damage. Defendant's policy called for a verbal warning because this was the first accident in
23  a twelve-month period. But Defendant violated its policy and suspended Mr. de la Cueva for
24  three days as a result of this accident.

25      14.    During this time, on or about April 17, 2009, Mr. de la Cueva underwent a
26  gastrointestinal endoscopy. He requested disability leave from approximately April 29, 2009
27  through May 13, 2009, so that he could recover from surgery. But Defendant refused this
28  request. Again, Defendant gave Mr. de la Cueva significant pushback. At first, Ms. Correa

1   claimed not to get the paperwork, which Mr. de la Cueva had given to his supervisor (as
2   instructed). So Mr. de la Cueva brought her another copy.

3        15.    In response, Defendant made it very clear that it did not want Mr. de la Cueva
4   to take two weeks off for a disability leave. Defendant further made Mr. de la Cueva fear
5   retaliation (*i.e.*, losing his job) if he took such a leave. Thus, Mr. de la Cueva returned to
6   work the day following his surgery and was not able to take the requested and needed time
7   off.

8        16.    Mr. de la Cueva tried to continue doing his job. But thereafter, his supervisor
9   continued to treat him differently than the others, and consistently gave him a hard time for
10  anything he could think of.

11       17.    On or about May 4, 2009, Mr. de la Cueva's physician requested that he be
12  granted time off as needed to attend medical appointments. Again, Defendant played games
13  with Mr. de la Cueva and claimed it did not have the necessary paperwork. Mr. de la Cueva
14  kept turning in additional copies of the necessary documents. Then, Defendant refused the
15  request on the grounds that it could not grant an "indefinite" accommodation. But that was
16  not what Mr. de la Cueva was asking for. Nonetheless, Mr. de la Cueva's physician clarified
17  his request for time off to 1-3 times per month for physician appointments. Defendant
18  purported to grant this request, but continued to treat Mr. de la Cueva with hostility thereafter.

19       18.    On or about May 15, 2009, Mr. Llamas and Ms. Correa discussed Mr. de la
20  Cueva's request for accommodation. They were very stern. They made Mr. de la Cueva sign
21  a document essentially stating that the "maximum" number of sick days he could take for his
22  illness was three per month.

23       19.    Throughout the rest of 2009, Defendant continued to give Mr. de la Cueva a
24  difficult time accommodating his disability / medical condition. At one point, Mr. de la
25  Cueva was forced to file an appeal concerning his disability benefits from the government
26  because of Defendant's initial refusals to grant requested leaves. Then in approximately June
27  2009, Ms. Correa demanded specific paperwork from Mr. de la Cueva's physician. Mr. de la
28  Cueva explained that his physician was away on vacation, but that he had left a message and

1  would make sure to get it promptly upon the doctor's return. Ms. Correa again became

2  hostile. She threatened Mr. de la Cueva's employment, making comments such as "You want

3  to keep your job, don't you." He underwent another colonoscopy on June 10, 2009 and was

4  forced to return to work the very next day.

5    20. Reaching a limit of this harassing conduct, Mr. de la Cueva filed a complaint

6  with the Department of Labor on or about April 20, 2009, explaining that he was being

7  denied leave of absence and/or other reasonable accommodation(s) for his medical condition.

8  Ms. Correa then denied making any of the foregoing statements or engaging in conduct

9  intending to preclude Mr. de la Cueva from exercising his disability rights. Immediately

10  following this complaint, Defendant began changing Mr. de la Cueva's schedule, thereby

11  preventing him from attending doctor's appointments. Mr. de la Cueva explained that he

12  needed to know in advance what his days off would be so that he could make appointments

13  with his physician. Eventually, Defendant complied – but again, only after making it

14  abundantly clear that Mr. de la Cueva's requests for accommodations were not well-received.

15    21. Throughout 2010, Mr. de la Cueva continued to suffer symptoms from his

16  diverticulitis. And his symptoms would worsen severely when he was unable to eat for

17  prolonged periods. Mr. de la Cueva generally was denied meal and rest breaks. He was

18  required to drive his load to the destination and was neither authorized nor permitted to eat

19  until after the delivery had been completed. This meant that Mr. de la Cueva would usually

20  go at least six hours if not more without eating anything.

21    22. Once Mr. de la Cueva began having stomach problems, the denial of his meal

22  break became even more acute physically. On one occasion, after having driven for nearly

23  nine hours, Mr. de la Cueva's stomach was in severe pain. He, thus, called his supervisor,

24  Jesse Sanchez, and explained again his medical condition and need to eat. He asked if he

25  could stop for a quick fifteen-minute break to eat. Mr. Sanchez, however, refused this

26  request. He sternly instructed Mr. de la Cueva to complete his route and to take no breaks

27  until he did so. Mr. de la Cueva complied.

28    23. Thereafter, Mr. de la Cueva brought up the issue of needing meal and rest

1 breaks multiple times to his supervisors. Each time, his requests were denied and met with
2 hostility.

3     24.   In late February 2010, Mr. de la Cueva was driving a truck and just minutes
4 after leaving the Highland Branch and making a right turn, one of the doors of the refrigerator
5 unit became dislodged due to the dips and bumps on the road. The door opened and hit the
6 back of the tractor. Only minor damage was caused – a small crack on the fiberglass of the
7 door. Even though the damage was minor (it was never even repaired while Mr. de la Cueva
8 worked there), he reported the incident.

9     25.   On or about February 26, 2010, Defendant issued Mr. de la Cueva a written
10 warning and placed him on twelve-month probation for this "accident." Defendant claimed
11 this constituted Mr. de la Cueva's second accident in twelve months. Mr. de la Cueva is
12 informed and believes that employees who were not disabled and/or did not complain about
13 lack of meal and rest breaks were treated differently and *not written up* for such minor
14 damage. But it was clear that Defendant's supervisors had it in for Mr. de la Cueva and were
15 looking for any reason to write him up in a concerted effort ultimately to get rid of him.

16     26.   Later in 2010, Mr. de la Cueva noticed damage to a cross-member bar of a
17 truck. He did not cause this damage, nor did he drive the truck. He merely reported what he
18 saw in the parking lot to his supervisor. Even though he had no involvement in this damage,
19 the company required Mr. de la Cueva to do an accident report and sent him for a DOT drug
20 test (which he passed).

21     27.   In approximately late November 2010, Mr. de la Cueva approached the General
22 Manager, Mr. Llamas and inquired about changing to another route that had a consistent
23 assignment. (As previously explained, Mr. de la Cueva had been placed on a route that was
24 inconsistent covering "as needed" shipments.) Mr. de la Cueva wanted this other consistent
25 route so that he could better address his disability by eating and planning doctors'
26 appointments, among other things. Mr. de la Cueva had made this request previously, but his
27 requests had been denied without any proffered legitimate non-discriminatory or non-
28 retaliatory reason. As the break issue was becoming increasingly difficult, Mr. de la Cueva

1 again made this request to Mr. Llamas in late November 2010. Mr. de la Cueva further

2 explained to Mr. Llamas that the current driver on the route that he desired had less seniority

3 than Mr. de la Cueva. Mr. Llamas got angry and raised his voice, stating "Don't come to me

4 with this bullshit!" Mr. de la Cueva did not want to anger his supervisors and, thus, let the

5 matter go.

6    28.    Thereafter, on or about December 6, 2010, Mr. de la Cueva was attempting to

7 attach a loaded trailer to his tractor. The trailer was too low, however, so Mr. de la Cueva

8 backed under the trailer in an attempt to lift it, causing approximately three inches of damage

9 on the cross-member bar of the tractor. Defendant acknowledged that this damage was no

10 more than $300 to repair. Mr. de la Cueva reported this accident even though Company

11 policy only required him to report damages exceeding $500.

12    29.    A couple weeks later, before leaving on a route, Mr. de la Cueva was given a

13 message from a supervisor (Greg) – namely that Mr. Llamas (the General Manager), asked

14 him to tell Mr. de la Cueva, "no lunch until he finishes his work." Mr. de la Cueva took this

15 as a clear message that Defendant was upset with his repeated requests for meal and/or rest

16 breaks.

17    30.    Barely a week after this comment, on or about December 20, 2010, Defendant

18 suspended Mr. de la Cueva without pay pending an alleged investigation for the December 6,

19 2010 incident. Then, on or about December 27, 2010, Defendant summarily terminated his

20 employment. The Company claimed this was Mr. de la Cueva's third accident in a twelve-

21 month period. But it was not – the first accident occurred in April 2009 – more than twelve

22 months prior. Thus, Defendant deviated from its own policy yet again.

23    31.    In addition, Mr. de la Cueva is informed and believes that Defendant did not

24 fire other employees who had more accidents and/or who caused more severe damage.

25 Defendant, however, treated Mr. de la Cueva differently. The only difference between Mr. de

26 la Cueva and these other employees is that Mr. de la Cueva had exercised his disability leave

27 rights, requested disability accommodations, reported complaints about his treatment in that

28 regard to the Department of Labor, and repeatedly requested that Defendant allow meal and

9
FIRST AMENDED COMPLAINT

1 | rest breaks.

2 | 32.  Accordingly, Defendant terminated Mr. de la Cueva's employment – after over
3 | 20 years of dedicated service – for false and otherwise pretextual reasons.

4 | 33.  On December 2, 2011, Mr. de la Cueva filed charges of discrimination with the
5 | Department of Fair Employment and Housing and obtained an immediate right-to-sue notice.
6 | Mr. de la Cueva has exhausted his administrative remedies.

7 | **CLASS ALLEGATIONS**

8 | 34.  The class for whose benefit this action is being prosecuted is defined as
9 | follows: *All persons who were employed by Defendant as a "Driver" from December 2007*
10 | *to the present (the "putative class").*  Plaintiff reserves the right to create sub-classes if
11 | necessary.

12 | 35.  All members of the putative class have had their rights under the California
13 | Labor Code violated by Defendant's wage and hour/labor practices and have suffered injury
14 | as the result of Defendant's conduct.

15 | 36.  The putative class members as described in Paragraph 34, above, are
16 | ascertainable.  Members of the class, estimated to be approximately at least 200 in number,
17 | can be readily identified from personnel files, payroll records, computer databases or other
18 | records maintained by Defendant.

19 | 37.  The litigation of the questions of fact and law involved in this action will
20 | resolve the rights of all putative class members and hence will have a binding effect on all
21 | class members.

22 | 38.  The class is sufficiently numerous, and joinder of separate claims brought by
23 | each and every class member is impracticable, due to both a reluctance of certain class
24 | members to join in a lawsuit that could impose costs on their current or former employer and
25 | the high cost of separate, individual litigation in comparison to the amount of monetary
26 | recovery for individual class members.

27 | 39.  The putative class has a well-defined community of interest in the questions of
28 | fact and law to be litigated.  The common questions of law and fact predominate with respect

1 | to the liability issues, relief issues and anticipated affirmative defenses.

2 | 40. The claims of the named plaintiffs are typical of those for all putative class
3 | members. Plaintiffs are informed and believe that Defendants had a corporate policy and/or
4 | practice that did not permit "drivers" (such as Plaintiff") from taking a meal and/or rest break
5 | until a shipment was completed (*i.e.* driven from Defendant's principal place of business in
6 | City of Industry to another local California delivery destination). Often times, these routes
7 | would last longer than four (4) hours. In addition, often times if a driver had two or more
8 | routes in a single day, Defendants would neither authorize nor permit a meal and/or rest break
9 | in between routes because that would delay delivery. Indeed, Plaintiffs are informed and
10 | believe and thereupon allege that Defendant made absolutely no effort to build in any time in
11 | a drivers' schedule for required meal and/or rest breaks. This meant that Plaintiffs, and other
12 | drivers, often went six (6) hours if not longer without a meal and/or rest break. Thus, from at
13 | least 2004, Plaintiffs and the putative class members were not authorized or permitted to take
14 | a meal and/or rest break, and – in turn – received less than what was due to them on the next
15 | pay check (and/or at the termination of employment). Furthermore, Defendants have a
16 | uniform policy and practice of restricting all drivers' during their alleged meal periods to
17 | remain within a one-mile radius of their designated routes. Thus, Defendants did not allow
18 | Plaintiff or any putative class member a duty free meal period as required by the California
19 | Labor Code and the applicable Industrial Welfare Commission Wage Orders. Plaintiffs are
20 | informed and believe these policies and/or practices continued from at least 2004 to Mr.
21 | Parkers' termination in approximately March 2012. Plaintiffs are further informed and
22 | believe that this practice applied to all of Defendants' drivers.

23 | 41. Furthermore, Plaintiffs are informed and believe and thereupon allege that
24 | beginning in at least 2008 to the present, Defendants instituted a practice of automatically
25 | deducting 30 minutes of work time and, thus, 30 minutes of pay each day from each driver
26 | regardless of whether or not the driver actually took a 30 minute duty free meal period if the
27 | driver worked beyond his minimum shift of eight or ten hours. Defendants did not obtain
28 | Plaintiffs' or putative class members' consent for this deduction. Nor did Defendants provide

1  Plaintiffs or putative class members with any way to override this automatic deduction. This

2  policy and/or practice resulted in Defendants not paying Plaintiffs and the putative class

3  members for all hours worked, including straight time and/or overtime compensation.

4       42.    Moreover, Plaintiffs are informed and believe and thereupon allege that

5  Defendants were and are aware that their drivers were and are not taking a 30 minute duty

6  free meal periods (or should have been aware[1]) – yet Defendants were and are deducting 30

7  minutes of pay from its drivers automatically as described hereinabove.  Defendants not only

8  made no effort to adjust routes to allow the drivers to take a 30 minute duty free meal break,

9  but Defendants control the drivers at all times (*e.g.*, limiting any break to within a one mile

10  radius of the route) and are fully aware that many drivers will often log a break even though

11  they are not actually taking one for fear of being disciplined.  Defendants made such

12  deductions without any notice or written authorization of Plaintiffs or any putative class

13  member.

14       43.    Plaintiffs can fairly and adequately represent and protect the interests of the

15  class in that there is no conflict between their interests and the interests of the other class

16  members, this action is not collusive, the named Plaintiffs and counsel have the necessary

17  resources to litigate this action and class counsel has the experience and ability to prosecute

18  this case as a class action.  Mr. Parker worked for Defendants for approximately 15 years.  He

19  previously worked for Heartland Farms before it was acquired by Defendants.  He was

20  terminated in approximately March 2012.  Mr. Parker, like Mr. de la Cueva, was precluded

21  from taking meal and rest breaks as described herein because of the nature of the routes

22

23  [1] From approximately 2009 to the present, Defendants used a computerized GPS system
called "XATA" to track the drivers' routes.  This system generated reports that Defendants
24  reviewed on a regular basis.  These reports show when meal breaks are not logged.  Further,
when meal breaks are logged, the reports show what time and what other work the drivers
25  have accomplished that day.  Plaintiffs are informed and believe that in many instances a
legitimate review of these records easily demonstrates that the drivers could not have taken a
26  30 minute duty free meal break and accomplished all the other tasks completed within the
27  similar time frame.

28

1  Defendants provided to him. On many occasions, Mr. Parker would log a meal break even

2  though he was unable to take one for fear of reprimand – for either not logging the break or

3  not timely making his deliveries. There were also many occasions where Mr. Parker neither

4  took nor logged a meal break in his workday. And it was virtually impossible to take meal

5  breaks before the 6th hour worked. Yet, Defendant also deducted 30 minutes pay from Mr.

6  Parker's wages, regardless of whether he took a meal break or not.

7       44.    In addition, pursuant to California Labor Code § 2699.3, Mr. de la Cueva took

8  the initiative to notify the Labor and Workforce Development Agency ("LWDA") of these

9  violations, including the facts and theories to support the violations, on or about December

10  12, 2011. The LWDA did not notify Mr. de la Cueva whether it would investigate the

11  violations detailed in his December 12, 2011, letter within 33 days of that date. Accordingly,

12  Mr. de la Cueva has followed the appropriate steps to enable Plaintiffs and the putative class

13  members to pursue civil penalties pursuant to California Labor Code § 2699 for Defendants'

14  violations of California Labor Code §§ 201-203, 226, 226.3, 226.7, and 512, and California

15  Business & Professions Code §§ 17200 *et seq*., as alleged herein. Furthermore, since

16  Plaintiffs have become aware of the 30-minute automatic deduction policy and/or practice

17  described hereinabove, on February 1, 2013, Plaintiffs have notified the LWDA of this

18  unlawful practice and related Labor Code violations. Plaintiffs reserve the right to seek leave

19  to amend this first amended complaint following the process described in California Labor

20  Code § 2699.3 in the event the LWDA does not intend to investigate or pursue the matter.

21       45.    The certification of a class in this action is superior to the separate litigation of

22  a multitude of cases by members of the putative class. Class adjudication will conserve

23  judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are

24  class members who are unlikely to join or bring an action due to, among other reasons, their

25  fear of retaliation for joining a lawsuit against their current or former employer and/or their

26  inability to afford the prosecution of separate, individual actions. Finally, equity dictates that

27  all persons who stand to benefit from the relief sought herein should be subject to the lawsuit

28  and hence subject to an order spreading the costs of litigation among all class members.

# CLASS CLAIMS

## FIRST CAUSE OF ACTION

### (VIOLATION OF CALIFORNIA LABOR CODE §§ 226.7. 512

### AGAINST ALL DEFENDANTS

#### ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)

46. Plaintiffs, on behalf of themselves and all putative class members, hereby reallege and incorporate herein paragraphs 1 through 45 of this complaint as though fully set forth.

47. From at least 2004 to March 2012, Defendants failed to comply with California Labor Code §§ 226.7 and 512 because they did not authorize or permit its drivers two rest periods during a work-day and/or a duty-free-meal period after five hours of work, if at all.

48. Under California Labor Code § 226.7, Plaintiffs and putative class members are entitled to at least one hour of premium pay for each failure of Defendants to provide statutorily required rest periods and/or meal periods.

49. Plaintiffs and the putative class members have been damaged by Defendants' violation of California Labor Code § 226.7, and they seek recovery of unpaid wages, interest, and attorneys' fees, and costs, in addition to penalties under California Labor Code §§ 203, 210, 226, 226.3, 558, 1194(a), and/or 2699 because Defendants did not pay Plaintiffs and putative class members accurately in a timely manner for the rest periods and/or meal periods they were deprived of during their employment and/or upon their discharge.

50. Plaintiffs, on behalf of themselves and the putative class members, have been required to retain counsel to pursue their rights and the rights of the putative class members and therefore seeks attorneys' fees and costs pursuant to California Labor Code §§ 218.5, 226(g), 558 and/or 2699.

51. Plaintiffs, on behalf of themselves and the putative class members, seek an award of interest pursuant to California Labor Code § 218.6.

# SECOND CAUSE OF ACTION

## (VIOLATION OF CALIFORNIA LABOR CODE §§ 201-204

### AGAINST ALL DEFENDANTS

#### ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)

52. Plaintiffs, on behalf of themselves and all putative class members, hereby reallege and incorporate herein paragraphs 1 through 51 of this complaint as though fully set forth.

53. California Labor Code § 204 requires that an employer who pays its employees semi-monthly must pay their employees all wages earned within 10 or 11 days following the semi-monthly pay period in which work was performed. Defendants paid Plaintiffs semi-monthly. Plaintiffs are informed and believe all drivers were similarly paid semi-monthly.

54. By failing to pay premium pay for meal and/or rest breaks that were not provided, Defendants failed to pay all wages earned within 10 or 11 days following the semi-monthly pay period in which work was performed. Furthermore, as described herein, Defendants' policy and/or practice of automatically deducting 30 minutes of compensation from its employees' earned compensation if they worked more than their scheduled shift necessarily results in Defendants paying less than all wages earned and owed in a timely manner. In fact, Defendants still owe Plaintiffs and the putative class members wages that they earned from at least 2004 to the present. Accordingly, Defendants willfully have violated California Labor Code § 204.

55. In addition, California Labor Code §§ 201-202 requires an employer to immediately pay due and owing upon termination. By failing to pay Plaintiffs and the putative class members the foregoing wages upon termination, Defendants also violated California Labor Code §§ 201-202.

56. Pursuant to California Labor Code §§ 210 and 2699, Plaintiffs and the putative class members seek civil penalties for Defendants' violation of California Labor Code §§ 201-204.

57. Plaintiffs, on behalf of themselves and the putative class members, have been

1  required to retain counsel to pursue his rights and the rights of the putative class members and

2  therefore seek attorneys' fees and costs pursuant to California Labor Code §§ 218.5 and 2699.

3     58.    Plaintiffs, on behalf of themselves and the putative class members, seek an

4  award of interest pursuant to California Labor Code § 218.6.

5                        **THIRD CAUSE OF ACTION**

6  **(VIOLATION OF CALIFORNIA LABOR CODE §§ 221, 223, 224, 510, 511 & 1194**

7                        **AGAINST ALL DEFENDANTS**

8    **ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)**

9     59.    Plaintiffs, on behalf of themselves and all putative class members, hereby

10  reallege and incorporate herein paragraphs 1 through 58 of this complaint as though fully set

11  forth.

12     60.    California Labor Code § 221 prohibits employers from recollecting or

13  otherwise clawing back any earned wages from its employees. California Labor Code § 223

14  prohibits employers from secretly paying a lower wage than that to which the parties agreed.

15  California Labor Code § 224 prohibits employers from making any deductions from

16  employees' compensation that are not authorized in writing and in any event not such

17  authorization can be used to violate Sections 221 or 223. As set forth herein above,

18  Defendants violated these sections by automatically deducting 30 minutes of pay each day

19  from each employee if they worked more than their minimum shift. Defendants did not have

20  any authorization for making such deductions nor did they have any legitimate basis to do so

21  given that Plaintiffs and the putative class members did not actually take a 30 minute duty

22  free meal break. Furthermore, Defendants were and are aware (or should have been aware)

23  that their drivers routinely log a 30 minute break even though they do not actually take a 30

24  minute break (i.e., the drivers are never truly duty free and in any event rarely log a break

25  within the first six hours of their shift). In addition, Defendants did not disclose this unlawful

26  practice in any manner reasonably calculated to inform the aggrieved employees of its

27  practice. Nor do the paystubs that Defendants provided to Plaintiffs or any putative class

28  member indicate that Defendants have deducted automatically 30 minutes of compensation.

1  Defendants' unlawful policy and practice necessarily resulted in lost earned wages, whether
2  minimum wage, straight time or overtime compensation due under California Labor Code
3  §§ 510, 511 or 1194, to the benefit of Defendants and detriment of Plaintiffs and the putative
4  class members.

5       61.    Pursuant to California Labor Code §§ 218.5, 510, 511, 1194(a), and 1194.2
6  (and any other applicable section), Plaintiffs on behalf of themselves and all putative class
7  members and/or aggrieved employees, hereby seek recovery of all earned but unpaid wages
8  whether deemed unpaid minimum wage, straight time or overtime compensation based on the
9  above describe policy and/or practice.

10       62.    Pursuant to California Labor Code §§ 210, 225.5, Plaintiffs, on behalf of
11  themselves and all putative class members, hereby seek civil penalties for Defendants' above
12  described violations of California Labor Code §§ 204, 221, and 223, including 25% of all
13  amounts unlawfully withheld by Defendants pursuant to California Labor Code § 225.5.

14       63.    Pursuant to California Labor Code §§ 218.5, 218.6, and 1194(a), Plaintiffs, on
15  behalf of themselves and all putative class members, seek reasonable attorneys' fees, interest,
16  and costs in an amount according to proof.

17  **FOURTH CAUSE OF ACTION**
18  **(VIOLATION OF CALIFORNIA LABOR CODE § 1182.12**
19  **AGAINST ALL DEFENDANTS**
20  **ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)**

21       64.    Plaintiffs, on behalf of themselves and all putative class members, hereby
22  reallege and incorporate herein paragraphs 1 through 63 of this complaint as though fully set
23  forth.

24       65.    Under California Labor Code § 1182.12, Defendants had a statutory obligation
25  to pay Plaintiffs and the putative class members at least the current minimum wage for all
26  hours worked.  By automatically deducting 30 minutes from drivers pay regardless of
27  whether they worked during that time or not, when they worked in excess of their scheduled
28  shift, Defendants failed to pay Plaintiffs and the putative class members at least the current

minimum wage for those hours worked. Indeed, Defendants failed to pay for this time at all. Such off-the-clock work is a violation of the Labor Code and the applicable IWC Order.

66.     Pursuant to California Labor Code § 1194(a), Plaintiffs may and hereby do bring this action to recover for themselves and the putative class members the balance of unpaid minimum wages, interest, reasonable attorneys' fees, and costs of suit.

67.     Plaintiffs and the putative class members have been damaged by Defendants' violation of California Labor Code § 1182.12 and they seek recovery of unpaid wages, interest, and attorneys' fees, and costs.

68.     Pursuant to California Labor Code § 1194.2, Plaintiffs, on behalf of themselves and all putative class members, hereby seek liquidated damages in an amount to be proven at trial.

69.     Plaintiffs, on behalf of themselves and the putative class members, have been required to retain counsel to pursue their rights and the rights of the putative class members and therefore seek attorneys' fees and costs pursuant to California Labor Code § 1194(a).

70.     Plaintiffs, on behalf of themselves and the putative class members, seek an award of interest pursuant to California Labor Code § 218.6.

## FIFTH CAUSE OF ACTION

### (VIOLATION OF CALIFORNIA LABOR CODE § 226

### AGAINST ALL DEFENDANTS

### ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)

71.     Plaintiffs, on behalf of themselves and all putative class members, hereby reallege and incorporate herein paragraphs 1 through 70 of this complaint as though fully set forth.

72.     California Labor Code § 226 requires employers to provide an accurate itemized statement showing the total wages due to the employee for the pay period. Cal. Lab. Code §§ 226(a). As set forth above, Defendants failed to authorize and/or permit putative class members with required meal and/or rest breaks and/or failed to pay Plaintiffs and the other putative class members all wages due. Defendant accordingly owed putative class

1  members premium pay as wages for those missed meal and/or rest breaks and/or additional
2  earned compensation. But Defendants failed to pay such wages. Nor did they provide the
3  putative class members with a pay stub that accurately reflected these wages due, the hours
4  worked, the applicable pay rates, or any deductions that were being made. Defendants, thus,
5  violated California Labor Code § 226 for these and other reasons.

6      73. Defendants' failure to comply with California Labor Code § 226(a) was
7  knowing and intentional and each putative class member is entitled to statutory penalties or
8  actual damages under California Labor Code § 226(e).

9      74. Plaintiffs, on behalf of themselves and the putative class members, also hereby
10 seek civil penalties pursuant to California Labor Code § 226.3, which provides that any
11 employer who violates California Labor Code § 226(a) shall be subject to a civil penalty in
12 the amount of $250 per employee per violation in an initial citation and $1,000 per employee
13 for each violation in a subsequent citation. Under California Labor Code § 2699, Plaintiffs
14 and the putative class are entitled to their share of this civil penalty because Defendants'
15 violation was knowing, intentional, and certainly not inadvertent or due to a clerical error.

16     75. Plaintiffs, on behalf of themselves and the putative class members, also hereby
17 requests attorneys' fees, costs, and interest pursuant to California Labor Code § 226(g).

18 **SIXTH CAUSE OF ACTION**
19 **(VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.***
20 **AGAINST ALL DEFENDANTS**
21 **ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED)**

22     76. Plaintiffs, on behalf of themselves and all putative class members, hereby
23 realleges and incorporates herein paragraphs 1 through 75 of this complaint as though fully
24 set forth.

25     77. As described hereinabove, Defendants followed a policy and practice of failing
26 to authorize and/or permit meal and/or rest breaks, failing to timely pay wages due and
27 owing, automatically deducting 30 minutes of pay from each employee if they worked more
28 than their scheduled shift, and failing to provide an accurately itemized paystub, from at least

1  2004 through 2012 and/or to the present.  During this time period, Defendants failed to follow
2  the law and failed to pay all wages due to Plaintiffs and the putative class members.

3        78.    Defendants knowingly, intentionally, and fraudulently concealed its unlawful
4  payroll practices from Plaintiffs and the putative class members so that it could save money
5  and bolster its bottom line.  Defendants engaged in this sharp, unlawful, and unfair practice to
6  avoid payment to Plaintiffs and the putative class members of that what was legal owed to
7  them.  In engaging in the aforementioned conduct, Defendants have engaged in unlawful,
8  unfair, and fraudulent business practices in violation of California Business and Professions
9  Code §§ 17200 *et seq.*

10        79.    Plaintiffs and the putative class members have suffered economic harm and
11  actual injury as the result of Defendant's unlawful, unfair, and fraudulent business practices
12  and, therefore, have standing to bring this action on behalf of themselves and the putative
13  class members.

14        80.    As the result of Defendants' unlawful, unfair, and fraudulent conduct,
15  Defendants have been unjustly enriched insofar as Defendants have withheld and recouped
16  wages that were due to Plaintiffs and the putative class members and avoided its legal
17  obligation to pay Plaintiffs and the putative class members wages and statutory penalties that
18  were due to them.

19        81.    Plaintiffs, on behalf of themselves and the putative class members, are entitled
20  to restitution of all of the wages earned and due to the putative class members, any other of
21  Defendants' ill begotten gains, and injunctive relief prohibiting Defendants from engaging in
22  the unlawful, unfair, and fraudulent payroll practices described herein.

23        82.    Plaintiffs, on behalf of themselves and the putative class members, also seek
24  interest on the amount of restitution awarded to Plaintiffs and the putative class members.

25        83.    Plaintiffs, on behalf of themselves and the putative class members, also seek
26  attorneys' fees under California Code of Civil Procedure § 1021.5 because this lawsuit seeks
27  to enforce important public rights guaranteed by the California Labor Code.

28

## INDIVIDUAL CLAIMS

## SEVENTH CAUSE OF ACTION

### (DISABILITY DISCRIMINATION IN VIOLATION OF CAL. GOV'T CODE
### §§ 12900 *ET SEQ.*

### AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC
### ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)

84.     Plaintiff Miguel de la Cueva ("Plaintiff") realleges and incorporates herein paragraphs 1 through 33 of this complaint as though fully set forth.

85.     Under the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900 *et seq.*, it is an unlawful employment practice for an employer to discharge an employee in whole or in part because of an employee's disability and/or medical condition. *See, e.g.*, Cal. Gov't Code § 12940(a).

86.     As set forth above, Plaintiff suffers from a disability under California law because he suffers from diverticulitis (and other stomach ailments), which caused him weakness, nausea, severe stomach pain, fever, sweats, and chills, among other symptoms, and limits him in several major life activities, including making him unable to go prolonged periods without eating, concentrate, and otherwise perform every day tasks. Plaintiff made Defendant aware he was disabled and requested reasonable accommodations for his disability, e.g., a disability leave of absence, a steadier route, and meal and rest breaks. In addition, Defendant clearly regarded Plaintiff as disabled given his status at time on a disability leave of absence and repeated requests for accommodation. While Defendant initially purported to grant Plaintiff the leave of absence that he required, Defendant then intimidated Plaintiff from taking all of the requested time off. At least twice, plaintiff went without disability related leaves, which caused him physical and emotional harm. Defendant also refused to adjust Plaintiff's schedule to accommodate his disability. Defendant also refused to permit Plaintiff to take meal and rest breaks to accommodate his disability. Defendant initially agreed to provide Plaintiff with an advance schedule so that Plaintiff could attend doctors' appointments, but Defendant did not ultimately do so. All of Plaintiff's

1 requests for accommodation were met with hostility. Defendant treated Plaintiff differently

2 than his non-disabled peers by retaliating against and ultimately terminating Plaintiff's

3 employment. And after 20+ years of dedicated and excellent service, Defendant terminated

4 Plaintiff because of his disability, requests for accommodation, and other protected activity

5 described herein. Defendant, thus, terminated Plaintiff in violation of the FEHA.

6       87.    In addition, as set forth above, Defendant engaged in a consistent and

7 continuous pattern of failing to accommodate Plaintiff's disability, discriminating, and/or

8 retaliating against him as party of a pattern of discriminatory and unlawful conduct. While

9 some of this conduct occurred more than one year before Plaintiff filed his charge with the

10 DFEH, the conduct was sufficiently similar in kind and character and had not achieved a

11 degree of permanence such that the continuing violations doctrine applies. Plaintiff offered

12 several reasonable accommodations to which Defendant would initially agree only to later

13 than renege or change its mind. At no time, however, did Defendant engage in any informal

14 good-faith dialogue to determine if an alternative reasonable accommodation existed when it

15 rejected or stopped accommodating Plaintiff's disability. Indeed, all of Plaintiff's requests

16 for accommodation were met with hostility and ultimately retaliation and discrimination.

17       88.    As a direct, legal, and proximate result of Defendant's conduct, as alleged

18 above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which

19 Plaintiff is entitled to general and special damages according to proof.

20       89.    As a further direct, legal and proximate result of Defendant's conduct, Plaintiff

21 was caused to and did employ the services of counsel to prosecute this action, and is

22 accordingly entitled to an award of attorneys' fees according to proof.

23       90.    Plaintiff is informed and believes and thereupon alleges that Defendant's

24 actions and each of them were taken with malice, oppression, fraud, and/or willful and

25 conscious disregard of Plaintiff's rights, and were carried out by Defendant's managing

26 agents and/or ratified by Defendant. Plaintiff is therefore entitled to punitive damages in an

27 amount to be determined at trial.

28

**EIGHTH CAUSE OF ACTION**

**(FAILURE TO PROVIDE REASONABLE ACCOMMODATION IN VIOLATION OF**

**CAL. GOV'T CODE §§ 12900 *ET SEQ.***

**AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC**

**ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)**

91.     Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84 through 90 of this complaint as though fully set forth.

92.     Under the FEHA, it is an unlawful employment practice for an employer to fail to offer a reasonable accommodation to an employee with a known disability. *See, e.g.*, Cal. Gov't Code § 12940(m).

93.     As set forth above, Plaintiff suffers from a disability under California law because he suffers from physiological impairment – diverticulitis (and other stomach ailments) – which caused him weakness, nausea, severe stomach pain, fever, sweats, and chills, among other symptoms, and limits him in several major life activities, including making him unable to go prolonged periods without eating, concentrate, and otherwise perform every day tasks.  Plaintiff made Defendant aware he was disabled and requested reasonable accommodations for his disability, *e.g.*, a disability leave of absence and meal and/or rest breaks.  In addition, Defendant clearly regarded Plaintiff as disabled given that he went on a disability leave of absence and repeatedly reminded Defendant of his physiological impairment when he requested breaks.  While Defendant initially purported to grant Plaintiff the leave of absence that he requested and required, Defendant then intimidated Plaintiff from taking all of the requested time off.  Defendant also refused to adjust Plaintiff's schedule to accommodate his disability.  Defendant also refused to permit Plaintiff to take meal and rest breaks to accommodate his disability.  Defendant initially agreed to provide Plaintiff with an advance schedule so that Plaintiff could attend doctors' appointments, but Defendant did not ultimately do so.  All of Plaintiff's requests for accommodation were met with hostility.

94.     Defendant did not provide these accommodations – or explore any alternatives. Defendant, thus, failed to reasonably accommodate Plaintiff in violation of the FEHA.  While

1  some of these failures occurred more than one year before Plaintiff filed his charge with the

2  DFEH, the conduct was sufficiently similar in kind and character and had not achieved a

3  degree of permanence such that the continuing violations doctrine applies. Plaintiff offered

4  several reasonable accommodations that Defendant would initially agree to only to later than

5  renege or change its mind. At no time, however, did Defendant engage in any informal good-

6  faith dialogue to determine if an alternative reasonable accommodation existed when it

7  rejected or stopped accommodating Plaintiff's disability. Indeed, all of Plaintiff's requests

8  for accommodation were met with hostility and ultimately retaliation.

9      95.    As a direct, legal, and proximate result of Defendant's conduct, as alleged

10  above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which

11  Plaintiff is entitled to general and special damages according to proof.

12      96.    As a further direct, legal and proximate result of Defendant's conduct, Plaintiff

13  was caused to and did employ the services of counsel to prosecute this action, and is

14  accordingly entitled to an award of attorneys' fees according to proof.

15      97.    Plaintiff is informed and believes and thereupon alleges that Defendant's

16  actions and each of them were taken with malice, oppression, fraud, and/or willful and

17  conscious disregard of Plaintiff's rights, and were carried out by Defendant's managing

18  agents and/or ratified by Defendant. Plaintiff is therefore entitled to punitive damages in an

19  amount to be determined at trial.

20              **NINTH CAUSE OF ACTION**

21  **(FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS IN VIOLATION OF**

22          **CAL. GOV'T CODE §§ 12900 *ET SEQ*.**

23      **AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC**

24      **ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)**

25      98.    Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84

26  through 97 of this complaint as though fully set forth.

27      99.    Under the FEHA, it is an unlawful employment practice for an employer to fail

28  to engage in a timely, good-faith interactive process with a disabled employee to determine if

1  a reasonable accommodation exists. *See, e.g.*, Cal. Gov't Code § 12940(n).

2      100.   As set forth above, Defendant engaged in a consistent and continuous pattern of
3  failing to accommodate Plaintiff's disability. While some of these failures occurred more
4  than one year before Plaintiff filed his charge with the DFEH, the conduct was sufficiently
5  similar in kind and character and had not achieved a degree of permanence such that the
6  continuing violations doctrine applies. Plaintiff offered several reasonable accommodations
7  that Defendant would initially agree to only to later than renege or change its mind. At no
8  time, however, did Defendant engage in any informal good-faith dialogue to determine if an
9  alternative reasonable accommodation existed when it rejected or stopped accommodating
10  Plaintiff's disability. Indeed, all of Plaintiff's requests for accommodation were met with
11  hostility and ultimately retaliation.

12      101.   Instead of engaging in a good-faith interactive process with Plaintiff to
13  determine what routes would work for him, when he could take a meal break, or if he needed
14  any additional accommodation to do his job, Defendant failed to provide reasonable
15  accommodation. Accordingly, Defendant failed to engage in a good-faith interactive process
16  in violation of the FEHA.

17      102.   As a direct, legal, and proximate result of Defendant's conduct, as alleged
18  above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which
19  Plaintiff is entitled to general and special damages according to proof.

20      103.   As a further direct, legal and proximate result of Defendant's conduct, Plaintiff
21  was caused to and did employ the services of counsel to prosecute this action, and is
22  accordingly entitled to an award of attorneys' fees according to proof.

23      104.   Plaintiff is informed and believes and thereupon alleges that Defendant's
24  actions and each of them were taken with malice, oppression, fraud, and/or willful and
25  conscious disregard of Plaintiff's rights, and were carried out by Defendant's managing
26  agents and/or ratified by Defendant. Plaintiff is therefore entitled to punitive damages in an
27  amount to be determined at trial.

28

**TENTH CAUSE OF ACTION**

**(RETALIATION IN VIOLATION OF CAL. GOV'T CODE**

**§§ 12900 *ET SEQ.***

**AGAINST ALL DEFENDANT**

**ON BEHALF OF PLAINTIFF ALONE)**

105.    Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84 through 104 of this complaint as though fully set forth.

106.    Under the FEHA, it is an unlawful employment practice for an employer to retaliate against an employee because they raise concerns about unlawful or what they perceive to be unlawful conduct under the FEHA.  As set forth more fully above, Plaintiff repeatedly complained about the denial of accommodations for his disability, including his need for disability leave, an advance schedule (for time to attend doctors' appointments), an alternate schedule, time for a meal break, and other similar accommodations.  Plaintiff complained about the denial of his disability accommodations, and for being discriminated against and treated differently because of his disability / medical status (*i.e.* being suspended for a first accident when other non-disabled or healthy employees were not).  Plaintiff made such complaints to his supervisors and Human Resources.  His supervisors and Human Resources representatives were also made aware that Plaintiff had filed a complaint with the Department of Labor.

107.    Plaintiff's supervisors and Ms. Correa made it clear to Plaintiff his complaints were not well-received.  Shortly after Plaintiff's complaints, Defendant retaliated against Plaintiff and terminated his employment in violation of the FEHA.

108.    As a direct, legal, and proximate result of Defendants' conduct, as alleged above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which Plaintiff is entitled to general and special damages according to proof.

109.    As a further direct, legal and proximate result of Defendants' conduct, Plaintiff was caused to and did employ the services of counsel to prosecute this action, and is accordingly entitled to an award of attorneys' fees according to proof.

110.    Plaintiff is informed and believes and thereupon alleges that Defendants'
actions and each of them were taken with malice, oppression, fraud, and/or willful and
conscious disregard of Plaintiff's rights, and were carried out by Defendants' managing
agents and/or ratified by Defendant.  Plaintiff is therefore entitled to punitive damages in an
amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (VIOLATION OF CAL. LABOR CODE § 1102.5

### AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC

### ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)

111.    Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84
through 110 of this complaint as though fully set forth.

112.    California Labor Code § 1102.5 makes it unlawful for an employer to retaliate
against an employee for disclosing information to a government or law enforcement agency,
where the employee reasonably believes a violation of state or federal statute, or violation or
noncompliance with a state or federal rule or regulation has occurred.

113.    As previously explained, Mr. de la Cueva reported Defendant's refusal to
provide a leave of absence and/or otherwise accommodate his medical condition to the U.S.
Department of Labor.  Defendant thereafter retaliated against him – ultimately by terminating
his employment.  Accordingly, Defendant thereby violated California Labor Code § 1102.5.

114.    As a direct, legal, and proximate result of Defendants' conduct, as alleged
above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which
Plaintiff is entitled to general and special damages according to proof.

115.    As a further direct, legal and proximate result of Defendants' conduct, Plaintiff
was caused to and did employ the services of counsel to prosecute this action, and is
accordingly entitled to an award of attorneys' fees according to proof.

116.    Plaintiff is informed and believes and thereupon alleges that Defendants'
actions and each of them were taken with malice, oppression, fraud, and/or willful and
conscious disregard of Plaintiff's rights, and were carried out by Defendants' managing

1  agents and/or ratified by Defendant.  Plaintiff is therefore entitled to punitive damages in an
2  amount to be determined at trial.

### TWELFTH CAUSE OF ACTION

### (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC
### ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)

7  117.   Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84
8  through 116 of this complaint as though fully set forth.

9  118.   It is against fundamental and well-established public policy to discharge an
10  employee because of his disability, fail to accommodate the employee, and fail to engage in
11  the interactive process.  This fundamental public policy is embodied in the FEHA and
12  California Constitution.  *See*, *e.g.*, Cal. Gov't Code § 12940(a), (m), (n).  It is also against
13  fundamental and well-established public policy to deny an employee a meal and/or rest break.
14  Cal. Lab. Code §§ 226.7 and 512.  In addition, it is also against fundamental public policy to
15  retaliate against an employee for disclosing information to a government or law enforcement
16  agency, where the employee reasonably believes a violation of state or federal statute, or
17  violation or noncompliance with a state or federal rule or regulation has occurred.  Cal. Lab.
18  Code § 1102.5.

19  119.   As set forth above, Defendant discharged Plaintiff in whole or in part in
20  violation of these fundamental public policies and/or because Plaintiff opposed these
21  practices.  Defendant, thus, has committed the tort of wrongful discharge in violation of
22  public policy.

23  120.   As a direct, legal, and proximate result of Defendant's conduct, as alleged
24  above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which
25  Plaintiff is entitled to general and special damages according to proof.

26  121.   Plaintiff is informed and believes and thereupon alleges that Defendant's
27  actions and each of them were taken with malice, oppression, fraud, and/or willful and
28  conscious disregard of Plaintiff's rights, and were carried out by Defendant's managing

28

agents and/or ratified by Defendant. Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### AGAINST DEFENDANT ALTA DENA CERTIFIED DAIRY, LLC

### ON BEHALF OF PLAINTIFF MIGUEL DE LA CUEVA ALONE)

122. Plaintiff realleges and incorporates herein paragraphs 1 through 33 and 84 through 121 of this complaint as though fully set forth.

123. Defendant's above described conduct was extreme and outrageous and beyond the bounds of all decency and as a violation of statute and/or public policy outside the course and scope of the normal employment relationship. Defendant acted with the intent to denigrate and degrade Plaintiff. The conduct of Defendant in terminating Plaintiff based on his disability, refusing to accommodate a disabled employee, and/or terminating Plaintiff to avoid having to engage in the interactive process, violated California statutory law and public policy against such conduct and was not anticipated by Plaintiff at the inception or during the course of his employment.

124. Plaintiff could not have reasonably anticipated termination in violation of California statutory law or public policy as a consequence of his employment.

125. As a legal, direct, and proximate result of Defendant's extreme and outrageous conduct, as alleged above, Plaintiff has suffered severe emotional distress, anxiety, worry, sleeplessness, and shock, in an amount according to proof.

126. Plaintiff is informed and believes and thereupon alleges that Defendant's actions and each of them were taken with malice, oppression, fraud, and/or willful and conscious disregard of Plaintiff's rights, and were carried out by Defendant's managing agents and/or ratified by Defendant. Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Miguel de la Cueva and Scott Parker, on behalf of themselves and those similarly situated, pray for judgment against Defendants Alta Dena Certified Dairy LLC, Dean Transportation, Inc., Heartland Farms, Fresh Dairy Direct of So Cal, Dean Foods Company, and Does 1 through 10, inclusive, and each of them, as follows:

1.    For general damages according to proof, on each cause of action for which such damages are available;

2.    For compensatory damages, according to proof on each cause of action for which such damages are available;

3.    For special damages, including punitive damages, according to proof on each cause of action for which such damages are available;

4.    For statutory and civil penalties, according to proof on each cause of action for which such damages are available;

5.    For prejudgment and postjudgment interest on any lost or unpaid wages according to law;

6.    For reasonable attorneys' fees and costs of suit incurred herein pursuant to Government Code § 12965(b), California Labor Code §§ 218.5, 226, 1194(a), and any other relevant provision under California law that provides for attorneys' fees;

7.    For equitable relief to the extent available under law;

8.    For statutory penalties to the extent available under law; and

9.    For such other and further relief as the Court deems proper and just.

FIRST AMENDED COMPLAINT

1 | **PLAINTIFFS HEREIN DEMAND A TRIAL BY JURY OF ALL CAUSES OF**

2 | **ACTION ALLEGED HEREIN.**

3 | DATED:  February 1, 2013

THE LAW OFFICES OF
TIMOTHY B. McCAFFREY, JR.

5

By _____

6 | Timothy B. McCaffrey, Jr.

7 | Attorneys for Plaintiffs and Class
Representatives Miguel de la Cueva and
8 | Scott Parker

# Exhibit 5

1   MARC SELTZER (54534)
    STEVEN G. SKLAVER (237612)
2   KALPANA SRINIVASAN (237460)
    AMANDA BONN (270891)
3   SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
4   Los Angeles, CA 90067-6029
    Telephone: (310) 789-3100
5   Fax: (310) 789-3150
    Email: sselaver@susmangodfrey.com
6   Email: ksrinivasan@susmangodfrey.com
    Email: abonn@susmangodfrey.com
7
    *Attorneys for Defendant*
8   *Alta-Dena Certified Dairy, LLC*

9

10                **UNITED STATES DISTRICT COURT**

11               **CENTRAL DISTRICT OF CALIFORNIA**

12

13                      **WESTERN DIVISION**

14
    MIGUEL DE LA CUEVA, on behalf of      Case No. CV12-01804 GHK (CWx)
15  himself and those similarly situated,
                                          <u>**CLASS**</u> <u>**ACTION**</u>
16             Plaintiff,

17        v.                              **DEFENDANT ALTA-DENA**
                                          **CERTIFIED DAIRY, LLC'S**
18  ALTA DENA CERTIFIED DAIRY,            **OPPOSITION TO PLAINTIFF'S**
    LLC, a Delaware Limited Liability     ***EX PARTE* APPLICATION FOR**
19  Company; ALTA-DENA CERTIFIED          **LEAVE TO FILE FIRST**
    DAIRY, INC., a Delaware Corporation;  **AMENDED COMPLAINT OR, IN**
20  and DOES 1 through 10, inclusive,     **THE ALTERNATIVE, FOR**
                                          **LEAVE TO FILE ON**
21             Defendants.                **SHORTENED TIME MOTION**
                                          **FOR LEAVE TO FILE FIRST**
22                                        **AMENDED COMPLAINT**

23

24                                        Date:
                                          Time:
25                                        Place:

26

27

28

I, Marjorie Ball, declare:

1.    I am the Senior Human Resources Business Partner for Alta-Dena Certified Dairy, LLC ("Alta-Dena").  I am familiar with Alta-Dena's corporate structure and the corporate structure of other indirect subsidiaries of Dean Foods Company that do business in southern California.  I am a current authorized custodian of Plaintiff Miguel de la Cueva's personnel file.  I am also a current authorized custodian of Mr. Scott Parker's personnel file.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify thereto.

2.    This declaration is submitted in support of Alta-Dena's Opposition To Plaintiff's *Ex Parte* Application to File First Amended Complaint.

3.    Alta-Dena Certified Dairy, LLC is a limited liability company organized under the laws of Delaware, with its executive offices located in Dallas, Texas, and is registered to do business in California.

4.    Alta-Dena is a wholly-owned subsidiary of Dean West II, LLC, which is a wholly-owned subsidiary of Dean Dairy Holdings, LLC, which is a wholly-owned subsidiary of Dean Holding Company, which is a wholly-owned subsidiary of Dean Foods Company.  True and correct copies of documents evidencing the above are attached hereto as Exhibits A-C.

5.    Dean Foods Company is a publicly traded company headquartered in Dallas, Texas and organized under the laws of Delaware.

6.    Between February 1, 2008, and December 27, 2010, Plaintiff Miguel de la Cueva was employed by Alta-Dena as a driver at its City of Industry North ("COI-N") facility located at 17637 E. Valley Blvd., City of Industry, California 91744.

7.    In addition to the COI-N facility, Alta-Dena also employed drivers at a second facility in Highland, California and a third facility in San Diego, California between February 1, 2008 and December 31, 2010.

8.    Dean Transportation, Inc. is a long-standing entity indirectly and wholly-owned by Dean Foods that owns and operates commercial vehicles across the United States.

9.    Effective January 1, 2011, drivers previously employed at various Dean Foods indirect subsidiaries in southern California—including drivers employed by Swiss II, LLC, Alta-Dena, and Dean Foods of Southern California, LLC—transferred to and became employees of Dean Transportation, Inc.  Because Plaintiff Miguel de la Cueva was terminated before this re-organization, at no point was he ever employed by Dean Transportation, Inc.

10.   At the same time that Swiss II, LLC's drivers transferred to and became employed by Dean Transportation, Inc., the legal entity Swiss II, LLC merged with and into Alta-Dena Certified Dairy, LLC effective December 31, 2010.  None of the Swiss II, LLC drivers became Alta-Dena drivers as a result of that merger; instead, Swiss II, LLC drivers were immediately transferred to and became employees of Dean Transportation, Inc. Mr. Steven Steven M. Ikeda was a former employee of Swiss II, LLC.  At no point was Plaintiff Miguel de la Cueva ever an employee of Swiss II, LLC.

11.   A true and correct copy of Swiss II, LLC's Certificate of Merger into Alta-Dena Certified Dairy, LLC is attached hereto as Exhibit D.

12.   Dean Foods of Southern California, LLC—unlike Swiss II, LLC—did not merge with and into Alta-Dena until January 1, 2013.  Instead, it remained a separate and active legal entity registered to do business in California until the date of such merger.  Drivers employed by Dean Foods of Southern California, LLC never became employees of Alta-Dena as a result of the above-described corporate reorganizations in December 2010, January 2011, and January 2013.  A true and correct copy of the Certificate of Merger from Dean Foods of Southern California, LLC to Alta-Dena is attached hereto as Exhibit E.

13.     Plaintiff's proposed First Amended Complaint refers to an entity supposedly named "Heartland Farms." Heartland Farms is not an entity but instead was an assumed name used by Dean Foods of Southern California, LLC, registered in the State of California and is additionally a colloquial or branding term used to refer to the Dean Foods of Southern California, LLC (now known as Alta-Dena since January 1, 2013) facility located at 17851 East Railroad Street, City of Industry, California 91748. That facility is also commonly referred to as the Heartland City of Industry South or "COI-S" facility.

14.     Mr. Scott Parker was employed at the Heartland or COI-S facility. Prior to October 2009, that facility was owned by a company called Santee Dairies, Inc., which was not a Dean Foods affiliate or subsidiary. As such, prior to October 2009, Mr. Parker was not employed by any Dean Foods-related entity but instead was employed by Santee Dairies, Inc. Between October 2009 and December 31, 2010, Mr. Parker was employed by Dean Foods of Southern California, LLC and worked at the Heartland or COI-S branch location. Effective January 1, 2011, Mr. Parker became a Dean Transportation, Inc. employee and continued to work out of the Heartland COI-S facility. In or around August 2011, Mr. Parker transferred to and began working at the COI-N facility as a Dean Transportation, Inc. driver. Mr. Parker continued to work as a Dean Transportation, Inc. driver at the COI-N facility until his employment was terminated in or around March 2012.

15.     Mr. Parker has never been employed by Alta-Dena Certified Dairy, LLC; by Dean Foods Company; or by "Heartland Farms" or "Fresh Dairy Direct of So. Cal.," neither of which are actually legal entities.

16.     The drivers at the Heartland COI-S facility were members of Teamsters Local Union No. 63 and the terms of their employment were governed by the Conventional Dairy Plant/Driver Agreement Heartland Farms, City of Industry Plant between March 1, 2007 and February 29, 2012. This collective bargaining agreement ("CBA") never applied to drivers at the Alta-Dena COI-N,

1  Highland, or San Diego branches. The drivers at the COI-N and Highland branches
2  were not covered by any CBA at all until 2011, while the drivers in San Diego were
3  subject to two separate CBAs between February 2008 and February 2012. A true
4  and correct copy of the Heartland CBA is attached hereto as Exhibit F.

5      17.   Since January 1, 2011, in addition to employing drivers at the COI-N,
6  Highland, San Diego, and COI-S branches, Dean Transportation, Inc. has also
7  employed drivers that had previously been employed by other Dean Foods indirect
8  subsidiaries at locations in Ventura, Adelanto, Corona, Riverside, Buena Park, El
9  Centro, Desert Hot Springs, and Commerce. None of those facilities are Alta-Dena
10  affiliated facilities, nor has Alta-Dena employed any drivers at those facilities
11  during the class period. Instead, those facilities were previously associated with
12  other Dean Foods indirect subsidiaries including Swiss II, LLC and Dean Foods of
13  Southern California, LLC.

14      18.   "Fresh Dairy Direct of So. Cal." and "FDD So. Cal." are not legal
15  entities or employers of drivers in California. Instead, Dean Foods and its direct
16  and indirect subsidiaries use the term "Fresh Dairy Direct" or "FDD" as a branding
17  term or trade name for its fluid milk dairy processing business across the country.
18  Likewise, the terms "Fresh Dairy Direct of So. Cal." or "FDD So. Cal." are
19  branding terms or trade names Dean Foods uses to describe its fluid milk dairy
20  processing business in southern California across various Dean Foods indirect
21  subsidiaries.

22      19.   Following the re-organizations above that became effective January 1,
23  2011, new policies—including new meal and rest break policies—were rolled out
24  to Dean Transportation, Inc. drivers at each of the above-named facilities in
25  southern California. These policies, which applied to all Dean Transportation, Inc.
26  drivers across various Dean Foods-related locations in southern California, were
27  sometimes labeled "Fresh Dairy Direct of So. Cal." or "FDD So. Cal." policies.

28

20.     Based on an initial review of our records, it appears that there were approximately 350 drivers or more employed by Dean Transportation, Inc. at the above twelve facilities since January 1, 2011.

21.     By contrast, my review of our records shows that between February 1, 2008 and December 31, 2010, Alta-Dena Certified Dairy, LLC employed approximately 148 drivers at three locations.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 5th day of February 2013, at City of Industry, California.

Marjorie Ball

# Exhibit A

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### ALTA-DENA CERTIFIED DAIRY, LLC

This LIMITED LIABILITY COMPANY AGREEMENT of Alta-Dena Certified Dairy, LLC (the "Agreement") is made as of the 27th day of April, 2006, by Dean West II, LLC, a Delaware limited liability company (the "Sole Member").

### ARTICLE I

### ORGANIZATIONAL MATTERS

1.1    Formation. The Company was converted from a corporation to a limited liability company in accordance with the Delaware Act on April 27, 2006. The Sole Member hereby agrees to continue the Company as a Delaware limited liability company under and pursuant to the Delaware Act and agrees that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Sole Member and the administration and termination of the Company shall be governed by the Delaware Act.

1.2    Name. The name of the Company shall be, and the business of the Company shall be conducted under the name of, Alta-Dena Certified Dairy, LLC. The Company's business may be conducted under any other name or names approved by the Manager.

1.3    Registered Office and Principal Office of Company. The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware. The Company may maintain offices at such locations as the Manager deems advisable.

1.4    Term. The existence of the Company commenced on the Commencement Date, and the Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article VIII hereof.

1.5    Assumed Name Certificate. The Sole Member shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Company.

1.6    Limits of Company. The Sole Member intends that the Company shall be treated as a limited liability company in accordance with the Delaware Act for all purposes under state law; this Agreement shall not be construed to provide otherwise.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"Accounting Year" means the accounting year of the Company for accounting and tax purposes, which will be the calendar year.

"Agreement" means this Limited Liability Company Agreement, as it may be further amended, supplemented or restated from time to time in accordance with the terms of this Agreement.

"Capital Account" means the capital account maintained for the Sole Member pursuant to Section 4.2.

"Capital Contribution" means any contribution to the capital of the Company in cash or property when and as such contribution is actually made to the Company by the Sole Member.

"Certificate" means the Certificate of Formation of the Company filed with the Secretary of State of Delaware, as it may be amended or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"Commencement Date" means the date that the Certificate was filed with the Secretary of State of Delaware.

"Company" means Alta-Dena Certified Dairy, LLC, a Delaware limited liability company, established by the filing of the Certificate with the Secretary of State of Delaware.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"Dissolution Event" has the meaning set forth in Section 8.1.

"Distributable Cash" means the amount by which the aggregate amount of all cash and cash equivalents from time to time held by the Company on hand or in bank accounts or other temporary investments pending distribution, exceeds the aggregate of all amounts to be paid or set aside by the Company for: (i) when due, all principal and interest payments on indebtedness of the Company and all other sums payable to lenders; (ii) all cash expenditures to be incurred in the normal operations of the business of the Company; and (iii) such cash reserves as the Sole Member may mutually deem reasonably necessary for the proper operation of the business of the Company.

Step 82
45735831.2/10602506

"Fair Market Value" means the price in cash, or its equivalent, that an asset would bring considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"Losses" mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the Method of Accounting of the Company.

"Manager" has the meaning set forth in Section 6.2.

"Membership Interest" means the interest of the Sole Member in the Company, including, without limitation, such Member's right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; (b) to a distributive share of the assets of the Company; and (c) to participate in the management and operation of the Company as provided in this Agreement.

"Method of Accounting" means the accrued basis method of accounting unless another method of accounting is agreed upon by the Sole Member or is required to be used by the Code.

"Officers" has the meaning set forth in Section 6.5.

"Percentage Interest" means the percentage interest of the Sole Member in certain allocations of Profits, Losses, and other items of income, gain, loss, or deduction and certain distributions of cash and property.

"Person" means any individual or entity, public or private.

"Profits" means the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the Company's Method of Accounting.

"Sole Member" means Dean West II, LLC, a Delaware limited liability company.

"Treasury Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

## ARTICLE III

## PURPOSE, MEMBER AND MEMBERSHIP INTEREST

3.1 Purposes and Scope. The Company is organized to transact any and all lawful business for which limited liability companies may be organized under the Delaware Act.

3.2 Sole Member. The Sole Member of the Company is Dean West II, LLC, a Delaware limited liability company, which has, subject to the provisions of Section 4.1 hereof, the entire Membership Interest and the entire initial Capital Account balance of the Company as shown on Exhibit "A" of this Agreement.

3.3     Restrictions on the Disposition of a Membership Interest. Except as expressly set forth herein, the Sole Member will have the right to sell, transfer, encumber or assign all or any portion of its Membership Interest in the Company.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1     Contributions. The Sole Member may, in its sole and absolute discretion, make Capital Contributions in such amounts as it deems appropriate.

4.2     Maintenance of Capital Account. A Capital Account will be established and maintained for the Sole Member.

4.3     Limited Liability of Sole Member. The Sole Member will not be liable for the debts, obligations, or liabilities of the Company beyond such Sole Member's Capital Contribution to the Company. The Sole Member will not be required to make any Capital Contribution or loan to the Company.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1     Allocation of Profits and Losses. All Profits and Losses of the Company for each fiscal quarter and each Accounting Year (or portion thereof) will be allocated entirely to the Sole Member as provided in this Agreement. Any credit available for federal income tax purposes will be allocated entirely to the Sole Member in the same manner.

5.2     Interim Distributions. Interim distributions of Distributable Cash will be made not less often than each fiscal quarter, or at such other times as the Manager may approve, and will be made by the Company to the Sole Member in accordance with this Article V.

5.3     Distributions on Termination. Upon the dissolution and winding-up of the Company, its assets will be distributed in the manner prescribed in Article VIII of this Agreement.

5.4     Limitation on Distributions. Any other provision of this Agreement to the contrary notwithstanding, no interim distribution or distribution on termination to the Sole Member will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Sole Member on account of its Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company.

5.5    Distributions in Kind. The Sole Member is entitled to demand and receive a distribution from the Company in the form of cash or any other property.

## ARTICLE VI

## MANAGEMENT OF THE COMPANY

6.1    Management by Manager.

(a)    The Manager of the Company shall have full and complete discretion to manage and control the business and affairs of the Company in accordance with the terms and provisions of this Agreement.

(b)    Any action required by the Delaware Act to be taken at any management meeting, or any action that may be taken at any management meeting, may be taken without a meeting, without prior notice, and without a vote, if a written consent, setting forth the action so taken, is signed by the Sole Member or the Manager.

6.2    Appointment of Manager and Tenure. The Manager of the Company (the "Manager") will be a Person designated from time to time by the Sole Member. As of the date hereof, the Manager of the Company shall be Steven J. Kemps. The Manager will hold the office of Manager for such term and shall have the authority to exercise such powers and perform such duties as will be determined from time to time by the Sole Member. The salary or other compensation, if any, of the Manager of the Company will be fixed from time to time by the Sole Member.

6.3    Removal. The Manager may be removed as such at any time by the Sole Member, either with or without cause, in the discretion of the Sole Member. Designation of the Manager shall not of itself create contract rights.

6.4    Duties of Manager. The Manager shall have general and active management of the day-to-day business and affairs of the Company and shall be authorized and directed to implement all orders, resolutions and business plans adopted by the Sole Member that do not violate applicable laws.

6.5    Officers. The Manager may designate such officers of the Company as it deems necessary or appropriate from time to time, including a President, one or more Vice Presidents and a Secretary, and such other officers as the Manager shall deem desirable (the "Officers"). The Manager hereby delegates to each Officer the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

As of the date hereof, the Officers shall be as follows:

| Name | Title |
| --- | --- |
| Rick Beaman | President |

Step 82
45735831.2/10602506

- 5 -

| Eddie K. Tollison | Vice President and Chief Financial Officer |
| Michael L. Ahart | Vice President - Finance |
| Alan J. Bernon | Vice President |
| Stephen D. Brewer | Vice President |
| Nancy F. Duessel | Vice President and Assistant Secretary |
| Patrick K. Ford | Vice President |
| Steven J. Kemps | Vice President and Secretary |
| Michelle P. Goolsby | Vice President and Assistant Secretary |
| Ronald L. McCrummen | Vice President |
| Cory M. Olson | Vice President and Treasurer |
| Shawn Pinon | Vice President |
| Angela B. Miro | Assistant Secretary |

6.6    Indemnification.    The Company will indemnify its Sole Member, Manager, and Officers to the same extent a corporation may indemnify its directors, officers and others under applicable law.

## ARTICLE VII

## ACCOUNTING AND TAX MATTERS

7.1    Books and Records.    The Company will maintain such books and records of the operations and expenditures of the Company as the Manager and Officers shall determine.

## ARTICLE VIII

## DISSOLUTION AND LIQUIDATION

8.1    Dissolution.    The Company will be dissolved upon the earliest to occur of the following events:  (each such event is referred to as a "Dissolution Event"):

(a)    an election to dissolve the Company is approved in writing by the Sole Member; or

(b)    any other event occurs that, under the Delaware Act, would cause the Company's dissolution.

8.2    Effect of Dissolution.    Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on

Step 82
45735831.2/10602506

which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

      8.3    Winding Up Procedures. Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Sole Member; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

      8.4    Distribution of Assets Upon Dissolution. In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority:

      (a)    First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Sole Member as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves;

      (b)    Second, to its Sole Member.

      8.5    Distributions in Kind. If any assets of the Company are distributed in kind, such assets will be distributed in accordance the provisions of Section 8.4 above to the Sole Member.

      8.6    Articles of Dissolution. When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Sole Member, the Company shall cause the Certificate to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

## ARTICLE IX

## GENERAL PROVISIONS

      9.1    Captions and Headings. The captions and heading used in this Agreement are for convenience of reference only and will not be taken into account in constructing the meaning or intent of this Agreement.

      9.2    Amendment of Articles. The Certificate may be amended, supplemented or restated by written consent of the Sole Member. Upon executing the necessary consent with respect to, such amendment, supplement, or restatement of the Certificate, the Sole Member will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Delaware Act.

Step 82
45735831.2/10602506

9.3     Amendment of this Agreement. This Agreement may be amended, supplemented, or restated by the written consent of the Sole Member.

9.4     Number and Gender. Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

9.5     Binding Effect. Except as otherwise expressly provided herein, this Agreement will be binding upon and will inure to the benefit of the Sole Member and its heirs, legal representatives, executors, administrators, distributees, successors, and assigns.

9.6     Severability. If any one or more of the provisions contained in this Agreement for any reason are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement and this Agreement will be construed as if such invalid, illegal, or unenforceable provisions had never been contained in this Agreement.

9.7     Counterparts. This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Sole Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

9.8     Governing Law. This Agreement and the construction interpretation will be governed exclusively by the Delaware Act and other applicable laws of the State of Delaware.

[*The remainder of this page is intentionally left blank; signature page follows.*]

**IN WITNESS WHEREOF**, the Sole Member has executed this Limited Liability Company Agreement as of the date first set forth above.

<div align="center">

**SOLE MEMBER:**

</div>

DEAN WEST II, LLC

By: _____

Nancy F. Duessel, Vice President

Step 82
45735831.2/10602506

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ALTA-DENA CERTIFIED DAIRY, LLC**

---

## EXHIBIT "A"

## Membership Interest.

Name of Sole Member                                    Membership Interest

Dean West II, LLC,                                          100%
      a Delaware limited liability company

# Exhibit B

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN WEST II, LLC

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN WEST II, LLC

## TABLE OF CONTENTS

**Page**

ARTICLE I ........................................................................................................... 1
   1.1 Formation ................................................................................................ 1
   1.2 Name ...................................................................................................... 1
   1.3 Registered Office and Principal Office of Company ............................. 1
   1.4 Term ...................................................................................................... 1
   1.5 Assumed Name Certificate ................................................................... 1
   1.6 Limits of Company ................................................................................ 1

ARTICLE II ......................................................................................................... 1

ARTICLE III ........................................................................................................ 4
   3.1 Purposes and Scope .............................................................................. 4
   3.2 Sole Member ......................................................................................... 4
   3.3 Restrictions on the Disposition of a Membership Interest .................... 4

ARTICLE IV ........................................................................................................ 4
   4.1 Initial Capital Contributions ................................................................. 4
   4.2 Additional Contributions ...................................................................... 4
   4.3 Maintenance of Capital Account .......................................................... 4
   4.4 Limited Liability of Sole Member ........................................................ 4

ARTICLE V ......................................................................................................... 4
   5.1 Allocation of Profits and Losses ........................................................... 4
   5.2 Interim Distributions ............................................................................. 4
   5.3 Distributions on Termination ................................................................ 4
   5.4 Limitation on Distributions ................................................................... 5
   5.5 Distributions in Kind ............................................................................ 5

ARTICLE VI ........................................................................................................ 5
   6.1 Management by Manager ...................................................................... 5
   6.2 Appointment of Manager and Tenure ................................................... 5
   6.3 Removal ................................................................................................. 5
   6.4 Duties of Manager ................................................................................. 5
   6.5 Officers ................................................................................................. 5
   6.6 Indemnification ..................................................................................... 6

ARTICLE VII ..................................................................................................... 7
   7.1 Certificates Representing Units ................................................................. 7
   7.2 Registration, Registration of Transfer and Exchange ............................. 7
   7.3 Mutilated, Destroyed, Lost or Stolen Certificates ................................... 7
   7.4 Record Holder ........................................................................................... 8
   7.5 Legend ....................................................................................................... 8

ARTICLE VIII .................................................................................................... 9
   8.1 Books and Records ................................................................................... 9
   8.2 Nonentity for Federal Income Tax Purposes .......................................... 9

ARTICLE IX ...................................................................................................... 9
   9.1 Dissolution ............................................................................................... 9
   9.2 Effect of Dissolution ............................................................................... 9
   9.3 Winding Up Procedures ........................................................................... 9
   9.4 Distribution of Assets Upon Dissolution ................................................ 9
   9.5 Distributions in Kind ............................................................................. 10
   9.6 Articles of Dissolution .......................................................................... 10

ARTICLE X ...................................................................................................... 10
   10.1 Captions and Headings ........................................................................ 10
   10.2 Amendment of Certificate of Formation ............................................. 10
   10.3 Amendment of this Agreement ............................................................ 10
   10.4 Number and Gender ............................................................................. 10
   10.5 Binding Effect ...................................................................................... 10
   10.6 Severability .......................................................................................... 10
   10.7 Counterparts ......................................................................................... 11
   10.8 Governing Law ..................................................................................... 11

Exhibit A

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN WEST II, LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (as amended, the "Agreement") of Dean West II, LLC (the "Company") is made as of April 27, 2006 by Dean Dairy Holdings, LLC, a Delaware limited liability company (the "Sole Member").

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1     Formation. The Sole Member hereby agrees to form the Company as a Delaware limited liability company under and pursuant to the Delaware Act and agrees that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Sole Member and the administration and termination of the Company shall be governed by the Delaware Act.

1.2     Name. The name of the Company shall be, and the business of the Company shall be conducted under the name of, Dean West II, LLC. The Company's business may be conducted under any other name or names approved by the Manager.

1.3     Registered Office and Principal Office of Company. The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware. The Company may maintain offices at such locations as the Manager deems advisable.

1.4     Term. The Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article IX hereof.

1.5     Assumed Name Certificate. The Sole Member shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Company.

1.6     Limits of Company. The Sole Member intends that the Company shall be treated as a limited liability company in accordance with the Delaware Act for all purposes under state law and this Agreement shall not be construed to provide otherwise.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

1

purposes, which will initially be the calendar year.

"Additional Contribution" means any Capital Contribution in excess of the Sole Member's Initial Contribution made to the Company pursuant to Section 4.2 hereof.

"Agreed Contribution" means the sum of the Sole Member's Initial Contribution and any Additional Contributions that the Sole Member has made or is obligated to make to the Company.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Business Day" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States or the State of Texas shall not be regarded as a Business Day.

"Capital Account" means the capital account maintained for the Sole Member pursuant to Section 4.3.

"Capital Contribution" means any Initial Contribution or Additional Contribution to the capital of the Company in cash or property when and as such contribution is actually made to the Company by the Sole Member.

"Certificate" means a certificate issued by the Company evidencing ownership of one or more Units.

"Certificate of Amendment" means a Certificate of Amendment of the Company filed with the Secretary of State of Delaware to make certain changes to the Certificate of Formation.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of Delaware, as it may be amended or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"Company" shall have the meaning set forth in the preamble hereto.

"Delaware Act" means the Delaware Revised Limited Liability Company Act, 6 Del. C. § 18-101, et. seq., as amended from time to time.

"Dissolution Event" has the meaning set forth in Section 9.1.

"Distributable Cash" means the amount by which the aggregate amount of all cash and cash equivalents from time to time held by the Company on hand or in bank accounts or other temporary investments pending distribution, exceeds the aggregate of all amounts to be paid or set aside by the Company for: (i) when due, all principal and interest payments on indebtedness of the Company and all other sums payable to lenders; (ii) all cash expenditures to be incurred in the normal operations of the business of the Company; and (iii) such cash reserves as the Sole Member may mutually deem reasonably necessary for the proper operation of the business of the Company.

2

"Fair Market Value" means the price in cash, or its equivalent, that an asset would bring considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"Initial Contribution" means the initial Capital Contribution to the Company made by the Sole Member as set forth in Exhibit "A" hereto.

"Losses" mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the Method of Accounting of the Company.

"Manager" has the meaning set forth in Section 6.2.

"Membership Interest" means the interest of the Sole Member in the Company, including, without limitation, the right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; (b) to a distributive share of the assets of the Company; and (c) to participate in the management and operation of the Company as provided in this Agreement.

"Method of Accounting" means the accrual basis method of accounting unless another method of accounting is agreed upon by the Sole Member or is required to be used by the Code.

"Officers" has the meaning set forth in Section 6.5.

"Person" means any individual or entity, public or private.

"Profits" means the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the Company's Method of Accounting.

"Record Holder" means the Person in whose name a Unit is registered on the books of the Company as of the opening of business on a particular Business Day.

"Sole Member" shall have the meaning set forth in the preamble hereto.

"Treasury Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

"Unit" means the interest of a Member or an assignee in the Company, including, without limitation, such Member's or Assignee's right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; and (b) to distributions from the Company of the assets of the Company. No fractional Units will be issued, but, instead, any fractional Unit that would otherwise be issuable will be rounded to the nearest whole Unit. Each Unit shall be equivalent to a Membership Interest of one percent (1%).

"Unit Register" has the meaning specified in Section 7.2 hereof.

3

## ARTICLE III

## PURPOSE, SOLE MEMBER AND MEMBERSHIP INTEREST

      3.1    <u>Purposes and Scope</u>. The Company is organized to transact any and all lawful business for which limited liability companies may be organized under the Delaware Act.

      3.2    <u>Sole Member</u>. The Sole Member of the Company is Dean Dean Dairy Holdings, LLC, a Delaware limited liability company, which has, subject to the provisions of <u>Section 4.1</u> hereof, the entire Membership Interest and the entire initial Capital Account balance of the Company as shown on <u>Exhibit "A"</u> of this Agreement.

      3.3    <u>Restrictions on the Disposition of a Membership Interest</u>. Except as expressly set forth herein, the Sole Member will have the right to sell, transfer, encumber or assign all or any portion of its Membership Interest in the Company.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

      4.1    <u>Initial Capital Contributions</u>. Concurrently with the adoption of this Agreement, the Sole Member will contribute to the capital of the Company the Initial Contribution and will receive the Membership Interest set forth on <u>Exhibit "A"</u>, of this Agreement.

      4.2    <u>Additional Contributions</u>. The Sole Member may, in its sole and absolute discretion, make Additional Contributions in such amounts as it deems appropriate.

      4.3    <u>Maintenance of Capital Account</u>. A Capital Account will be established and maintained for the Sole Member.

      4.4    <u>Limited Liability of Sole Member</u>. The Sole Member will not be liable for the debts, obligations, or liabilities of the Company beyond such Sole Member's Agreed Contribution to the Company. The Sole Member will not be required to make any Capital Contribution or loan to the Company beyond the amount of such Sole Member's Agreed Contribution.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

      5.1    <u>Allocation of Profits and Losses</u>. All Profits and Losses of the Company for each fiscal quarter and each Accounting Year (or portion thereof) will be allocated entirely to the Sole Member as provided in this Agreement. Any credit available for federal income tax purposes will be allocated entirely to the Sole Member in the same manner.

      5.2    <u>Interim Distributions</u>. Interim distributions of Distributable Cash will be made not less often than each fiscal quarter, or at such other times as the Manager may approve, and will be made by the Company to the Sole Member in accordance with this <u>Article V</u>.

      5.3    <u>Distributions on Termination</u>. Upon the dissolution and winding-up of the Company,

its assets will be distributed in the manner prescribed in Article IX of this Agreement.

5.4 Limitation on Distributions. Any other provision of this Agreement to the contrary notwithstanding, no interim distribution or distribution on termination to the Sole Member will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Sole Member on account of its Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company.

5.5 Distributions in Kind. The Sole Member is entitled to demand and receive a distribution from the Company in the form of cash or any other property.

## ARTICLE VI

## MANAGEMENT OF THE COMPANY

6.1 Management by Manager.

(a) The Manager of the Company shall have full and complete discretion to manage and control the business and affairs of the Company in accordance with the terms and provisions of this Agreement.

(b) Any action required by the Delaware Act to be taken at any management meeting, or any action that may be taken at any management meeting, may be taken without a meeting, without prior notice, and without a vote, if a written consent, setting forth the action so taken, is signed by the Sole Member or the Manager.

6.2 Appointment of Manager and Tenure. The Manager of the Company (the "Manager") will be a Person designated from time to time by the Sole Member. As of the date hereof, the Manager of the Company will be Steven J. Kemps. The Manager will hold the office of Manager for such term and shall have the authority to exercise such powers and perform such duties as will be determined from time to time by the Sole Member. The salary or other compensation, if any, of the Manager of the Company will be fixed from time to time by the Sole Member.

6.3 Removal. The Manager may be removed as such at any time by the Sole Member, either with or without cause, in the discretion of the Sole Member. Designation of the Manager shall not of itself create contract rights.

6.4 Duties of Manager. The Manager shall have general and active management of the day-to-day business and affairs of the Company and shall be authorized and directed to implement all orders, resolutions and business plans adopted by the Sole Member that do not violate applicable laws.

6.5 Officers. The Manager may designate such officers of the Company as it deems necessary or appropriate from time to time, including a President, one or more Vice Presidents and a Secretary, and such other officers as the Manager shall deem desirable (the "Officers"). The Manager hereby delegates to each Officer the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

As of the date hereof, the Officers shall be as follows:

| Name | Title |
|------|-------|
| Rick Beaman | President and Chief Operating Officer |
| Eddie K. Tollison | Vice President and Chief Financial Officer |
| Michael Ahart | Vice President |
| Alan Bernon | Vice President |
| Stephen Brewer | Vice President |
| Nancy Duessel | Vice President and Assistant Secretary |
| Patrick K. Ford | Vice President |
| Michelle P. Goolsby | Vice President and Assistant |
| Steven J. Kemps | Vice President and Secretary |
| Ronald McCrummen | Vice President |
| Cory M. Olson | Vice President and Treasurer |
| Shawn Pinon | Vice President |
| Angela B. Miro | Assistant Secretary |

6.6     Indemnification.

(a)     The Company shall indemnify present and former Managers and present and former members to the same extent and on the same basis that a corporation is allowed to indemnify its present and former directors. The Company shall have the power to indemnify its officers, employees and agents to the same extent and on the same basis as a corporation is allowed to indemnify its officers, employees and agents.

(b)     The Company shall advance reasonable expenses incurred by a present or former Manager or a present or former member in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its directors. The Company shall have the power to advance reasonable expenses incurred by a present or former officer in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its present or former officers. The Company shall indemnify its officers against expenses incurred by a present or former officer in connection with any action, suit or proceeding to the same extent and on the same basis as a corporation is required to so indemnify its present and former officers.

(c)     The Company shall have the power to purchase and maintain insurance on behalf of any person who is a member, manager, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any liability to the same extent and on the same basis as a corporation would have the power to purchase and maintain such insurance on behalf of its directors, officers, employees or agents.

# ARTICLE VII

## UNIT CERTIFICATES

7.1     <u>Certificates Representing Units</u>. Upon the Company's issuance of Units to any Person, the Company shall issue one or more Certificates in the name of such Person evidencing the number of Units being so issued. Certificates shall be executed on behalf of the Company by the Manager.

7.2     <u>Registration, Registration of Transfer and Exchange</u>.

(a)     The Manager shall cause to be kept on behalf of the Company a register (the "<u>Unit Register</u>") in which, subject to such reasonable regulations as it may prescribe and subject to the provisions of <u>Section 7.2(b)</u>, the Manager will provide for the registration and the transfer of the Units. The Company shall not recognize transfers of Certificates representing Units unless the same are effected in the manner described in this <u>Section 7.2</u>, and provided the transfer is in accordance with the provisions of <u>Article VII</u>. Upon surrender for registration of transfer of any Units evidenced by a Certificate, and subject to the provisions of <u>Section 7.2(b)</u>, the Manager on behalf of the Company will execute and deliver, in the name of:

(i)     the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are to be so transferred; and

(ii)     the designated transferor, if pursuant to such transfer the transferor has not thereby transferred all of its Units held by it that are evidenced by such Certificate, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are not to be so transferred.

(b)     The Company shall not recognize any transfer of Units until the Certificates evidencing such Units are surrendered for registration of transfer duly executed by the transferor (or the transferor's attorney-in-fact duly authorized in writing). No charge shall be imposed by the Company for such transfer, <u>provided</u>, that, as a condition to the issuance of any new Certificate under this <u>Section 7.2</u>, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed with respect thereto.

7.3     <u>Mutilated, Destroyed, Lost or Stolen Certificates</u>.

(a)     If any mutilated Certificate is surrendered to the Manager, the Manager on behalf of the Company shall execute and deliver in exchange therefor, a new Certificate evidencing the same number of Units as the Certificate so surrendered.

(b)     The Manager on behalf of the Company shall execute and deliver a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate:

(i) makes proof by affidavit, in form and substance satisfactory to the Manager, that a previously issued Certificate has been lost, destroyed or stolen;

(ii) requests the issuance of a new Certificate before the Company has received notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(iii) if requested by the Manager, delivers to the Company such security and indemnity as may be required by the Manager, in form and substance satisfactory to the Manager, with surety or sureties and with fixed or open penalty as the Manager may direct, in its sole discretion, to indemnify the Company and the Manager against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and

(iv) satisfies any other reasonable requirement imposed by the Manager.

If the Sole Member or an assignee fails to notify the Company within a reasonable time after it has notice of the loss, destruction or theft of a Certificate, and a transfer of the Units represented by the Certificate is registered before the Company or the Manager receives such notification, the Sole Member shall be precluded from making any claim against the Company or the Manager for such transfer or for a new Certificate.

(c) As a condition to the issuance of any Certificate under this <u>Section 7.3</u>, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

7.4 <u>Record Holder</u>. In accordance with <u>Section 7.2(b)</u>, the Company shall be entitled to recognize the Record Holder as the Sole Member with respect to the Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by applicable law. Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring or holding Units, as between the Company on the one hand and such other Persons on the other hand, such representative Person:

(a) shall be the Sole Member of record and beneficially; and

(b) shall be bound by this Agreement and shall have the rights and obligations of a Member or an assignee (as the case may be) hereunder and as provided for herein.

7.5 <u>Legend</u>. The Certificates evidencing the number of Units shall be legended as follows:

THE INTERESTS IN THE COMPANY (THE "UNITS") EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT

COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAW OR APPLICABLE EXEMPTIONS THEREFROM.

## ARTICLE VIII

## ACCOUNTING AND TAX MATTERS

8.1     <u>Books and Records</u>. The Company will maintain such books and records of the operations and expenditures of the Company as the Manager and Officers shall determine.

8.2     <u>Nonentity for Federal Income Tax Purposes</u>. The Company shall not make elections or file returns for federal income tax purposes. The Company shall conduct its affairs so as to be disregarded for federal income tax purposes as an entity separate from its Sole Member pursuant to Treasury Regulation § 301.7701-3(b)(1)(ii).

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

9.1     <u>Dissolution</u>. The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a "<u>Dissolution Event</u>"):

(a)     the expiration of its term as provided in <u>Section 1.4</u>;

(b)     an election to dissolve the Company is approved in writing by the Sole Member; or

(c)     any other event occurs that, under the Delaware Act, would cause the Company's dissolution.

9.2     <u>Effect of Dissolution</u>. Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

9.3     <u>Winding Up Procedures</u>. Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Sole Member; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

9.4     <u>Distribution of Assets Upon Dissolution</u>. In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority:

9

(a)     First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Sole Member as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves;

(b)     Second, to its Sole Member.

9.5     <u>Distributions in Kind</u>. If any assets of the Company are distributed in kind, such assets will be distributed in accordance the provisions of <u>Section 9.4</u> above to the Sole Member.

9.6     <u>Articles of Dissolution</u>. When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Sole Member, the Company shall cause the Certificate of Formation to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

## ARTICLE X

## GENERAL PROVISIONS

10.1     <u>Captions and Headings</u>. The captions and headings used in this Agreement are for convenience of reference only and will not be taken into account in construing the meaning or intent of this Agreement.

10.2     <u>Amendment of Certificate of Formation</u>. The Certificate of Formation may be amended, supplemented or restated by written consent of the Sole Member. Upon executing the necessary consent with respect to such amendment, supplement, or restatement of the Certificate of Formation, the Sole Member will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Delaware Act.

10.3     <u>Amendment of this Agreement</u>. This Agreement may be amended, supplemented, or restated by the written consent of the Sole Member.

10.4     <u>Number and Gender</u>. Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

10.5     <u>Binding Effect</u>. Except as otherwise expressly provided herein, this Agreement will be binding upon and will inure to the benefit of the Sole Member and its heirs, legal representatives, executors, administrators, distributees, successors, and assigns.

10.6     <u>Severability</u>. If any one or more of the provisions contained in this Agreement for any reason are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement and this Agreement will be construed as if such invalid, illegal, or unenforceable provisions had never been contained in this Agreement.

10.7     Counterparts. This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Sole Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

10.8     Governing Law. This Agreement and the construction interpretation will be governed exclusively by the Delaware Act and other applicable laws of the State of Delaware.

**IN WITNESS WHEREOF,** the Sole Member has executed this Limited Liability Company Agreement as of the date first set forth above.

DEAN DAIRY HOLDINGS, LLC

By: _____

Name: _Steven J. Kumps_

Title: _Vice President and Secretary_

# AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## DEAN WEST II, LLC

---

## EXHIBIT "A"

### Initial Capital Contributions and Membership Interest.

| Name of Sole Member | Initial Capital Contribution | Membership Interest | Number of Units |
|---|---|---|---|
| Dean Dairy Holdings, LLC | 100% (unless a lesser percentage is (indicated) of stock or membership interests in each of: | 100% | 100 |

1. Berkeley Farms, Inc.
2. Dean Foods Company of California, Inc.
3. Alta-Dena Certified Dairy, Inc.
4. Bell Dairy Products, Inc.
5. Creamland Dairies, Inc. - 48.9864%, 49,296 shares out of 100,632 outstanding
6. Gandy's Dairies, Inc.
7. Dean SoCal, LLC
8. International Milk Sales, Inc.

# Exhibit C

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN DAIRY HOLDINGS, LLC

009346.00109:632882.02

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN DAIRY HOLDINGS, LLC

### TABLE OF CONTENTS

                                                                    **Page**

ARTICLE I ....................................................................................................1
    1.1 Formation .........................................................................................1
    1.2 Name ...............................................................................................1
    1.3 Registered Office and Principal Office of Company .........................1
    1.4 Term ...............................................................................................1
    1.5 Assumed Name Certificate ..............................................................1
    1.6 Limits of Company ..........................................................................1

ARTICLE II ..................................................................................................2

ARTICLE III .................................................................................................4
    3.1 Purposes and Scope .......................................................................4
    3.2 Sole Member ...................................................................................4
    3.3 Restrictions on the Disposition of a Membership Interest ................4

ARTICLE IV ................................................................................................4
    4.1 Initial Capital Contributions ...........................................................4
    4.2 Additional Contributions ................................................................4
    4.3 Maintenance of Capital Account .....................................................4
    4.4 Limited Liability of Sole Member .....................................................4

ARTICLE V ..................................................................................................5
    5.1 Allocation of Profits and Losses ......................................................5
    5.2 Interim Distributions .......................................................................5
    5.3 Distributions on Termination ...........................................................5
    5.4 Limitation on Distributions .............................................................5
    5.5 Distributions in Kind .......................................................................5

ARTICLE VI .................................................................................................5
    6.1 Management by Manager .................................................................5
    6.2 Appointment of Manager and Tenure ...............................................5
    6.3 Removal ..........................................................................................6
    6.4 Duties of Manager ...........................................................................6
    6.5 Officers ...........................................................................................6
    6.6 Indemnification ...............................................................................6

i

ARTICLE VII .................................................................................................................7
  7.1 Certificates Representing Units .............................................................................7
  7.2 Registration, Registration of Transfer and Exchange ..........................................7
  7.3 Mutilated, Destroyed, Lost or Stolen Certificates ...............................................8
  7.4 Record Holder ........................................................................................................9
  7.5 Legend ....................................................................................................................9

ARTICLE VIII ..............................................................................................................9
  8.1 Books and Records .................................................................................................9
  8.2 Nonentity for Federal Income Tax Purposes ........................................................9

ARTICLE IX ................................................................................................................10
  9.1 Dissolution ...........................................................................................................10
  9.2 Effect of Dissolution ............................................................................................10
  9.3 Winding Up Procedures .......................................................................................10
  9.4 Distribution of Assets Upon Dissolution ............................................................10
  9.5 Distributions in Kind ...........................................................................................10
  9.6 Articles of Dissolution .........................................................................................10

ARTICLE X ..................................................................................................................11
  10.1 Captions and Headings .......................................................................................11
  10.2 Amendment of Certificate of Formation ...........................................................11
  10.3 Amendment of this Agreement ..........................................................................11
  10.4 Number and Gender ............................................................................................11
  10.5 Binding Effect ....................................................................................................11
  10.6 Severability .........................................................................................................11
  10.7 Counterparts .......................................................................................................11
  10.8 Governing Law ...................................................................................................11

Exhibit A

009346.00109:632882.02

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN DAIRY HOLDINGS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (as amended, the "Agreement") of Dean Dairy Holdings, LLC (the "Company") is made as of December 21, 2001 by Dean Holding Company, a Delaware corporation (the "Sole Member").

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1     Formation.  The Sole Member hereby agrees to form the Company as a Delaware limited liability company under and pursuant to the Delaware Act and agrees that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Sole Member and the administration and termination of the Company shall be governed by the Delaware Act.

1.2     Name.  The name of the Company shall be, and the business of the Company shall be conducted under the name of, Dean Dairy Holdings, LLC.  The Company's business may be conducted under any other name or names approved by the Manager.

1.3     Registered Office and Principal Office of Company.  The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.  The Company may maintain offices at such locations as the Manager deems advisable.

1.4     Term.  The Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article IX hereof.

1.5     Assumed Name Certificate.  The Sole Member shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Company.

1.6     Limits of Company.  The Sole Member intends that the Company shall be treated as a limited liability company in accordance with the Delaware Act for all purposes under state law and this Agreement shall not be construed to provide otherwise.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

1

"<u>Accounting Year</u>" means the accounting year of the Company for accounting and tax purposes, which will initially be the calendar year.

"<u>Additional Contribution</u>" means any Capital Contribution in excess of the Sole Member's Initial Contribution made to the Company pursuant to <u>Section 4.2</u> hereof.

"<u>Agreed Contribution</u>" means the sum of the Sole Member's Initial Contribution and any Additional Contributions that the Sole Member has made or is obligated to make to the Company.

"<u>Agreement</u>" shall have the meaning set forth in the preamble hereto.

"<u>Business Day</u>" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States or the State of Texas shall not be regarded as a Business Day.

"<u>Capital Account</u>" means the capital account maintained for the Sole Member pursuant to <u>Section 4.3</u>.

"<u>Capital Contribution</u>" means any Initial Contribution or Additional Contribution to the capital of the Company in cash or property when and as such contribution is actually made to the Company by the Sole Member.

"<u>Certificate</u>" means a certificate issued by the Company evidencing ownership of one or more Units.

"<u>Certificate of Amendment</u>" means a Certificate of Amendment of the Company filed with the Secretary of State of Delaware to make certain changes to the Certificate of Formation.

"<u>Certificate of Formation</u>'' means the Certificate of Formation of the Company filed with the Secretary of State of Delaware, as it may be amended or restated from time to time.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"<u>Company</u>" shall have the meaning set forth in the preamble hereto.

"<u>Delaware Act</u>" means the Delaware Revised Limited Liability Company Act, 6 Del. C. §18-101, et. seq., as amended from time to time.

"<u>Dissolution Event</u>" has the meaning set forth in <u>Section 9.1</u>.

"<u>Distributable Cash</u>" means the amount by which the aggregate amount of all cash and cash equivalents from time to time held by the Company on hand or in bank accounts or other

2

temporary investments pending distribution, exceeds the aggregate of all amounts to be paid or set aside by the Company for: (i) when due, all principal and interest payments on indebtedness of the Company and all other sums payable to lenders; (ii) all cash expenditures to be incurred in the normal operations of the business of the Company; and (iii) such cash reserves as the Sole Member may mutually deem reasonably necessary for the proper operation of the business of the Company.

"Fair Market Value" means the price in cash, or its equivalent, that an asset would bring considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"Initial Contribution" means the initial Capital Contribution to the Company made by the Sole Member as set forth in Exhibit "A" hereto.

"Losses" mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the Method of Accounting of the Company.

"Manager" has the meaning set forth in Section 6.2.

"Membership Interest" means the interest of the Sole Member in the Company, including, without limitation, the right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; (b) to a distributive share of the assets of the Company; and (c) to participate in the management and operation of the Company as provided in this Agreement.

"Method of Accounting" means the accrual basis method of accounting unless another method of accounting is agreed upon by the Sole Member or is required to be used by the Code.

"Officers" has the meaning set forth in Section 6.5.

"Person" means any individual or entity, public or private.

"Profits" means the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the Company's Method of Accounting.

"Record Holder" means the Person in whose name a Unit is registered on the books of the Company as of the opening of business on a particular Business Day.

"Sole Member" shall have the meaning set forth in the preamble hereto.

"Treasury Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

"Unit" means the interest of a Member or an assignee in the Company, including, without limitation, such Member's or assignee's right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Company; and (b) to distributions from the Company of the assets of the Company. No fractional Units will be issued, but, instead, any fractional Unit that would otherwise be issuable will be rounded to the nearest whole Unit. Each Unit shall be equivalent to a Membership Interest of one percent (1%).

"Unit Register" has the meaning specified in Section 7.2 hereof.

## ARTICLE III

## PURPOSE, SOLE MEMBER AND MEMBERSHIP INTEREST

3.1     Purposes and Scope. The Company is organized to transact any and all lawful business for which limited liability companies may be organized under the Delaware Act.

3.2     Sole Member. The Sole Member of the Company is Dean Holding Company, a Delaware corporation, which has, subject to the provisions of Section 4.1 hereof, the entire Membership Interest and the entire initial Capital Account balance of the Company as shown on Exhibit "A" of this Agreement.

3.3     Restrictions on the Disposition of a Membership Interest. Except as expressly set forth herein, the Sole Member will have the right to sell, transfer, encumber or assign all or any portion of its Membership Interest in the Company.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1     Initial Capital Contributions. Concurrently with the adoption of this Agreement, the Sole Member will contribute to the capital of the Company the Initial Contribution and will receive the Membership Interest set forth on Exhibit "A" of this Agreement.

4.2     Additional Contributions. The Sole Member may, in its sole and absolute discretion, make Additional Contributions in such amounts as it deems appropriate.

4.3     Maintenance of Capital Account. A Capital Account will be established and maintained for the Sole Member.

4.4     Limited Liability of Sole Member. The Sole Member will not be liable for the debts, obligations, or liabilities of the Company beyond such Sole Member's Agreed Contribution to the Company. The Sole Member will not be required to make any Capital Contribution or loan to the Company beyond the amount of such Sole Member's Agreed Contribution.

4

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1     <u>Allocation of Profits and Losses</u>.  All Profits and Losses of the Company for each fiscal quarter and each Accounting Year (or portion thereof) will be allocated entirely to the Sole Member as provided in this Agreement.  Any credit available for federal income tax purposes will be allocated entirely to the Sole Member in the same manner.

5.2     <u>Interim Distributions</u>.  Interim distributions of Distributable Cash will be made not less often than each fiscal quarter, or at such other times as the Manager may approve, and will be made by the Company to the Sole Member in accordance with this <u>Article V</u>.

5.3     <u>Distributions on Termination</u>.  Upon the dissolution and winding-up of the Company, its assets will be distributed in the manner prescribed in <u>Article IX</u> of this Agreement.

5.4     <u>Limitation on Distributions</u>.  Any other provision of this Agreement to the contrary notwithstanding, no interim distribution or distribution on termination to the Sole Member will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Sole Member on account of its Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company.

5.5     <u>Distributions in Kind</u>.  The Sole Member is entitled to demand and receive a distribution from the Company in the form of cash or any other property.

## ARTICLE VI

## MANAGEMENT OF THE COMPANY

6.1     <u>Management by Manager</u>.

(a)     The Manager of the Company shall have full and complete discretion to manage and control the business and affairs of the Company in accordance with the terms and provisions of this Agreement.

(b)     Any action required by the Delaware Act to be taken at any management meeting, or any action that may be taken at any management meeting, may be taken without a meeting, without prior notice, and without a vote, if a written consent, setting forth the action so taken, is signed by the Sole Member or the Manager.

6.2     <u>Appointment of Manager and Tenure</u>.  The Manager of the Company (the "<u>Manager</u>") will be a Person designated from time to time by the Sole Member.  As of the date hereof, the Manager of the Company will be Michelle P. Goolsby.  The Manager will hold the office of Manager for such term and shall have the authority to exercise such powers and perform such duties as will be determined from time to time by the Sole Member.  The salary or

5

other compensation, if any, of the Manager of the Company will be fixed from time to time by the Sole Member.

  6.3 <u>Removal</u>. The Manager may be removed as such at any time by the Sole Member, either with or without cause, in the discretion of the Sole Member. Designation of the Manager shall not of itself create contract rights.

  6.4 <u>Duties of Manager</u>. The Manager shall have general and active management of the day-to-day business and affairs of the Company and shall be authorized and directed to implement all orders, resolutions and business plans adopted by the Sole Member that do not violate applicable laws.

  6.5 <u>Officers</u>. The Manager may designate such officers of the Company as it deems necessary or appropriate from time to time, including a President, one or more Vice Presidents and a Secretary, and such other officers as the Manager shall deem desirable (the "<u>Officers</u>"). The Manager hereby delegates to each Officer the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

  As of the date hereof, the Officers shall be as follows:

| **Name** | **Title** |
| --- | --- |
| Pete Schenkel | President |
| Patrick K. Ford | Senior Vice President & Chief Financial Officer |
| Martin Devine | Senior Vice President, Industry Relations |
| Dan Killingsworth | Senior Vice President |
| Michelle P. Goolsby | Vice President, Secretary, Sole Director |
| Cory M. Olson | Vice President |
| John Robinson | Senior Vice President, Sales |
| John Bivens | Vice President, Purchasing |
| Barry A. Fromberg | Vice President |
| John W. Madden | Vice President |
| Ronald H. Klein | Vice President |
| Bridget G. Johnson | Vice President |
| Lisa N. Tyson | Vice President & Assistant Secretary |
| Angela B. Miro | Assistant Secretary |
| Willis R. Kemp | Vice President |
| Greg Cooper | Vice President, Sales |
| Kelly Kading | Senior Vice President |
| Robert D. Dunn | Vice President |

009346.00109:632882.02

6.6     Indemnification.

(a)     The Company shall indemnify present and former Managers and present and former members to the same extent and on the same basis that a corporation is allowed to indemnify its present and former directors. The Company shall have the power to indemnify its officers, employees and agents to the same extent and on the same basis as a corporation is allowed to indemnify its officers, employees and agents.

(b)     The Company shall advance reasonable expenses incurred by a present or former Manager or a present or former member in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its directors. The Company shall have the power to advance reasonable expenses incurred by a present or former officer in connection with any civil, criminal, administrative or investigative action, suit or proceeding to the same extent and on the same basis as a corporation is allowed to advance such expenses to its present or former officers. The Company shall indemnify its officers against expenses incurred by a present or former officer in connection with any action, suit or proceeding to the same extent and on the same basis as a corporation is required to so indemnify its present and former officers.

(c)     The Company shall have the power to purchase and maintain insurance on behalf of any person who is a member, manager, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any liability to the same extent and on the same basis as a corporation would have the power to purchase and maintain such insurance on behalf of its directors, officers, employees or agents.

## ARTICLE VII

## UNIT CERTIFICATES

7.1     Certificates Representing Units. Upon the Company's issuance of Units to any Person, the Company shall issue one or more Certificates in the name of such Person evidencing the number of Units being so issued. Certificates shall be executed on behalf of the Company by the Manager.

7.2     Registration, Registration of Transfer and Exchange.

(a)     The Manager shall cause to be kept on behalf of the Company a register (the "Unit Register") in which, subject to such reasonable regulations as it may prescribe and subject to the provisions of Section 7.2(b), the Manager will provide for the registration and the transfer of the Units. The Company shall not recognize transfers of Certificates representing Units unless the same are effected in the manner described in this Section 7.2, and provided the transfer is in accordance with the provisions of Article VII. Upon surrender for registration of transfer of any Units evidenced by a Certificate,

7

and subject to the provisions of <u>Section 7.2(b)</u>, the Manager on behalf of the Company will execute and deliver, in the name of:

        (i)      the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are to be so transferred; and

        (ii)      the designated transferor, if pursuant to such transfer the transferor has not thereby transferred all of its Units held by it that are evidenced by such Certificate, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are not to be so transferred.

    (b)    The Company shall not recognize any transfer of Units until the Certificates evidencing such Units are surrendered for registration of transfer duly executed by the transferor (or the transferor's attorney-in-fact duly authorized in writing). No charge shall be imposed by the Company for such transfer, <u>provided</u>, that, as a condition to the issuance of any new Certificate under this <u>Section 7.2</u>, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed with respect thereto.

7.3    <u>Mutilated, Destroyed, Lost or Stolen Certificates</u>.

    (a)    If any mutilated Certificate is surrendered to the Manager, the Manager on behalf of the Company shall execute and deliver in exchange therefor, a new Certificate evidencing the same number of Units as the Certificate so surrendered.

    (b)    The Manager on behalf of the Company shall execute and deliver a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate:

        (i)      makes proof by affidavit, in form and substance satisfactory to the Manager, that a previously issued Certificate has been lost, destroyed or stolen;

        (ii)      requests the issuance of a new Certificate before the Company has received notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

        (iii)     if requested by the Manager, delivers to the Company such security and indemnity as may be required by the Manager, in form and substance satisfactory to the Manager, with surety or sureties and with fixed or open penalty as the Manager may direct, in its sole discretion, to indemnify the Company and the Manager against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and

8

(iv)     satisfies any other reasonable requirement imposed by the Manager.

If the Sole Member or an assignee fails to notify the Company within a reasonable time after it has notice of the loss, destruction or theft of a Certificate, and a transfer of the Units represented by the Certificate is registered before the Company or the Manager receives such notification, the Sole Member shall be precluded from making any claim against the Company or the Manager for such transfer or for a new Certificate.

(c)     As a condition to the issuance of any Certificate under this <u>Section 7.3</u>, the Manager may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

7.4     <u>Record Holder</u>.  In accordance with <u>Section 7.2(b)</u>, the Company shall be entitled to recognize the Record Holder as the Sole Member with respect to the Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by applicable law.  Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring or holding Units, as between the Company on the one hand and such other Persons on the other hand, such representative Person:

(a)     shall be the Sole Member of record and beneficially; and

(b)     shall be bound by this Agreement and shall have the rights and obligations of a Member or an assignee (as the case may be) hereunder and as provided for herein.

7.5     <u>Legend</u>.  The Certificates evidencing the number of Units shall be legended as follows:

THE INTERESTS IN THE COMPANY (THE "UNITS") EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAW OR APPLICABLE EXEMPTIONS THEREFROM.

**ARTICLE VIII**

**ACCOUNTING AND TAX MATTERS**

8.1     <u>Books and Records</u>.  The Company will maintain such books and records of the operations and expenditures of the Company as the Manager and Officers shall determine.

9

8.2     Nonentity for Federal Income Tax Purposes.   The Company shall not make elections or file returns for federal income tax purposes.  The Company shall conduct its affairs so as to be disregarded for federal income tax purposes as an entity separate from its Sole Member pursuant to Treasury Regulation § 301.7701-3(b)(1)(ii).

<div align="center">

**ARTICLE IX**

**DISSOLUTION AND LIQUIDATION**

</div>

9.1     Dissolution.   The Company will be dissolved upon the earliest to occur of the following events  (each such event is referred to as a "Dissolution Event"):

(a)     the expiration of its term as provided in Section 1.4;

(b)     an election to dissolve the Company is approved in writing by the Sole Member; or

(c)     any other event occurs that, under the Delaware Act, would cause the Company's dissolution.

9.2     Effect of Dissolution.   Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

9.3     Winding Up Procedures.   Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Sole Member; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

9.4     Distribution of Assets Upon Dissolution.   In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority:

(a)     First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Sole Member as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves;

(b)     Second, to its Sole Member.

<div align="center">

10

</div>

9.5     Distributions in Kind.  If any assets of the Company are distributed in kind, such assets will be distributed in accordance the provisions of Section 9.4 above to the Sole Member.

9.6     Articles of Dissolution.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Sole Member, the Company shall cause the Certificate of Formation to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

# ARTICLE X

## GENERAL PROVISIONS

10.1     Captions and Headings.  The captions and headings used in this Agreement are for convenience of reference only and will not be taken into account in construing the meaning or intent of this Agreement.

10.2     Amendment of Certificate of Formation.  The Certificate of Formation may be amended, supplemented or restated by written consent of the Sole Member.  Upon executing the necessary consent with respect to such amendment, supplement, or restatement of the Certificate of Formation, the Sole Member will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Delaware Act.

10.3     Amendment of this Agreement.  This Agreement may be amended, supplemented, or restated by the written consent of the Sole Member.

10.4     Number and Gender.  Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

10.5     Binding Effect.  Except as otherwise expressly provided herein, this Agreement will be binding upon and will inure to the benefit of the Sole Member and its heirs, legal representatives, executors, administrators, distributees, successors, and assigns.

10.6     Severability.  If any one or more of the provisions contained in this Agreement for any reason are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement and this Agreement will be construed as if such invalid, illegal, or unenforceable provisions had never been contained in this Agreement.

10.7     Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Sole Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

11

10.8    <u>Governing Law</u>.    This Agreement and the construction interpretation will be governed exclusively by the Delaware Act and other applicable laws of the State of Delaware.

12

IN WITNESS WHEREOF, the Sole Member has executed this Limited Liability Company Agreement as of the date first set forth above.

DEAN HOLDING COMPANY

By: _Michelle P Goolsby_

Name: _Michelle P. Goolsby_

Title: _Executive Vice President_

13

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DEAN DAIRY HOLDINGS, LLC

---

## EXHIBIT "A"

## Initial Capital Contributions and Membership Interest.

| Name of Sole Member | Initial Capital Contribution | Membership Interest | Number of Units |
|---|---|---|---|
| Dean Holding Company | 100% (unless a lesser percent is indicated) of the stock or membership interests in each of: | 100% | 100 |

1. Dean Transportation, Inc.
2. Barber Dairies, Inc.
3. T.G. Lee Foods, Inc.
4. McArthur Dairy, Inc.
5. Mayfield Dairy Farms, Inc.
6. Purity Dairies, Incorporated
7. 31 Logistics, Inc.
8. Dean Foods Company of Indiana, Inc.
9. Liberty Dairy Company
10. Verifine Dairy Products Corporation of Sheboygan, Inc.
11. Dean Milk Company, Inc.
12. Dean Foods North Central, Inc.
13. Dean Dairy Products Company
14. Meadow Brook Dairy Company
15. Reiter Dairy, Inc.
16. Wengert's Dairy
17. Bell Dairy Products, Inc.
18. Creamland Dairies, Inc. – 48.9864%, 49,296 shares out of 100,632 outstanding
19. Gandy's Dairies, Inc.
20. Dean SoCal, LLC
21. International Milk Sales, Inc.
22. Berkeley Farms, Inc.
23. Dean Foods Company of California, Inc.
24. Alta-Dena Certified Dairy, Inc.
25. Dean Foods Ice Cream Company
26. The Meadows Distibuting Company
27. Dean Milk Procurement Company
28. Ice Cream Products LLC
29. Ryan Foods North Central, Inc.

A-1

# Exhibit D

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"SWISS II, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "ALTA-DENA CERTIFIED DAIRY, LLC" UNDER THE
NAME OF "ALTA-DENA CERTIFIED DAIRY, LLC", A LIMITED LIABILITY
COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF
DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-NINTH
DAY OF DECEMBER, A.D. 2010, AT 4:47 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTY-FIRST DAY OF
DECEMBER, A.D. 2010, AT 11:59 O'CLOCK P.M.

2964500    8100M

101245578

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State
AUTHENTICATION: 8459945

DATE: 12-29-10

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:46 PM 12/29/2010
FILED 04:47 PM 12/29/2010
SRV 101245578 - 2964500 FILE

## STATE OF DELAWARE

## CERTIFICATE OF MERGER OF

## SWISS II, LLC

## INTO

## ALTA-DENA CERTIFIED DAIRY, LLC

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act, the undersigned limited liability company executed the following Certificate of Merger:

**FIRST:** The name of the surviving limited liability company is Alta-Dena Certified Dairy, LLC, a Delaware limited liability company.

**SECOND:** The name of the limited liability company being merged into this surviving limited liability company is Swiss II, LLC, a Delaware limited liability company.

**THIRD:** The merger is to become effective as of December 31, 2010, at 11:59 p.m. Eastern Daylight Time.

**FOURTH:** The Agreement and Plan of Merger is on file at 2711 North Haskell Avenue, Suite 3400, Dallas, Texas 75204, the place of business of the surviving limited liability company.

**FIFTH:** A copy of the Agreement and Plan of Merger will be furnished by the surviving limited liability company on request, without cost, to any member of either of the surviving limited liability company or the merging limited liability company.

**SIXTH:** The Agreement of Merger is approved and executed by each of the domestic Limited Liability Companies.

IN WITNESS WHEREOF, said surviving limited liability company has caused this certificate to be signed by an authorized person, the 28th day of December 2010.

ALTA-DENA CERTIFIED DAIRY, LLC

By: _____

Rachel A. Gonzalez
Vice President, Secretary and Sole Manager

I:\ADM\Administrative\Consol\2010-LLR\Cert of Merger-Swiss ir to Alta-Dena.doc

# Exhibit E



# Delaware

*PAGE 1*

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"DEAN FOODS OF SOUTHERN CALIFORNIA, LLC", A DELAWARE LIMITED
LIABILITY COMPANY,

WITH AND INTO "ALTA-DENA CERTIFIED DAIRY, LLC" UNDER THE
NAME OF "ALTA-DENA CERTIFIED DAIRY, LLC", A LIMITED LIABILITY
COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF
DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE THIRTY-FIRST
DAY OF DECEMBER, A.D. 2012, AT 8:48 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF MERGER IS THE FIRST DAY OF JANUARY,
A.D. 2013.

2964500  8100M

121406054

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0110659

DATE: 01-02-13

You may verify this certificate online
at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:40 AM 12/31/2012
FILED 08:48 AM 12/31/2012
SRV 121406054 - 2964500 FILE

### CERTIFICATE OF MERGER

### MERGING

### DEAN FOODS OF SOUTHERN CALIFORNIA, LLC
**a Delaware limited liability company**

### INTO

### ALTA-DENA CERTIFIED DAIRY, LLC
**a Delaware limited liability company**

\* \* \* \* \* \* \*

Pursuant to Title 6, Section 18-209 of the Delaware Limited Liability Company Act, the undersigned limited liability company executed the following Certificate of Merger:

**FIRST:** The names of the merging limited liability companies are **Alta-Dena Certified Dairy, LLC**, a Delaware limited liability company formed on November 9, 1998, and **Dean Foods of Southern California, LLC**, a Delaware limited liability company organized on March 27, 2009.

**SECOND:** The Agreement of Merger has been approved, adopted, certified, executed and acknowledged by the surviving limited liability company and the merging limited liability company in accordance with Section 18-209 of the Delaware Limited Liability Company Act.

**THIRD:** The name of the surviving limited liability company is **Alta-Dena Certified Dairy, LLC**.

**FOURTH:** The Agreement of Merger is on file at 2711 North Haskell Avenue, Suite 3400, Dallas, Texas 75204, the place of business of the surviving limited liability company.

**FIFTH:** The surviving limited liability company on request, without cost, will furnish a copy of the Agreement of Merger to any member of any constituent limited liability company.

**IN WITNESS WHEREOF** said limited liability company has caused this Certificate to be signed, this 19th day of December, 2012, to be effective as of the 1st day of January, 2013.

### ALTA-DENA CERTIFIED DAIRY, LLC

By _Rachel Gonzalez_

Rachel A. Gonzalez
Senior Vice President and Secretary

I:\ADM (Administrative)\Connell#2012 LER;5 - Cert of Merger-DFSC into Alta-Dena.docx

# Exhibit F

**CONVENTIONAL DAIRY PLANT / DRIVER AGREEMENT
HEARTLAND FARMS, CITY OF INDUSTRY PLANT**

**MARCH 1, 2007 - FEBRUARY 29, 2012**

**THIS AGREEMENT**, made and entered into this 1st day of March, 2007 by and between the "Employer" and Teamsters Local Unions No. 63, 166, 542, 630 and 683, Affiliated with the International Brotherhood of Teamsters hereinafter referred to as "Union".

**WITNESSETH:**

That, whereas the parties to this Agreement are desirous of promoting and maintaining harmonious relations between Employer, the Union and its membership, it is mutually agreed as follows:

## ARTICLE 1 - EMPLOYEES COVERED BY THIS AGREEMENT

1.1 This Agreement shall apply only to employees of Employer eligible for membership in the Union, located at plants or branches situated in the Counties of Los Angeles, San Diego, Riverside, Orange, San Bernardino, Imperial, Santa Barbara, Ventura, and any other territory mutually agreed upon by the parties hereto.

1.2 The Employer acknowledges the Union as the sole bargaining agent for the employees classified herein.

1.3 Whenever the masculine gender is used in this agreement, it shall be deemed to include the feminine gender as well and vice versa.

1.4 This Agreement shall apply to all such employees of the Employer doing work covered by this Agreement. It is understood that when an abnormal situation occurs and the full complement of bargaining unit employees of Employer proves inadequate to assure the uninterrupted conduct of the work, then in that event exempt supervisory employees may be assigned work covered by this Agreement.

In keeping with the principle involved, the Employer must first make provision to handle, with bargaining unit employees; the contingencies, which experience shows, may reasonably be expected to occur. When an abnormal situation beyond this occurs and all Employer's bargaining unit employees are busy, Employer shall make a further effort to conform to the underlying principle by giving a bargaining unit employee on the same string where the vacancy occurs, an opportunity to work on his day of rest.  It is understood that this is practical only when the Employer knows a day ahead that such a vacancy will occur or continue.

When the Employer has followed the foregoing procedure he may then use exempt employees to do work covered by this Agreement.

## ARTICLE 2 - UNION MEMBERSHIP

2.1    It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of shall remain members in good standing, and those who are not members on the effective date of this Agreement shall, on the thirtieth (30th) day following the effective date of this Agreement, become and thereafter remain members in good standing of the Union.  It shall also be a condition of employment that all employees covered by this Agreement, and hired on or after its effective date shall, on the thirtieth (30th) day following the beginning of such employment, become and thereafter remain members in good standing of the Union.

2.2    The Employer shall discharge any employee who fails to complete or maintain membership in good standing in the Union within seventy-two (72) hours of written notice from the Union that such employee is delinquent in the payment of initiation fees and/or dues uniformly required as a condition of union membership.

2.3     At the option of the Local Union, the Employer shall deduct monthly Union Dues from the wages of each employee who has filed with the Employer a written

assignment of such monies to the Local Union having jurisdiction in the area in which the individual is employed.

2.4     The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE.  DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked.  The phrase "weeks worked" excludes any week other than a week in which the employee earned a wage. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check, the total amount deducted with the name of each employee on whose behalf a deduction is made, the employee's social security number and the amount deducted from the employee's paycheck.

2.5     The assignments shall be irrevocable for a period of one (1) year or until the termination of this collective bargaining agreement, whichever occurs sooner. The assignment shall be automatically renewed and shall be irrevocable for successive periods of one (1) year each, or for the period of each succeeding applicable collective bargaining agreements, whichever shall be shorter, unless written notice is given by the employee to the Employer and to the Local Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year of each applicable collective bargaining agreement.

2.6     The appropriate deduction shall be made on the first (1st) payday of each month and shall be promptly forwarded to the designated Local Union.

2.7     When new or additional employees are needed, the Employer shall notify the Union of the number and classification of employees needed. The Union shall have twenty four (24) hours from receipt of such notice to nominate applicants for such jobs. The Employer shall choose between applicants nominated by the Union and any other applicants on the basis of their respective qualifications for the job, and no applicants will be preferred or discriminated against because of membership or non-membership in the union.

HEARTLAND FARMS, 2007- 2012                                                                                    3

2.8    The Employer agrees to notify the Union of all new employees hired before the employee starts to work.  The Employer also agrees to notify the Union promptly of all employees leaving employment

2.9    The Employer and the Union agree not to discriminate against any employee or applicant for employment for upholding the principles of unionism, nor because race, color, religious creed, national origin, age, or sex, disabled or status as a Vietnam veteran.

2.10   It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful primary picket line, including the lawful primary picket line of Unions, party to this Agreement, and including the lawful primary picket line at the Employer's places of business provided such lawful primary picket lines are sanctioned by Joint Council of Teamsters No. 42.

2.11   In the event of such picketing at the Employer's place of business, work shall continue for a period of time necessary to clear or remove perishable products from the plant, not to exceed seventy-two (72) hours from the commencement of such picketing.

2.12   Employer agrees to admit to its plants at all reasonable times any authorized representative of the Union for the purpose of ascertaining whether or not this Agreement is being adhered to and to assist in the adjustment of grievances. Such Union representative agrees to observe reasonable plant entrance requirements of the Employer.

## ARTICLE 3 - ROUTE FOREMEN, RELIEF DRIVERS, ROUTE DRIVERS, ICE CREAM DRIVERS AND TRUCK DRIVERS

3.1 Specific working conditions and the regular rates of pay for Route Foremen, Relief Drivers, Route Drivers, Ice Cream Drivers, and Truck Drivers, are set forth in Appendix A attached hereto and included herein the same as if set out in full at this place.

## ARTICLE 4 - PLANT EMPLOYEES

4.1 Specific working conditions and regular hourly rates of pay for Plant Employees are set forth in Appendix B attached hereto and included herein the same as if set out in full at this place.

## ARTICLE 5 - HOLIDAYS

5.1 The following holidays are recognized as hereinafter provided for all employees who have been in the employ of the Employer for ninety-one (91) days or more:

| January 1st | Washington's Birthday | Memorial Day |
|---|---|---|
| July 4th | Employee's Birthday | Labor Day |
| Veterans' Day | Thanksgiving Day | December 25th |

The above holidays shall be observed on the day designated by federal legislation.

### 5.2 Employee's Birthday

(a) Employee shall be required to notify their Employer at least four (4) weeks in advance of the date of their birthday. The Employer shall be allowed to assign any regularly scheduled workday for such holiday, which falls the week before, the week of, or the week after the employee's birthday.

HEARTLAND FARMS, 2007- 2012                                          5

(b) Seven (7) days prior notice shall be given the employee for his scheduled birthday holiday.

(c) Failure to give Employer notice of birthday will result in Employer assigning a day off within thirty (30) days or paying a day's wages at straight time rate.

5.3    It is the Employer's option as to whether or not any employee or group of employees shall work on any of the above holidays.

5.4    Any regular employee, as described in Article 5.1 above shall be paid as a holiday premium eight (8) hours pay for each of the above holidays and that day shall be considered as eight (8) hours worked for the purpose of computing overtime in that workweek.

In the event a holiday falls on a regular day off, however, and the employee does not work that day, the holiday premium shall not be considered as eight (8) hours worked for purposes of computing overtime in that workweek.

5.5    When an employee works on any of the above holidays, he shall be paid as a holiday premium eight (8) hours pay and shall be paid in addition at time and one-half (1 1/2) for the numbers of hours that he actually works, but for not less than eight (8) hours.

5.6    To be eligible for holiday pay an employee must work his scheduled workday immediately preceding and succeeding the holiday, unless he works the holiday or except for excusable absence due to illness or injury on the holiday, the day preceding or the day succeeding the holiday. The Employer may require reasonable proof of illness or injury.

5.7     In the event a holiday falls within an employee's vacation period, he shall receive a holiday premium of eight (8) hours pay, in addition to his vacation pay.

5.8     Any regular employee who has been laid off and recalled within thirty (30) days of any holiday shall be paid for any holiday(s) that fall within the period if otherwise eligible.

5.9     The Employer shall have the option to substitute Day after Thanksgiving for Veterans' Day.

## ARTICLE 6 - VACATIONS

6.1     All employees covered by this Agreement shall be entitled to one (1) week's vacation with pay after one (1) year continuous employment, two (2) weeks vacation with pay after two (2) years continuous employment, three (3) weeks vacation with pay after five (5) years continuous employment, four (4) weeks vacation with pay after fifteen (15) years continuous employment, and five (5) weeks vacation with pay after twenty (20) years continuous employment.

6.2     A week's pay for the purpose of this Article shall be forty (40) hours of pay.

6.3     Preference in the taking of vacations shall be according to departmental seniority of employment wherever possible. Vacation schedules shall be made readily available to all eligible employees. An employee may elect to split his vacation. In such case the employee's seniority preference for the remaining vacation shall not be considered until all employees have had their first choice. An employee may take a vacation in the year it has been earned, provided the employees' request is for a date that is beyond his anniversary date of employment.

6.4     In the case of severance after the first (1st) year of employment and between the first and second year of employment, the employee shall be entitled to a

pro rata of vacation which shall be one-twelfth (1/12) of one (1) week's pay, as defined herein, for each full thirty (30) days since the last anniversary date of his employment.

6.5    In the case of severance after the second (2nd) year of employment the employee shall be entitled to a pro rata of vacation which shall be one-twelfth (1/12) of two (2) weeks pay, as defined herein, for each full thirty (30) days since the last anniversary date of his employment.

6.6    In the case of severance after the fifth (5th) year of employment the employee shall be entitled to a pro rata of vacation which shall be one-twelfth (1/12) of three (3) weeks pay as defined herein for each full thirty (30) days since the last anniversary date of his employment.

6.7    In the case of severance after the fifteenth (15th) year of employment the employee shall be entitled to a pro rata of vacation which shall be one-twelfth (1/12) of four (4) weeks pay as defined herein for each full thirty (30) days since the last anniversary date of his employment.

6.8    In the case of severance after the twentieth (20th) year of employment the employee shall be entitled to a pro rata of vacation which shall be one-twelfth (1/12) of five (5) weeks pay as defined herein for each full thirty (30) days since the last anniversary date of his employment.

6.9    If the employee works his vacation he is to be paid his earned vacation pay, plus time and one-half (1½), unless the Union and Employer agree in writing that he may work his vacation, in which event the employee will be paid at his regular rate of pay, plus his earned vacation pay.

6.10    Wage payment to which an employee is entitled under this Agreement for vacations and holidays shall be computed to include the straight-time rate for the job plus any night-shift, split-shift or relief premium, which the employee regularly earns.

Employer will pay earned vacation pay in advance of vacation, provided employee requests such payment not less than seven (7) days prior to his scheduled vacation.

## ARTICLE 7 - WELFARE BENEFITS

7.1     Employer and Union are parties to an Agreement and Declaration of Trust providing for the Southern California Dairy Industry Security Fund, which agreement is dated March 14, 1972 as amended, and hereinafter referred to as the "Declaration of Trust".

The said Declaration of Trust established a Trust administrated by an equal number of Trustees appointed by the Union on one hand and by all employers who make contributions to such Trust on the other hand for the purpose of providing medical, hospitalization and life insurance benefits, as more particularly set forth in said Trust to which reference is hereby made for all particulars pertaining to such Trust, its administration, etc., and all provisions of such Declaration of Trust are incorporated herein by reference. Employer and Union do hereby ratify and confirm such Declaration of Trust and agree to do and perform each and every act and thing required of Union and Employer respectively therein.

7.2     Employer and Union agree that the foregoing Declaration of Trust may be amended from time to time as hereinafter provided subject to the limitations hereinafter imposed. All amendments to such Declaration of Trust shall be in writing, shall fix the effective date thereof, and shall bear the written approval of all Employer and Union Trustees.

7.3     No such amendment shall (1) alter the basic principles of the Declaration of Trust; (2) conflict with the collective bargaining agreements between Employer and Union; (3) conflict with any then applicable, statute, law, ordinance, or regulation; (4)

permit monies deposited by Employer in the Trust Fund pursuant to the collective bargaining agreement between Employer and Union to be used for the purposes other than providing medical and hospitalization benefits and prescription drug benefits for retired employees and eligible employees, and life insurance, a dental plan, and vision care for eligible employees, the administration of said benefits, and the administration of such fund; or (5) give the Employer or the Union or any employee or any Trustee, individually or collectively, any right, title or interest in or to any money or other property of the Trust. Copies of all amendments shall be distributed to Employer upon the final adoption thereof.

7.4     The Employer shall pay monthly into the Southern California Dairy Industry Security Fund for each eligible employee that the amounts determined by the Trustees necessary to maintain the Health and Welfare programs in effect at the commencement of this Agreement, or as provided by Plan II, or established by the Trustees during the term of this Agreement as provided by the Contribution Agreement dated September 10, 1997.

A premium payment shall be due on each eligible employee following three (3) full calendar months of employment.

7.5     The parties hereto authorize the Trustees to pay any amount into another trust for the purpose of providing such benefits. The parties hereto agree to accept and execute such "Acceptance of Trust Documents" as may be required for participation in such trust and such payments shall be made in accordance with the provisions established by the Joint Board of Trustees.

7.6     The parties hereto authorize and instruct the Trustees to review the Employer contribution rates in January of each year of the Agreement and modify the Employers contribution rates effective in March of each year of the agreement if so determined by the Trustees. Employer contribution rates shall be based upon the

Trustees maintaining a three (3) month fund reserve and appropriate amount to cover incurred but unreported claims.

7.7    The Employer shall maintain Retiree Benefits as determined by the Trustees. The Board of Trustees is authorized to adjust the retiree co-payment premium as they may determine.

7.8    For purposes of this Article an eligible for benefits employee shall be:

(a)    An employee on the payroll on the first (1st) day of the calendar month who has been continuously employed by the same Employer during the preceding four (4) full calendar months.

(b)    An employee on the payroll on the first (1st) day of the calendar month who had been covered by this Welfare Plan within thirty one (31) days of his date of his date of employment.

7.9    All premium payments required pursuant to the provisions thereof shall be due and payable on the first (1st) of each calendar month, and shall become delinquent on the twentieth (20th) day of each such month. Failure to make premium payments in accordance herewith shall be deemed a violation of this Agreement and the Union is authorized to institute proceedings for the collections thereof from the Employer.

## ARTICLE 8 - PENSION BENEFITS

8.1    The Employer shall continue to pay into the Western Conference of Teamsters Pension Trust Fund sums computed as follows:

(a)    Effective April 1, 2006, based on March 2006 hours, for each employee who has worked One Hundred and Sixty hours (160) hours or more during a

calendar month, Five Hundred sixty-two Dollars and Twenty-five cents ($562.25) per month.

(b)      For each employee not covered under (a) above: One Hundred and thirty Dollars ($130.00) per calendar week of work or Twenty six Dollars ($26.00) per day of work of more than four (4) hours (or by combination of such weekly and daily rates) or Three Dollars and twenty-five cents ($3.25) for each straight-time compensable hour of work.

The contribution rate includes funding for the Program for Enhanced Early Retirement (PEER '84 which began with March 1992 hours). Effective April 1, 2006 based on March, 2006 hours, the hourly contribution rate to the Trust fund shall be Twenty cents ($0.20) per straight-time hour worked. This contribution shall be paid on the same basis as contributions provided for in 8.1(a) and 8.1(b) above. The total contribution to the Pension Trust Fund shall be Three Dollars and Twenty-five cents ($3.25) per straight-time hour. Three Dollars and five cents ($3.05) to basic plan and Twenty cents ($0.20) to PEER '84. The contributions required to provide for PEER '84 will not be taken into consideration for benefit accrual purposes under the Plan. The additional contributions for the PEER must at all times be six and one-half percent (6.5%) of the basic contribution and can not be decreased or discontinued at any time.

Effective April 1, 2007, based on March, 2007 hours, increase contributions an additional Ten cents ($0.10) per straight time hour to be allocated between basic benefits and PEER coverage as required.

Effective April 1, 2009, based on March, 2009 hours, increase contributions an additional    Ten cents ($0.10) per straight time hour to be allocated between basic benefits and PEER coverage as required.

Effective April 1, 2011, based on March, 2011 hours, increase contributions an additional Ten Cents ($0.10) per straight time hour to be allocated between basic benefits and PEER coverage as required

8.3    The Employer shall make pension contributions on all employees covered under this Agreement for all straight time compensable hours. Time paid for but not worked, such as holiday and vacation time, shall be considered as time worked for the purpose of this Article, but no payment shall be made on overtime hours.

8.4    The Employer shall not be obligated to make payments to the Pension Trust Fund of amounts in excess of those, which are deductible from gross income, by the Employer under Section 404 of the Internal Revenue Code.

8.5    The total amount due for each calendar month shall be remitted in a lump sum not later than the twentieth (20th) day of the following month. The Employer agrees to abide by such rules as may be established by the Trustees of said Trust Fund to facilitate the prompt and orderly collection of such amounts, and the accurate recording of such amounts paid on account of the employees. Failure to make the payments herein provided, within the time specified shall be a breach of this Agreement.

8.6    **Diversion of Monies to Pension**:  It is understood and agreed that Local Unions that are party to this Agreement may, by proper and timely notice to the Company (certifying a majority vote of the collective membership), divert all or part of a specified, upcoming contractual wage increase to an hourly Pension contribution to the Western Conference of Teamsters Pension Fund ("Trust Fund"). If the diversion is made, it will be in lieu of a wage increase, provided the Trust Fund Trustees approve and sufficient advance notice is given to make it administratively feasible to do so. Such diversion shall be applicable to all the employees covered by this Agreement.

8.7    **Break In Rate For Probationary Employees**:  For  probationary

employees hired on or after March 1, 2007 (or date of TRUST acceptance, if later), the employer shall pay an hourly contribution rate of ten cents ($.10) (including PEER/84) during the probationary period as defined in Article 10/Section 10.1, but in no case for a period longer then ninety (90) calendar days from an employee's first date of hire. Contributions shall be made on the same basis as set forth in this Article 8/Section 8.1 and 8.2 of the Agreement. After the expiration of the probationary period as defined in Article 10/Section 10.1 but in no event longer then ninety (90) calendar days from an employees first date of hire, the contribution shall be increased to the full contractual rate.

## ARTICLE 9 - COST-OF-LIVING

*Inoperative for the Term of This Agreement.*

9.1 Effective _____ all employees covered by this Agreement shall be entitled to a cost–of–living adjustment based on the following conditions:

(a) <u>Dates of Cost-Of-Living Adjustments</u>

March                September                March                September

(b) <u>Index</u>

CPI Index to be used is the CPI-W, (Revised Index, base the 1971-73 Consumer Price Survey) Los Angeles-Long-Beach-Anaheim Area-All Items- (1967=100).

(c) <u>Formula</u>

(1) There shall be an annual corridor of 3.0 points.

(2) Wage Rate increases after the "corridor" to be computed at .45 point, (45/100 of one full point), equals One Cent ($0.01) increase in the base hourly wage rate.

(3) Maximum increases in each of the four (4) adjustments to be Twenty-five Cents ($0.25) per hour.

(d) <u>Method</u>

HEARTLAND FARMS, 2007- 2012                                                                              14

Using the July, _____, as the Base Index for the first (1st and 2nd) adjustment, COL increases shall be computed as follow:

(1) First Adjustment:

The difference between the July, _____, Index and the January,_____ , Index, less the 3.0 annual "corridor", divided by .45 equals the cents per hour increase in the base Hourly Wage Rates, subject to the minimums and maximum referred to above. Effective date of increase to be the first Sunday in March, _____.

(2) Second Adjustment:

The difference between the July, _____,  Index and the July,_____, Index, less the 3.0 annual "corridor", divided  by .45 (less the increase of March _____) shall be applied to the Base Hourly Wage Rates, effective the first Sunday in September, _____.

3) The _____ adjustments shall be made in the same manner as above.

## ARTICLE 10 - FULL WEEK'S WORK

10.1   A full week's work shall be given to as many regular employees as possible. A full week's work shall consist of forty (40) hours within any five (5) scheduled days within the calendar week. A regular employee is one who has been continuously employed by the Employer for ninety (90) days.

10.2 The Employer may establish a basic straight-time workweek of four (4) ten (10) hour days as follows:

(a) Ten (10) hours shall constitute a day's work, and shall be completed within ten and one-half (10 ½) hours.

(b) Ten (10) hours work per day shall be offered each employee. When an employee requests to work less than ten (10) hours per day, he shall be paid at his regular hourly rate for the time actually worked.

(c) All such employees shall receive at least two (2) consecutive days off each calendar week.

(d) When a holiday falls on an employee's regularly scheduled day of work, and he is not required to work on that day, and his regularly scheduled workweek consists of four (4), ten (10) hour days, he shall be paid as a holiday premium, ten (10) hours pay for that day and that shall be considered as ten (10) hours worked for the purpose of computing overtime in that workweek.

(e) When a holiday falls on an employee's regularly scheduled day of work and the employee works on that day, he shall be paid as a holiday premium, eight (8) hours pay for that day and shall be paid, in addition, one and one half (1½) times the contract rate of pay for the number of hours that he actually works but for no less than (10) hours.

(f) When a holiday falls on an employee's regular day of rest, and he does not work, he shall receive a holiday premium of eight (8) hours pay and the holiday premium shall not be considered as hours worked for the purposes of computing overtime in that workweek.

(g) In the event a holiday falls on an employee's regular day of rest, and the employee is required to work, he shall be paid time and one-half (1 ½) for working that day plus a holiday premium of eight (8) hours pay.

(h) The fifth (5th) day worked in any workweek shall be paid for at one and one-half (1½) times the regular hourly rate. All hours worked in excess of ten (10) hours

HEARTLAND FARMS, 2007- 2012                                                    16

(excluding one half (1/2) hour for lunch) in any one day, or fifty (50) hours in any workweek shall be paid at two (2) times the regular hourly rate.

(i) The Employer agrees that there will be no layoffs because of the establishment of four (4) ten (10) hours per day workweeks.

10.3   Any employee who may be called as a witness or to make a deposition at the Company's request shall be reimbursed at the regular scale of wages for any time loss incurred.

10.4   The Union agrees it will meet with individual companies to try to establish alternate workweek schedules in accordance with Regulation 15 AQMD requirements.

## ARTICLE 11 - NEW EMPLOYEE

11.1   All new employees hired may be hired at 20 % less than classification rate for the first six (6) months, and 10% less than classification rate for the second six (6) months of employment, after which full classification rates shall be paid.

## ARTICLE 12 - METHOD OF PAYMENT

12.1 Employees shall be paid on a two-week basis; the payroll period shall end on Saturday. The actual payment will be made not later than seven (7) days following the end of each two (2) week period.  Amounts due to the Employer because of purchases or shortages may be deducted from the paycheck.

12.2 **Remittance Advice -** The remittance advice accompanying employee's pay shall show, separate from the regular pay, overtime, days off worked, holiday pay,

social security, disability insurance, withholding tax and any other deductions agreed upon between the Employer and Employee.

12.3   If the employee so requests, pay shortages shall be corrected within one (1) week after the shortage is reported.

## ARTICLE 13 - TIME CLOCKS

13.1 Employer shall provide and maintain a time clock for all employees covered by this Agreement and shall require employees to register on it properly.

13.2 **Verifying Pay -** Upon the request of the Union, the Employer agrees to submit the payroll records of Union members for an audit by any properly qualified person designated and paid for by the Union, provided, however, that the Employer's liability for any discrepancies found shall be limited to the period of six (6) months immediately preceding the date of the Union's request.

## ARTICLE  14 - TERMINATION NOTICE

14.1 Regular employees shall give and be given one (1) week's notice in case of termination of employment, including terminations resulting from layoffs, except in case of discharge for dishonesty, drinking of alcoholic beverages, use of illegal chemical substances or flagrant insubordination while on the job, or other instances of gross misconduct. A week's notice shall not include vacation. Employees who are about to retire are requested to give a minimum of sixty (60) days notice.

14.2   A regular employee who fails to give his Employer the one (1) week's notice provided above shall be paid only for time actually worked, and shall forfeit up to one (1) week of pro rata vacation pay, as well as all other benefits to which he might otherwise be entitled.

14.3 An employee who has not achieved the status of a regular employee as defined in Article 10.1 above may be terminated at the option of the Employer.

## ARTICLE 15 – DISCHARGE

15.1  An employee may be discharged for just cause. Violation of Employer's posted rules may constitute sufficient grounds for disciplinary action, including discharge. The severity of any penalty may be subject to the grievance procedure under Article 34. Employer shall submit to the Union a copy of any posted rules and subsequent changes.

15.2  Except for discharge for proven theft, drinking alcoholic beverage while on the job or on Company property, using illegal chemical substances while on the job or on Company property, violations of the substance abuse policy (which covers alcohol or illegal drugs), flagrant insubordination or other acts of serious willful misconduct, an employee shall not be discharged unless he / she has had a verbal warning (which is non-mandatory and will not always be used), a written warning, a final written warning, and is provided with an "employee conference"  as a final step prior to discharge being imposed (this provides for either a three step or a four step procedure of progressive discipline before termination of employment). The affected Local Union is to be mailed a copy of all disciplinary actions, other than verbal warnings. Employee warning notices shall not be valid after twelve (12) months from the date of issuance.

**Employee Conference** - When an employee's performance is deemed to be unsatisfactory, the Employer will meet with the Union and the employee in an effort to correct the employee's performance. If the employee continues to engage in a course of action that warrants disciplinary action(s), including discharge, then the Employer will notify the affected Local Union prior to the discharge of the employee.

When the Union is notified by the Employer that an Employee Conference is required and the Union Representative is unable to meet within a ten (10) day time period, the

Employer may continue with the attendance of a Shop Steward. Once the Union has been notified that an employee Conference is required, and the employee commits another infraction that warrants further discipline, the Employer may discipline that employee, provided that the Union has been notified of the Employee Conference in writing.

15.3    Failure by the employee or the Union to protest or grieve on a warning notice at the time of issuance shall not, in itself, constitute an agreement or admission as to the validity of the warning notice or the gravity of the alleged offense.

## ARTICLE 16 - LAYOFFS

16.1    When Employer finds it necessary to hire additional employees, he shall re-hire for a period of one hundred and eighty-two (182) days immediately following layoff, those regular employees whom he has previously laid off, in the reverse order in which they were laid off, provided they are available within forty-eight (48) hours and are able to do the work.

16.2    If a regular employee, having been laid off, is notified within one hundred eighty-two (182) days by registered mail at his last known address to return to work, fails to report for work within forty-eight (48) hours after such notice, his seniority is broken.

16.3    A regular employee who has been laid off shall accumulate seniority for a period not exceeding one hundred eight-two (182) days, at which time seniority shall be broken if such employee has not been notified to return to work.

16.4    Temporary employees who are re-employed within ninety-one (91) days of any layoff shall be given credit toward their continuous employment requirement for all time actually worked prior to the layoff. The period of any layoff shall not be considered as time worked for any purpose. This Article shall not have any bearing upon eligibility for the Health and Welfare benefits as provided under Section 7.8 of this Agreement.

## ARTICLE 17 - SENIORITY AND BIDDING

17.1    Jobs requiring performance of work covered by this Agreement shall be filled by the bidding procedure hereinafter set forth:

(a)      All jobs that are open shall be posted for a period of ninety-six (96) hours on a form agreed upon by the Employer and the Union. The results shall be posted for ninety-six (96) hours.

(b)      The initial posting for a vacancy of a new or existing job shall be made within seven (7) days after the vacancy occurs and shall be filled within fifteen (15) days after the successful bidder has been determined.

(c)       Only those employees in the department and branch where the opening exists may bid on such opening, provided that:

If no employee in the department where the vacancy occurs bids on the job, an employee in the plant or branch where the opening exists may bid on the job, and;

If an employee in the department where the vacancy occurs is the successful bidder, the opening created by the successful bidder may be bid by an employee in the plant or branch where the opening exists.

(d)      The Employer may consider Wholesale Sales, Milk Plant, Ice Cream Plant, Truck Drivers, Shipping and similar operating groups as Departments.

(e)      An employee may bid on another job within his Department at any time, but his bid need not be given consideration during the first twelve (12) months of his employment or during the six (6) months period since successfully bidding on

another job.  If an employee's job is eliminated within the six (6) month period after successfully having bid it, the six (6) months shall be waived.

(f)    The resulting changes shall be limited to two (2).

(g)    The Employer shall not consider any bids not made in conformity with the terms and provisions of Article 17.

(h)    It is not the intent of this Article to permit plant employees to bid on driving vacancies nor to permit driver employees to bid on plant vacancies except by mutual agreement between the Employer and the Union.

17.2   The following procedure shall be observed in filing job openings:

(a)    Where the Employer finds that the qualifications of two (2) or more bidders for the job which is open are substantially equal then seniority shall be the determining actor.

(b)    Where the Employer finds that there are qualified bidders but that the qualifications of none of the qualified bidders are substantially equal, then he shall select the employee best qualified to perform the job which is open.

(c)    Where the Employer does not find any bidder to be qualified or where there are no bidders, then employer shall make the best selection available.

(d)    In determining the qualifications of the bidders, the Employer shall give fair and impartial consideration to all of the facts bearing on the matter and any decision made shall not be arbitrary, discriminatory or the result of bias or prejudice.

(e)    Seniority shall prevail in the choice of days off but only when the day is available and open, and except in the plant where, the days off shall follow the job.

Seniority will prevail in the choice of days off whenever possible for employees in the same job classification, same department, and same shift.

f)	An employee will be allowed to displace any less senior employee when his job has been eliminated and he is subject to layoff (such displacement shall be allowed regardless of the shift or bracket rates involved), provided he is capable of performing the work involved.

## APPLICABLE TO DRIVERS ONLY

Subsequently displaced employees shall be allowed to "bump" less senior employees, to a maximum of three (3) with the fourth (4th) employee being forced to replace the least senior employee (without any reduction in pay).

(g)	Whenever a route is changed or revamped (stops/customers), and more than one-half (1/2) of the route remains intact, then the driver will remain with the route. If one-half (1/2) or more is changed or revamped, then it will be posted for bid.

## ARTICLE 18 - TRANSFERS

18.1	It is understood and agreed that the employer shall have the sole right to grant or deny any and all requests for transfer.

18.2	If an employee is transferred with his job to another branch within the same company and within the area covered by this Agreement, he shall retain all seniority rights.

18.3	If an employee is transferred without his job to another branch within the same company and within the area covered by this Agreement, the seniority rights of the employee shall be determined by the Employer and the Union before the transfer is consummated.

18.4    If an employee is transferred to an exempt job and is subsequently returned to a Union job that is open, his departmental seniority (less time spent on the exempt job) shall be restored after six (6) months.

18.5    If an employee transfers to another department his departmental seniority will start as of the date of such transfer.

(a)    If within one (1) year such employee is scheduled for layoff he may return to the department from which he transferred, with full departmental seniority rights (less time spent in the other department), and will bump the employee with the least seniority in the department, providing:

1)    He has greater departmental seniority than the employee he would replace, and

2)    He is qualified to do the work of the employee he would replace.

(b)    If such employee is unable to perform the job satisfactorily, or if he does not wish to remain on the job, he may, within one (1) year and at the option of the employer, return to his former department and his departmental seniority (less time spent in the other department) shall be restored after six (6) months.

## ARTICLE 19 - UNIFORMS AND CLOTHING

19.1    Employees shall keep themselves in a neat and clean condition at all times, and on duty shall wear such uniform with union labels as shall be specified by Employer. Uniforms shall be furnished by employee, but Employer shall pay for any insignia or advertising required on uniforms. A semi-annual allowance of forty dollars ($40.00) shall be payable as of March 1 and September 1 of each year to all employees who have been continuously employed by the Employer for three (3) full calendar months immediately preceding such dates.

The Employer may supply employees with uniforms in lieu of the allowance.

19.2     In accordance with the bulletin issued by the Dairy Industrial Relations Association, protective clothing shall be furnished by the Employer.

19.3     Employer shall launder or pay for laundering of coveralls, aprons, trousers, shirts, sweat shirts and cap covers worn by employees when on duty. All laundry will be done by a Union laundry whenever services and prices are comparable.

## ARTICLE 20 - FIDELITY BOND

20.1     Employer may require a fidelity bond of any employee, but premium shall be paid by Employer.

## ARTICLE 21 - PHYSICAL EXAMINATION

21.1     If an Employer requires physical examinations and/or drivers' clinic examinations of employees he shall pay for all such examinations.

## ARTICLE 22 - DONATIONS

22.1     Employer shall not require donations or contributions from employees.

## ARTICLE 23 - REDUCTION IN WAGE

23.1     No employee shall suffer a reduction in wage rates or working conditions as a result of this Agreement.

## ARTICLE 24 - LEAVES OF ABSENCE

24.1    Informal leaves of absence are those for a period of less than eight (8) days. Formal leaves of absence are those for a period of eight (8) days or more. An informal leave of absence without pay may be granted by Employer at any time. A formal leave of absence, without pay, for a period not to exceed ninety-one (91) days, may be granted by Employer upon written application by employee to Employer, with a copy to the Union. A formal leave of absence may, in exceptional cases, be extended by Employer upon written application from the employee and receipt of written approval from Employer. Seniority shall accumulate during both formal and informal leaves of absence provided the employee returns within the period of time specified in the leave of absence or extension thereof, and provided the employee has not been gainfully employed during leave of absence. For purposes of this Article, vacation seniority shall accrue for ninety (90) days provided the employee returns as specified herein and shall apply to all leaves of absence.

24.2    It is mutually understood that the words "gainfully employed," cover instances where an employee goes into business for himself, etc.

24.3    Whenever a regular employee becomes unable to perform his work by reason of illness or injury, he may request a medical leave of absence based on the following:

(a)    Upon presentation of proper medical evidence, the Employer shall grant a leave for the period of disability. The length of the leave shall not be longer than the period of the employee's employment at the commencement date of the disability or six (6) months, whichever period is the lesser.

(b)    The period of the leave of absence may be further extended by the Employer in exceptional cases.  Seniority shall accumulate during the period of such leave.

Any employee returning to work from an absence due to illness or injury of thirty (30) days duration or more shall notify the Employer of his return to work seventy-two (72) hours prior to his return.

24.4   Any employee returning to work from an absence due to illness or injury of less than thirty (30) days duration shall notify the Employer of his return to work by the end of his regular shift next preceding his return to work.

## ARTICLE  25 - FUNERAL LEAVE

25.1   An employee who loses time on scheduled work days as a result of the death of a member of his immediate family will be paid a maximum of three (3) days (each day at eight (8) straight time hours) or three (3) days at ten (10) straight time hours on a four (4) ten (10) work week for working time lost as a result of attendance at the funeral and/or burial or estate matters.

25.2   Immediate family shall be defined as an employees' parents, grand parents, spouse, children, brothers, sisters, grand children, stepchildren of current spouse and stepparents.

25.3   Employer may require reasonable proof or verification.

## ARTICLE 26 – SICK LEAVE

26.1   The Employer shall provide the employee the opportunity to earn, accrue, and accumulate up to four (4) sick days per year.

For purposes of sick leave accrual calculations, the Employer shall adopt the formula described below. The Employer shall not change that method during the term of the Agreement:

26.2   It is Understood and Agreed that in month's in which the Employer works the employees less than one-hundred and seventy three (173) hours, the employee must work at least 96.8 percent of the available hours to earn that months accrual.

26.3   Sick days will be earned on a monthly hour accrual basis: Each month an employee works or is paid for (such as holiday, vacation or sick leave pay) at least 96.8 percent of the available / scheduled hours the employee will earn two and two thirds (2 2/3) hours of sick leave if working a five (5) day eight (8) hour schedule or three and one-third (3 1/3) hours if working a four (4) day (10) hour schedule. In the case where the employee may work more then one schedule per month, the accrual shall be based on what schedule the employee spends the majority of time.

26.4   The employee shall either use or accumulate sick leave pay. However, if the employee is sick and has earned sick leave days available, he must use the sick leave in full day increments. All unused sick leave pay, in excess of four (4) days accrued, shall be paid to the employee on their Company anniversary date or on any other annual date selected by the employer. At the time of termination, all unused sick leave shall be paid unless the employee is discharged for just cause.

26.5   Sick Leave pay shall be paid on the first day lost. Employees working a five (5) day eight (8) hour schedule shall receive eight (8) hours pay. Employees on a four (4) day ten (10) hour schedule shall be paid ten (10) hours pay. For purposes of annual date pay off, all eligible employees shall be paid in full days only, regardless of workday schedules. When hours are accrued in addition to full days, those hours shall remain in the sick leave bank.

26.6   The use of sick leave pay shall prevent an employee from receiving an "occurrence" as it relates to attendance policies.

## ARTICLE  27 - EMPLOYEES UNABLE TO COMPLETE DAY'S WORK

27.1    If an employee sustains an industrial injury and there is medical evidence that such injury prevented him from continuing work on the day of the injury, he shall be paid for the time worked on such day, but for not less than eight (8) hours.

27.2    If an employee because of illness or some other personal reason is unable to continue with his work he shall be paid for the actual number of hours worked.

27.3    If an employee is called in to finish a shift for an employee who for some reason is unable to finish his work, such an employee shall be paid at the applicable rate, for the number of hours worked, but in no event is he to be paid for less than four (4) hours.

## ARTICLE 28 - VETERANS

28.1 A Veteran who is re-employed by his former Employer, after complying with the provisions of the Universal Military Training and Service Act, as amended, or the Reserve Forces Act of 1955, will be entitled to restoration of his former seniority date and following vacation benefits:

Pro rata vacation for each full thirty (30) days between the date of return from service and the next following anniversary of his seniority date. This shall be payable upon the anniversary of the seniority date or date of termination if earlier.

## ARTICLE 29 - REST PERIODS

29.1    Each Employer shall continue his present practice with respect to rest periods, provided each employee shall receive not less than two (2) ten (10) minute rest periods per day.

## ARTICLE 30 - BULLETIN BOARDS

30.1    The Employer shall provide bulletin board space for the exclusive purpose of posting official Union notices and bulletins.

## ARTICLE 31 - JOB CLASSIFICATION

31.1    The classification of new jobs established after the date of this contract shall be negotiated between the Employer and the Union.

## ARTICLE 32 - PRESERVATION OF WORK

32.1    For the purpose of preserving work and job opportunities for the employees covered by this Agreement, the Employer agrees that no work or services presently performed or hereafter assigned to the collective bargaining unit will be sub-contracted, transferred, leased, assigned or conveyed in whole or in part to any other plant, person or non-unit employees, unless such other plant, person or non-unit employees observes and causes its employees to observe substantially the same economic conditions of employment, or conditions of employment which are more beneficial to its employees, than those observed by the Employer. The word employee referred to above shall include so called "independent owner-operators."

32.2    Employer agrees that, unless required to do so by law or lawful public authority, it will not sell dairy products at its platform to any person, firm or corporation who buys said product for distribution to retail outlets in competition with route drivers covered by this Agreement and similar agreements with other employers in this area, unless such person, firm or corporation observes and causes its employees to observe substantially the same conditions of employment as those observed by Employer.

## ARTICLE 33 - NEW LOCATIONS

33.1   In the event the Employer moves the location of his present operation covered by this Agreement, to a location within the geographical jurisdiction of Joint Council of Teamsters No. 42, present employees shall have preference for vacancies at such locations in accordance with seniority and qualification. Such assignment shall be subject to Employer's work force requirements at both the old and new locations. Subject to the above, qualified employees with seniority rights who have been laid off or would be laid off because of such new locations shall have preference for employment before any new employees are hired.

## ARTICLE 34 - SETTLEMENT OF CONTROVERSIES

34.1    It is agreed by the Union and the Employer that there shall be no strikes or lockouts during the life of this Agreement, and that any and all controversies which may arise shall be settled as hereinafter provided.

34.2   When any dispute arises, an attempt shall first be made to settle the matter amicably by conference between the employee, a Union Steward if so desired, and his immediate supervisor. If called upon at this step of the grievance procedure, a Union Representative and supervisor or other representative of the Company may also attempt settlement.

34.3   Any grievance including, but not limited to, discharge or suspension must be submitted by the employee in writing to the Employer and the Union, within ten (10) days of the occurrence or knowledge of the event giving rise to the grievance, or it will be considered untimely and not subject to further process through the grievance procedure.

34.4    If the issue is still unresolved, either party may submit the grievance to a Joint Labor-Management Committee consisting of four (4) representatives. Two (2)

representatives shall be designated by the Union and two (2) representatives shall be designated by the Employer. However, the parties may by mutual agreement, bypass the Joint Labor-Management Committee and elect to go straight to arbitration.

34.5     The Joint Labor-Management Committee shall meet on the fourth (4th) Tuesday and if necessary on the fourth (4th) Wednesday of each month or other mutually agreed upon dates. Either party may cancel up to three (3) consecutive scheduled Joint Labor-Management Committee meetings. After the third (3rd) time a meeting has been canceled in which an issue has been scheduled, either party may elect to by-pass the Joint Labor-Management Committee and move directly to arbitration on that issue. While the arbitration is pending, a sincere effort will be made to hold a Joint Labor Management meeting and have the case heard. If a majority decision is rendered, then that decision will govern (as stated in following paragraph), and the arbitration will be canceled. If any fee or cost is associated with said cancellation, then the losing party will pay the fees and/or costs as decided by the panel decision.

A majority vote of the members of the Committee will decide the issue and the decision shall be final and binding on all parties. Issues to be considered at the meetings must have been received by the parties at least ten (10) days prior to the regular meeting date.

34.6     In the event of a tie vote or mutual agreement to by pass the Joint Labor-Management Committee pursuant to Article 34.4 above, either the Employer or the Union may request that the matter be submitted to an impartial arbitrator from the following list of seven (7) arbitrators by alternately striking off names until a single name remains. (By mutual agreement, the parties may send for a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service and select a single name as set forth above rather than using the following list.)

| | | |
|---|---|---|
| Howard Block | Donald Prayzich | George Marshall |
| Lou Zigman | Joseph Gentile | Harold Somers |
| ///////////////////////////////// | Lionel Richman | ///////////////////////////////// |

    34.7   The arbitrator selected shall hear the case within thirty (30) days after notification of selection and the arbitrator may make a bench decision at the end of the hearing. In the event a bench decision is not made, however, the arbitrator shall render a decision no later than thirty (30) days following the receipt of briefs and in cases where no briefs are filed, fifteen (15) days from the close of the hearing.

    34.8   The arbitrator's fee shall be borne by the losing party with the arbitrator making the decision as to whom the losing party is. If there is more than one losing party, the arbitrator is authorized to require a sharing of the arbitrator's fee. The decision of the arbitrator shall be final and binding on both parties, provided that the arbitrator shall not have the authority to change, alter or modify any of the terms or provisions of the Agreement.

## **ARTICLE 35 - SUCCESSORS AND ASSIGNS**

    35.1   This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event an entire operation, or any portion thereof, is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the Union not later than the effective date of sale.

## ARTICLE 36 - SUBSTANCE ABUSE POLICY

36.1    Substance abuse policy identified as "BITLC" is adopted and may be put into effect by individual employers. The policy is subject to change and modification by mutual agreement between the Union and Employer Negotiating Committees only. Employees covered by D.O.T. regulations must submit to drug and alcohol testing in accordance with D.O.T. regulations. If an employee tests positive, the employee will be subject to discipline and rehabilitation in accordance with the "BITLC" Policy.

36.2    When a job accident occurs that requires treatment by a Medical Professional, a sample will be taken for drug / alcohol testing. The sample will be split, and tested in accordance with the Substance Abuse Policy. If the test results are reported as positive then the employee will be subject to the terms and conditions of the Substance Abuse Policy.

## ARTICLE 37 - TERM

37.1    This Agreement shall become effective on the first shift starting on March 1, 2007, and shall continue in effect until the beginning of the first shift starting March 1, 2012, and from year to year thereafter unless either party shall give the other written notice of intention to terminate or modify this Agreement at least sixty (60) days prior to March 1, 2012, or March 1st of any calendar year thereafter. The parties agree that negotiations of a new Agreement shall commence as soon as practicable after such notice is given and that irrespective of the notice to terminate or modify, such negotiations may continue after the termination date. The termination notice may be made effective by either party at any time after such termination date, by giving the other party seven (7) days written notice by registered mail. This Agreement shall be deemed terminated seven (7) days after such written notice is given.

37.2    It is understood that should abnormal changes in living costs or economic conditions in the dairy industry arise, then either party may, upon sixty (60) days written notice to the other party, request opening negotiations to adjust wage rates only as

contained in Appendixes A and B of this Agreement, in which case this Agreement shall remain in force until consummation of a new Agreement on wages.

37.3   In the event that this Agreement is opened for negotiations as provided in Section 37.1 or Section 37.2 and should the parties hereto be unable to mutually reach a satisfactory agreement in the negotiations resulting from the opening of the contract within sixty (60) days after the date of such notice, then either party may request arbitration of the then existing differences as hereinabove provided.

37.4   **Separability and Savings Clause** - If any article of this Conventional Dairy Agreement, or any of the agreements supplemental hereto, or riders to such supplemental agreements, should be held invalid by operation of law or by any tribunal of competent jurisdiction or if compliance with or enforcement of any Article of the Agreements referred to above, should be restrained by such tribunal pending a final determination as to its validity, the
remainder of this Agreement, supplemental agreements, or of any rider, or the application of same to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

///

///

**IN WITNESS WHEREOF,** the parties hereto have executed this agreement the day and year first herein above written.

**FOR THE EMPLOYER:**               **FOR THE UNIONS:**

**HEARTLAND FARMS**

**On Behalf of Heartland Farms**        **On Behalf of Teamsters Union**
                                        **Local No. 630**

_____        _____

**Name:  Paul Bikowitz**              **Name:  Paul A. Kenny**

**Title:  President**                 **Title:  Secretary Treasurer**

**Date: _____**            **Date: _____**

                                        **On Behalf of Southwest**
                                        **Dairy Industry**
                                        **Teamsters Council**

                                        _____

                                        **Name:  Mike Bergen**

                                        **Title:  Chairman**

                                        **Date: _____**

# APPENDIX "A"

## ROUTE FOREMEN, RELIEF DRIVERS, ICE CREAM DRIVERS, ROUTE DRIVER, AND TRUCK DRIVERS

## *1.* WAGES, HOURS, OVERTIME, NIGHT PREMIUM AND WORKWEEK - ROUTE DRIVER, RELIEF DRIVERS, ROUTE FOREMAN, AND ICE CREAM DRIVER (STORE DOOR DELIVERY.)

(a)      All Route Drivers, Relief Drivers, Route Foreman and Ice Cream Drivers shall have made available to them five (5) days work per calendar week, unless by agreement with the Union. The Employer may establish a basic straight-time workweek of four (4) ten (10) hour days in accordance with Article 10. Ten (10) hours, exclusive of one-half (½) hour for lunch, shall constitute a day's work if the Employee is on a straight-time week of four (4) ten (10) hour days.

(b)      On Routes operating four (4) days per week, ten (10) hours per day, the Route Drivers shall receive two (2) designated days off per week and the third day will be scheduled on a rotating basis.

(c)      The working day shall commence when the Route Driver registers on the time clock ready for duty at the time designated by the Employer as the starting time, and shall finish when the Route Driver again registers on the time clock after completion of all duties required of him by the Employer. Time voluntarily spent by the Route Driver verifying his records or looking for discrepancies shall not be included in the clock time unless such discrepancies are determined to be errors on the part of the Employer.

(d)      Any time computed in accordance with No.1 (c) above in excess of nine (9) hours per day (exclusive of one-half (½) hour lunch period) shall be paid at the overtime rate of one and one (1 ½) times the hourly rate.

(e)   Any time, not in excess of nine (9) hours per day computed in accordance with No.1 (c) above, in excess of forty (40) hours per week (exclusive of two and one half (2 ½) hours for lunch periods) shall be paid at one and one-half (1 ½) times the hourly rate. For the purposes of this Article, time worked on any regular day shall be considered as not less than seven (7) hours.

(f)   If a Route Driver, Relief Driver, Route Foreman, or Ice Cream Driver is called in to work on either of his designated days off, he shall have at least eight (8) hours work made available to him or shall be paid a minimum of eight (8) hours pay at the overtime rate. The Employer may not offset any under time on such days against overtime worked during the regularly scheduled workweek.

(g)   The Employer agrees that he will not transfer a single route to a single truck, owner-operator without the prior consent of the Union during the life of this Agreement.

(h)   **WAGE RATES, FULL SERVICE ROUTES**

|  | $ .50 | $ .45 | $ .50 | $ .45 | $ .50 |
|---|---|---|---|---|---|
| **Classification** | **Effective 3-01-07** | **Effective 3-01-08** | **Effective 3-01-09** | **Effective 3-01-10** | **Effective 3-01-11** |
| Route Foreman | 21.3175 | 21.7675 | 22.2675 | 22.7175 | 23.2175 |
| Relief Driver | 21.0175 | 21.4675 | 21.9675 | 22.4175 | 22.9175 |
| Route Driver | 20.8175 | 21.2675 | 21.7675 | 22.2175 | 22.7175 |
| Ice Cream Driver | 20.4625 | 20.9125 | 21.4125 | 21.8625 | 22.3625 |

(i)   Drivers who drive equipment with a bed length of trailer or combination of trailers of twenty five (25) feet or more shall receive Seventeen and one half cents ($.175) per hour in addition to the applicable rate above.

HEARTLAND FARMS, 2007- 2012                                        38

(j) **NIGHT PREMIUM** - The following night work premium shall be paid to classifications in (h) above: a premium of Twenty Cents ($.20) per hour over the regular hourly rate for the job performed shall be paid for all regular shift hours worked between 6:00 p.m. and 6:00 a.m. and for all regular shift hours worked by anyone who starts to work between 6:00 p.m. and 4: 00 a.m.

A night work overtime rate shall apply to all overtime worked between 10:00 p.m. and 6:00 a.m. and to all overtime hours worked at any time by anyone who starts work between 6:00 p.m. and 4:00 a.m. All other overtime hours worked shall be paid at the day work overtime rate.

## 2.    RELIEF DRIVERS

Relief Drivers shall run the routes properly for the Regular Drivers they relieve, and shall furnish the Regular Driver with an accounting of the route relieved. In no event may the Relief Driver be required or allowed to exercise any supervisory duties, or break in new men except for his regular days on the route. Drivers relieving routes during regular vacations or extensions thereof shall be paid at the Relief Drivers rate.

## *3.*    ROUTE FOREMEN

A Route Foreman shall be required to supervise routes and Relief Drivers assigned to him and shall correct to the best of his ability any irregularities discovered, and shall report same to his immediate superior. He may be required to relieve Regular or Relief Drivers in cases of emergency but shall not have any permanent relief schedule.

## 4. CASH BOND

If a cash bond is required, it shall not be in excess of One Hundred Dollars ($100.00). Employees shall be paid annually the interest earned by the cash bond. Employer may withhold Cash Bond until Route Driver's account is settled but not exceeding (30) days.

## 5. RAIDING ROUTES

Route Drivers shall not work in a territory formally served for another Employer for a period of twelve (12) months after termination of said employment, and Employer shall not so employ a Route Driver except by mutual agreement with the former employer and Union.

## 6. CREDIT FOR DAMAGED GOODS

Employee shall be allowed credit for stolen, spilled, or soured goods upon proper evidence, providing Employer's rules, posted or issued in written form, are complied with.

## 7. ROUTE DRIVER'S ACCOUNTING WITH EMPLOYER

(a)    Route Drivers shall be advised within twenty four (24) hours of any special deliveries charged to their routes.

(b)    Route charges and credits not supported by documentary evidence cannot be claimed by Employer or Route Driver after the end of the next regular workday that falls between Monday and Friday.

(c)    All charges and credits and cash of Route Driver shall be checked with a full explanation daily on current daily sales.

(d)      Upon request of the Route Driver, all records necessary for him to check his account with Employer shall be made available to him at the plant where he works.

(e)      Route Driver's load sheet for each day shall be computed, balanced, and made available to him on that day.

(f)      Route Drivers who are charged for shortages shall be paid or credited for overages.

(g)       The accounting procedures specified in this Article shall not be changed except by mutual agreement with the Union.

## 8.   TRUCK DRIVERS (ALL OTHERS INCLUDING BRANCH, RELAY, LONG HAUL, AND TANKER DRIVERS) - WAGES, HOURS, OVERTIME AND WORKWEEK

(a)       Eight (8) hours (exclusive of one-half (½) hour for lunch), starting at the time designated by Employer, shall constitute a day's work. The Employer may establish a basic straight-time workweek of four (4) ten (10) hour days in accordance with Article 10.2. Ten (10) hours, exclusive of one-half (½) hour for lunch, shall constitute a day's work if the employee is on a straight time week of four (4) ten (10) hour days.

(b)      All Truck Drivers shall have made available to them five (5) days work per calendar week or the equivalent in wages, unless by agreement with the Union.

(c)      Any employee who reports for work, not having received twenty-four (24) hours notice otherwise, shall be paid for a half (½) day, and if he works more than four (4) hours he shall be paid for a day's work for each day so worked.

(d)     All hours worked in excess of eight (8) hours (excluding one-half (½) hour for lunch) in anyone (1) day, or forty (40) in any workweek, shall be paid at one and one half (1 ½) times the regular hourly rate.

(e)     Truck Drivers who make the entire delivery ordinarily made by a Route Driver including Military Installations shall be paid the Route Driver's rate of pay for such deliveries. If a Truck Driver makes deliveries which qualify under Paragraph 1. above, he shall be paid for time spent at Route Driver's rate and if such time exceeds four (4) hours, he shall be paid for the entire day at the Route Driver rate.

(f)     **Night Work Premium** - The following night Work Premium shall be paid to classification in (i) below: A premium of twenty cents ($0.20) per hour over the regular hourly rate for the job performed shall be paid for all regular shift hours worked between 6:00 p.m. and 6:00 a.m., and for all regular shift hours worked by anyone who starts to work between 6:00 p.m. and 4:00 a.m.

(g)     A night work overtime rate shall apply to all overtime work between 10:00 p.m. and 6:00 a. m., and to all overtime hours worked at anytime by anyone who starts work between 6:00 p.m. and 4:00 a.m. All other overtime hours worked shall be paid at the day work overtime rate.

(h)     The Employer agrees that he will not transfer a single route to a single truck, owner-operator without the prior consent of the Union during the life of this Agreement.

(i)   **TRUCK DRIVERS** - The hourly rates for the classifications listed below shall be as follows:

|  | $.50 | $.45 | $.50 | $.45 | $.50 |
| Classification | Effective | Effective | Effective | Effective | Effective |
|  | 3-01-07 | 3-01-08 | 3-01-09 | 3-01-10 | 3-01-11 |
| --- | --- | --- | --- | --- | --- |
| Driver of Tractor, and 2 Trailers, or Semi-Trailer with bed length of 25' or more | 20.9225 | 21.3725 | 21.8725 | 22.3225 | 22.8225 |
| Relief Truck Driver | 21.1225 | 21.5725 | 22.0725 | 22.5225 | 23.0225 |
| Driver Foreman | 21.4225 | 21.8725 | 22.3725 | 22.8225 | 23.3225 |
| Tanker Driver | 20.9225 | 21.3725 | 21.8725 | 22.3225 | 22.8225 |

(j)    The employee shall have time to check the mechanical and physical conditions of his equipment before leaving the Employer's yard. He shall have time to complete the procedure each time he makes an equipment change.

(k)    If an employee is required to be gone away from home overnight the Employer shall provide him with clean and reasonable lodging and two (2) meals each twenty-four (24) hours, or twenty five dollars  ($25.00) every twenty-four (24) hours, (meals only, Employer may require receipts).

(l)    All runs shall be in accordance with the proper governing body regarding hours of work.

(m)    The Employer shall not establish any runs based on conditions other than those provided for in this Agreement, except by mutual agreement with the Union.

(n)    Time spent at processor's facility pumping milk shall be considered as time worked, unless the employee is relieved of duty and all responsibilities.

## 9.     EMPLOYEES' MEETINGS

(a)     Not more than six (6) meetings per year, except for safety courts, shall be called on employee's time. Such meetings shall be called on not less than three (3) days notice and shall be held at an hour most convenient to the majority of employees affected, and at a time not to conflict with regular Union meetings. No employee shall be required to attend sales meetings or safety courts on his or her designated days off, and no employee shall be required to attend such meetings if the meeting time is scheduled for more than one (1) hour after the employee's check-out time.

(b)     It is the Employer's responsibility to set the time at which a sales meeting will start. In all cases the meeting is to be adjourned one (1) hour from the original starting time set by Employer.

## 10.    EQUALIZATION OF OVERTIME

No time off shall be given to equalize overtime.

## 11.    "WORK COVERED BY THIS AGREEMENT" as used herein shall not include:

(a)      Route riding by supervisory employees with regular Route Drivers in the performance of supervisory duties.

(b)     Route checking by supervisory employees with regular Route Drivers in the event of termination of employment of such Route Driver.

(c)     Route riding by any exempt employee for transportation only, and not for the purpose of aiding the Route Driver in performance of his duties.

## 12. LUNCH PERIOD

The lunch period shall be one-half (1/2) hour which shall be deducted from the time shown on the time clock.

## 13. DELIVERY

In making deliveries of milk or frozen dairy product to grocery and market customers, the driver of the delivery vehicle shall place it at any one of the following points, at the customers election:

    (a)    Within the confines of grocery store or market.

    (b)    Up to the customer's refrigeration facilities.

    (c)    Into the customer's refrigeration facilities.

## 14. EQUIPMENT VIOLATIONS

Employer shall assume responsibility for all citations issued for equipment violations.

## 15. DOT EXAMINATION

The Employer shall pay the cost of necessary; physical examination for D.O.T. card renewals for employees whose assignments require a D.O.T. card, and for initial examination of employees transferred to such assignments, provided employee goes to the Company doctor.

## 16.    DAYS OFF

All employees shall receive two (2) designated days off in every workweek, which shall be posted. So far as possible, days off shall be consecutive. Such designated days off shall not be changed on less than seven (7) days notice unless by agreement with the Union and may not be changed during the calendar week in which a Holiday falls, so long as the employee is guaranteed the holiday off. Provided however, that the Employer guarantees that all those employees whose days off have been changed shall have the aforementioned holidays off. Seniority shall prevail based on employee's choice within job classifications. Time worked at the Employers request on an employee's day of rest shall be paid at the overtime rate. Departmental seniority shall prevail in the choice of days off.

////

////

///

# APPENDIX "B"
# PLANT EMPLOYEES

1.  **Milk Plant Classifications**

    (a)  Working Foreperson

    (b)  Bracket No.1

    1.    Pasteurizer and Standardizer,

    2.    Churn Operator or Buttermilk Maker

    3.    Yogurt Mixer

    4.    Mix Processor/Separator Operator

    5.    Weigher and Sampler/Milk Receiver

    6.    Checker/Head Checker

    7.    Filler Operator (paper)

    8.    Blow Mold Machine Operator

    9.    Whipped Butter Maker

    10.   Sanitor - Processing Equipment / CIP Operator

    11.   Evaporator Operator

    12.   Dryer Operator (Milk Powder)

    13.   Laboratory Quality Control Technician

    Bracket No. 2

    1.    Employees working inside the refrigerated cold box

    2.    Bottle Filler Operator (Plastic)

    3.    Butter Machine Operator

    4.    Lid Knocker

    5.    Case-off Employee

    6.    Cheese Peeler and Cheese Cutter

    7.    Case De-Stacking Machine Operator

    8.    Butter Strippers

9.  Truck Spotter - Retail

10. Scholle Filler Operator

11. Loader and Return Goods Checker, Order Fillers

12. Bottle Feeder/Bottle Pusher

13. Box Operator

14. Pasteurizer's Helper

Bracket No. 3

1. Miscellaneous Clean Up Employee (other than processing equipment)

2. Case Stacker – Platform Outside Box

3. Plant Labor not otherwise classified, provided, however, that the classification of new job, established after the date of this contract shall be negotiated by the Employer and the Union.

Bracket No. 4

1.  Janitor

2.  **Ice Cream Plant and Miscellaneous Classifications:**

(a)  Working Forepersons

(b)  Bracket No.1

1. Mix Processor

2. Head Checker

3. Freezer Operator

4. Sharp Room Worker, including Reefer Loader while actually loading in reefers (relay equipment)

5. Novelty Machine Operator

6. Sanitor – Processing Equipment

7. Laboratory Quality Control Technician

Bracket No. 2

1. Novelty Employee
2. Slab Cutting Machine Operator
3. Loader Outside Sharp Room
4. Warehouse Employee or Stockroom Employee

Bracket No. 3

General Plant clean up employee and all other workers not classified, provided, however, that the classification of new jobs established after the date of this Contract shall be negotiated between the Employer and the Union.

Bracket No. 4

1. Janitor

Bracket No. 5

1. Bulkan Filling
2. Paper Can Forming Machine Operator
3. Hand Sticking
4. Butter Wrappers and Cheese Wrappers
5. Butter Machine Feeder
6. Feeders, Packers and Wrappers

Bracket No. 6

All other jobs such as:

Ice Cream/Novelty Packer       Cup Packer

Fresh Fruit Prep.       Cut-and-Wrap Packer

Hand Flavor Stamper       Nut-Roll Operation

Magazine Loader       Tying Machine Operator

Sandwich Packer

3.    **Regular Employees** - For the purpose of this Appendix, a regular employee is one who works at the same job on the same shift three (3) or more days of the workweek.

4.    **Combination Employee** - Combination employees are those whose regular work falls in more than one (1) classification within the same day, and the rate of pay shall be the rate of each classification for the time worked on each job, except that any employee who spends more than fifty-one percent (51%) of his time at a certain wage rate shall not be paid at lower wage rate for the balance of his days work.

5.    (a)    **RELIEF EMPLOYEES -** For the purposes of this Appendix, Relief Employees are those who work on different jobs or different shifts three (3) or more days of the workweek. Relief Employees shall receive twenty cents ($.20) per hour above the highest rated job relieved during the workweek, except when relieving a Working Foreperson, when the rate shall be the rate of the Working Foreperson for that day only.

   (b)    **REGULAR EMPLOYEES** - Regular Employees performing relief work shall receive for such relief work, Twenty Cents ($0.20) per hour over the rate of the job relieved or their regular Rate, whichever is higher.

6. (a) **NIGHT WORK PREMIUM -** The following night work premium shall be paid to all milk and ice cream plant jobs except that it shall not apply to Bracket 4. A premium of Twenty Cents ($.20) per hour over the regular hourly rate for the job performed shall be paid for all regular shift hours worked between 6:00 p.m. and 6:00 a.m. and for all regular shift hours worked by anyone who starts work between 6:00 p.m. and 4:00 a.m.

(b) A night work overtime rate shall apply to all overtime worked between 10:00 p.m. and 6:00 a.m. and to all overtime hours worked at any time by anyone who starts work between 6:00 p.m. and 4:00 a.m. All other overtime hours worked shall be paid at the day work overtime rate.

7. **HOURS**

(a) Eight (8) hours within eight and one half (8 ½) hours starting at the time designated by the Employer shall constitute a day's work.

The Employer may establish a basic straight time workweek of four (4) ten (10) hour days in accordance with Section 10.2. Ten (10) hours, exclusive of one half (½) hour for lunch, shall constitute a day's work if the employee is on a straight-time week of four (4) ten (10) hour days.

(b) Any employee who reports for work not having received twenty-four (24) hours notice otherwise, shall be paid for a half (½) day, and if he works more than four (4) hours he shall be paid for a day's work for each day so worked.

8. **OVERTIME**

(a) All hours worked in excess of eight (8) hours in any one day, or forty (40) in any workweek, shall be paid at the applicable overtime rate. The day work overtime rate shall be the regular hourly rate contained in No. 16 of this Appendix "B" times one and one-half (1 ½), and the night work overtime rate shall be the regular hourly day rate plus the night work premium times one and one half (1 ½).

(b)     All hours worked in excess of ten (10) hours per days shall be paid at two (2) times the straight time hourly rate.

(c)     Except in the case of emergency situations (i.e. fire, floods, Acts of God, breakdown, etc.) no employee shall be required to work overtime unless he has been notified prior to the middle of his normal shift that he will be expected to work overtime that day.

9.     **SPLIT SHIFT** - Any employee who is required to take more than one (1) hour off in a period of nine (9) hours, shall be classified as a split shift worker and shall receive Seventeen Cents ($.17) per hour more than the regular hourly rate as shown in No. 16 of this Appendix B.

10.     **MEALS**  - Time off for meals shall commence not less than three (3) hours after starting time and shall not extend beyond five (5) hours after starting time. Those employees working a regular ten (10) hour shift will receive time off for meals between the fourth (4th) and sixth (6th) hour from their starting time.

11.     **VACATION RELIEF** - Pay for vacation relief shall be at the Relief Man rate except that pay for relief of an employee on a leave of Absence shall be at the regular rate.

12.     **SHARP ROOM** - Employees who are required to work in a Sharp Room for thirty (30) minutes shall be worked at least ten (10) minutes outside of the box before being required to work again in the Sharp Room.

13.     **TIME OFF BETWEEN SHIFTS**

(a)     If an employee is required to return to work within twelve (12) hours after completing the regular straight time hours on any shift, he shall be paid at the rate of time and one-half (1 ½) for all time worked on that shift. This section shall not be applicable to employees who work a "split shift" as defined in No.9 of this Appendix.

HEARTLAND FARMS, 2007- 2012                                                                 52

(b)     In the case of four (4) ten (10) hour day operations, time off will be eight (8) hours between shifts instead of twelve (12) hours.

14.     **DAYS OFF** - All employees shall receive two (2) designated days off in every workweek which shall be posted. So far as possible, days off shall be consecutive. Such designated days off shall not be changed on less than seven (7) days notice unless by agreement with the Union, and may be changed during the calendar week in which a holiday falls. Provided however, that the Employer may change the employees' day off during any holiday week so long as the employee is guaranteed the holiday off. Seniority shall prevail based on employee's choice within job classifications. Time worked at the Employer's request on an employee's day of rest shall be paid at the overtime rate.

15.     **OVERTIME ASSIGNMENT** - All overtime work will be assigned by seniority whenever possible; first going to the employee(s) who regularly perform the job, second to the senior employee in the job classification, and lastly by the most senior employee in the seniority unit (provided the employee is qualified to perform the work). Whenever possible, all overtime will either be communicated to all employees or posted in a conspicuous place, especially any extra work or work on days off.

16.     **WAGE RATES** - Hourly wage rates shall be as follows:

### Hourly Rates

|  | $ .50 | $ .45 | $ .50 | $ .45 | $ .50 |
| Classification | Effective 3-01-07 | Effective 3-01-08 | Effective 3-01-09 | Effective 3-01-10 | Effective 3-01-11 |
|---|---|---|---|---|---|
| Working Foreperson | 21.0425 | 21.4925 | 21.9925 | 22.4425 | 22.9425 |
| Bracket 1 | 20.5425 | 20.9925 | 21.4925 | 21.9425 | 22.4425 |

| | | | | | |
|---|---|---|---|---|---|
| Bracket 2 | 20.3925 | 20.8425 | 21.3425 | 21.7925 | 22.2925 |
| Bracket 3 | 20.2325 | 20.6825 | 21.1825 | 21.6325 | 22.1325 |
| Bracket 4 | 20.065 | 20.515 | 21.015 | 21.465 | 21.965 |
| Bracket 5 | 19.915 | 20.365 | 20.865 | 21.315 | 21.815 |
| Bracket 6 | 19.835 | 20.285 | 20.785 | 21.235 | 21.735 |

**AGREEMENT**

**CONVENTIONAL DAIRY COMPANIES**

BALIAN ICE CREAM CO., INC.

BAY VALLEY FOODS

CALIFORNIA MILK PRODUCERS

CHALLENGE DAIRY PRODUCTS, INC.

HEARTLAND FARMS, INC.

HUMBOLDT CREAMERY

JON DONAIRE/RICH PRODUCTS

WESTERN FARMS

WHITE WAVE INC.

# Exhibit 6

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-1804-GHK (CWx) | Date | February 19, 2013 |
|---|---|---|---|
| Title | *Miguel de la Cueva v. Alta-Dena Certified Dairy Inc., et al.* | | |

| Presiding: The Honorable | GEORGE H. KING, CHIEF U. S. DISTRICT JUDGE |
|---|---|

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** **(In Chambers) Order re**: Ex Parte Application for Leave to File First Amended Complaint [Dkt. No. 41]

This matter is before us on Plaintiff Miguel de la Cueva's ("Plaintiff" or "de la Cueva") Ex Parte Application for Leave to File First Amended Complaint ("Application"). Defendant Alta-Dena Certified Dairy, LLC ("Defendant" or "Alta-Dena") opposes the Application. [Dkt. No. 43]. We have considered the papers filed in support of and in opposition to this Application, and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows.

Plaintiff seeks to amend the Complaint as follows: (1) to add allegations that Alta-Dena had a uniform policy of automatically deducting 30 minutes of pay from putative class members; (2) to add Scott Parker ("Parker") as an additional named plaintiff and potential class representative; and (3) to add four new Defendants – Dean Transportation, Inc., Dean Foods Company, Fresh Dairy Direct of So Cal, and Heartland Farms. (*See* Mot. at 6).

A party seeking to file an amended complaint after the deadline in a court's pretrial scheduling order, as here, must satisfy Federal Rule of Civil Procedure 16(b). *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). Pursuant to Rule 16, a pretrial scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. Proc. 16(b)(4). We may modify a pretrial schedule for good cause "if it cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 609 (9th Cir. 1992) (citation omitted). "Although the existence or degree of prejudice to the party opposing the modification" may supply "additional reasons to deny" a request to modify the scheduling order to amend, "the focus of the inquiry is upon the moving party's reason for seeking modification." *Id*. (internal citations omitted). Assuming good cause is established for modifying the Scheduling Order, we must then evaluate whether the proposed amendment should be granted in light of the factors relevant to Rule 15(a). *Id*. at 608. Under Rule 15(a), "liberality in granting a plaintiff leave to amend is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile." *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). Prejudice is the "touchstone of the inquiry

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-1804-GHK (CWx) | Date | February 19, 2013 |
|---|---|---|---|
| Title | *Miguel de la Cueva v. Alta-Dena Certified Dairy Inc., et al.* | | |

under rule 15(a)" and "carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). In assessing the potential prejudice of the amendment, a court considers whether the amended complaint would "greatly change the parties' positions in the action, and require the assertion of new defenses." *Phoenix Solutions, Inc. v. Sony Elecs., Inc.,* 637 F. Supp. 683, 690 (N.D. Cal. 2009). We also consider judicial economy. *See Lloyd v. Joshi*, 2009 WL 2488001, at *3 (N.D. Cal. 2009).

First, Plaintiff acknowledges that his current claims "encompass" his recent discovery that Alta Dena automatically deducted 30 minutes of its drivers' pay for meal and/or rest breaks. Indeed, the current Complaint already alleges that Alta Dena violated the California Labor Code by failing to pay wages for the meal and rest breaks it did not provide and seeks civil penalties and restitution based on these allegations. (Compl. ¶¶ 50, 51, 53, 66). Plaintiff fails to explain how adding specific allegations about the 30 minute automatic deductions would allow him to assert claims that he could not assert before. Plaintiff's Application is **DENIED** to the extent it seeks leave to add allegations about the automatic deductions, because such allegations are unnecessary. Alta Dena's purported automatic deductions are within the scope of the original complaint, and Plaintiff has failed to show good cause to modify our scheduling order in this respect.

Plaintiff seeks to add an additional plaintiff, Parker, whom Plaintiff contends he diligently found during the discovery process. But, as Defendant points out, adding Parker would significantly expand the scope of this suit. The original action involves three employer locations, whereas the amended action would involve twelve. (Opp. at 3-4). Further, the number of drivers in the putative class would increase from 148 drivers to more than 350. (Id.) Adding Parker would thus cause substantial prejudice by expanding the scope of discovery to nine additional employer locations and to roughly 200 additional class members. Such amendment would require Defendant to conduct much additional discovery and perhaps redo or supplement some of the discovery it has already done. Defendant has already obtained 38 declarations from class members to oppose class certification, for instance, and if we granted leave to amend, Defendant would need to seek declarations from the new class members at the additional locations. Because adding Parker would significantly change the scope of this suit, judicial economy favors separate actions rather than a disruptive, last minute amendment before the class certification deadline. Further, Parker is not a putative class member as defined in the original Complaint, and we have not yet certified any class in this matter. The proposition that courts routinely grant motions to add or substitute named plaintiffs therefore does not apply. *Velazquez v. GMAC Mortg. Corp.*, 2009 WL 2959838, *3 (C.D. Cal. 2009) ("[T]he reason substitution is appropriate after class certification is that 'once certified, a class acquires a legal status separate from that of the named plaintiffs'. . . . This line of reasoning is inapposite here, where no class has yet been certified." (citation omitted)). Thus, even assuming Plaintiff was diligent in discovering Parker, leave to amend is not warranted under the Rule 15(a) factors. Plaintiff's Application is **DENIED** to the extent it seeks leave to add Parker as an additional plaintiff and potential class representative.

Finally, Plaintiff seeks to add four new Defendants. Plaintiff acknowledges that de la Cueva never worked for Dean Transportation, Inc. ("DTI") or Heartland Farms ("Heartland") – these are the

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-1804-GHK (CWx) | Date | February 19, 2013 |
|----------|----------------------|------|-------------------|
| Title | *Miguel de la Cueva v. Alta-Dena Certified Dairy Inc., et al.* | | |

entities that Parker worked for. Because we are denying leave to add Parker as a named plaintiff, it does not make sense to grant leave to add DTI and Heartland as defendants. Adding these defendants just before the class certification deadline would prejudicially expand the scope of this suit. Accordingly, Plaintiff's Application is **DENIED** to the extent it seeks to add DTI and Heartland as defendants. Plaintiff also wishes to add Dean Foods Company and Farm Dairy Direct of So Cal ("FDD"), both of which are purportedly Alta Dena's parent companies in the Dean Foods corporate hierarchy. As Defendant points out, however, "Fresh Dairy Direct of So Cal" is not a suable entity because it is "a branding or marketing term that Dean Foods sometimes uses to refer to its lines of business in southern California." (Opp. at 7, 17). Adding FDD would thus be futile, and Plaintiff's Application is **DENIED** to the extent it seeks to add FDD as a defendant. Next, Plaintiff has failed to show that it has been diligent in seeking to add Dean Foods Company. Dean Foods Company is a major public company traded on the New York Stock Exchange and its relationship as a corporate parent to Alta Dena would not require sophisticated discovery. Rather, a simple google search would reveal their relationship. Thus, Plaintiff has failed to show that it has been diligent in seeking an amendment to add Dean Foods Company or why it could not meet the deadline to amend as set forth in our scheduling order.[1] Plaintiff also cites authority that a corporate parent may be named as a defendant in a wage and hour class action where such parent "employed or exercised control over wages, hours, or working conditions of any person' working in the subsidiary-owned locations." *See Akaosugi v. Benihana Nat. Corp.*, 282 F.R.D. 241, 258 (N.D. Cal. 2012). But the proposed amended complaint does not allege that Dean Foods Company exercised such control over its Alta Dena subsidiary. Rather, the proposed amended complaint conclusorily alleges alter ego liability. (*See* Proposed FAC ¶ 6). Adding Dean Foods Company thus appears to be futile. Accordingly, Plaintiff's Application is **DENIED** to the extent it seeks to add Dean Foods Company as a defendant.

In light of the forgoing, Plaintiff's Application is **DENIED** in its entirety. All present scheduling dates **STAND**.

**IT IS SO ORDERED.**

|  |  | -- | : | -- |
|--|--|----|---|----|
| | Initials of Deputy Clerk | | Bea | |

---

[1] We issued our scheduling order on August 3, 2012. The deadline for a motion to amend was September 4, 2012.

# Exhibit 7

*P/SEND*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-1804–GHK (CWx) | | Date | May 9, 2013 |
|---|---|---|---|---|
| Title | *Miguel De La Cueva v. Alta Dena Certified Dairy, LLC, et al.* | | | |

**Presiding: The Honorable**   **GEORGE H. KING, CHIEF U. S. DISTRICT JUDGE**

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**    **(In Chambers) Order re:** Motion to Certify Class (Dkt. No. 45)

This matter is before us on Plaintiff Miguel De La Cueva's ("Plaintiff") Motion to Certify Class ("Motion"). We have considered the papers filed in support of and in opposition to the Motion and deem this matter appropriate for resolution without oral argument. *See* L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows.

## I.    Background

Plaintiff filed this action against Alta Dena Certified Dairy, LLC ("Defendant" or "Alta Dena"), his former employer, asserting both wage and hour class claims and individual employment discrimination claims.

Alta Dena "manufactures, distributes, and exports dairy and beverage products in Southern California." (Mot. Ex. 113 at 2:25-27). Plaintiff "is a former truck driver for Alta Dena, who drove and delivered dairy products from Alta Dena's location in the City of Industry to Alta-Dena's California customers." (Dkt. No. 20, at 1). With respect to his wage and hour class claims, Plaintiff alleges that Alta Dena "had a corporate policy and/or practice that did not permit 'drivers' (such as Plaintiff) from taking [*sic*] a meal and/or rest break until a shipment was completed (*i.e.*, driven [*sic*] from Defendant's principal place of business in the City of Industry to another local California delivery destination)." (Compl. ¶ 39). The routes often last longer than four hours, and if a driver had two routes in a single day, Alta Dena "would neither authorize nor permit a meal and/or rest break in between the two routes because that would delay delivery." (*Id.*). "This . . . meant that Plaintiff, and other drivers, often went six (6) hours if not longer without a meal and/or rest break." (*Id.*). Because the drivers were not authorized or permitted to take a meal and/or rest break, they also received less wages than what was due to them on the next pay check and/or at termination. (*Id.*).

Based on the foregoing, Plaintiff asserts the following four claims on behalf of the class: (1) failure to provide meal and/or rest breaks in violation of Cal. Labor Code §§ 226.7, 512; (2) failure to

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-1804–GHK (CWx) | | Date | May 9, 2013 |
|---|---|---|---|---|
| Title | *Miguel De La Cueva v. Alta Dena Certified Dairy, LLC, et al.* | | | |

pay all wages due upon termination of employment in violation of Cal. Labor Code §§ 201-203; (3) failure to provide accurate paystub in violation of Cal. Labor Code § 226; and (4) violation of UCL.

Individually, Plaintiff also asserts the following claims based on allegations that Alta Dena prevented him from exercising his disability rights, including his right to take medical leaves: (5) disability discrimination in violation of FEHA; (6) failure to provide reasonable accommodation in violation of FEHA; (7) failure to engage in the interactive process in violation of FEHA; (8) retaliation in violation of FEHA; (9) violation of Cal. Labor Code § 1102.5; (10) wrongful discharge in violation of public policy; and (11) intentional infliction of emotional distress.

On February 19, 2013, Plaintiff filed the instant Motion to certify the following Class: All persons employed by Alta Dena Certified Dairy, LLC as a driver in California, including wholesale drivers, retail drivers, and transport drivers, from March 2008 until the time of final judgment in this action.[1] Plaintiff "moves for class certification based on non-compliant, *uniform policies and company-wide practices*, resulting in class-wide: (1) unprovided meal and rest breaks; (2) unprovided wages and/or forfeiture of earned wages; (3) unprovided accurate paystubs; and (4) waiting time penalties." (Mot. 1).

## II. Analysis

To obtain certification as a Rule 23(b)(3) class, Plaintiff bears the burden of establishing the requirements of Rule 23(a) and (b)(3), including that he "will fairly and adequately protect the interests of the class." Rule 23(a)(4). We find and conclude that Plaintiff cannot adequately represent the class for three reasons.

First, he lacks standing to seek penalties for the inaccurate paystub claim under Cal. Labor Code § 226. "The statute of limitations on a claim for § 226(a) penalties is one year . . . ." *Hernandez v. Towne Park, Ltd.*, 2012 WL 2373372, at *14 (C.D. Cal. June 22, 2012); *see also Hoffman v. Uncle P Prods., LLC*, 2008 WL 1887087, at *5 (Ct. App. Apr. 30, 2008) ("[W]age statement claims [are] in the nature of a penalty subject to the one year statute of limitations of [CCP § 340(a)].") Plaintiff does not dispute that he was terminated on December 27, 2010, (Opp'n, Ex. M., at 11), and received his last paystub more than one year before the filing of this action on March 2, 2012. Accordingly, he has no standing to seek penalties and cannot adequately represent class members who wish to seek penalties

---

[1] Plaintiff's Motion actually seeks to certify "[a]ll persons employed by Alta Dena Certified Dairy, LLC and its successor Dean Transportation." (Mot. 2). Just days before the class certification motion deadline, Plaintiff filed an ex parte application to add, *inter alia*, four new Defendants, including Dean Transportation, Inc. We denied the application on February 19, 2013, the same day this Motion was filed. Thus, we deem Plaintiff's Motion to seek certification of all persons employed by Alta Dena Certified Dairy, LLC only.

    **CIVIL MINUTES - GENERAL**    

*P/SEND*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-1804–GHK (CWx) | Date | May 9, 2013 |
|----------|----------------------|------|-------------|

| Title | *Miguel De La Cueva v. Alta Dena Certified Dairy, LLC, et al.* |
|-------|---------------------------------------------------------------|

under § 226(e).[1]  *See* Newberg on Class Actions § 3:59 (5th ed.) ("If a court finds that standing is lacking, then adequacy will be as well, for a plaintiff cannot be an adequate representative for claims she does not have standing to pursue.").

Second, Plaintiff, as a former employee, lacks standing to seek injunctive relief – which he sought in his Complaint, (Compl. ¶ 66), and continues to seek in his Motion, (*see* Reply 24) – on behalf of current employees.  In *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 988 (9th Cir. 2011), the Ninth Circuit held that "only current employees have standing to seek injunctive relief."  *See also* Newberg on Class Actions § 3.59 (recognizing *Ellis*'s holding in this respect).  As a result, inasmuch as Plaintiff purports to seek injunctive relief on behalf of current employees, he cannot adequately represent their interests in obtaining prospective relief.

Finally, Plaintiff's individual claims give rise to potential conflicts of interest that are more than speculative.  We are not convinced by Plaintiff's assertion that "nothing about the individual claims impacts or otherwise affects Plaintiff's desire to fully and vigorously pursue the class wide wage and hour claims" because "the class claims for unpaid wages and associated penalties are not available by virtue of Plaintiff's individual wrongful termination claims."  (Mot. 10).  While it may be true that the class claims and individual claims seek to remedy different injuries, Plaintiff has specifically testified that his "no.1 interest in this lawsuit is to try to get [his] job back with Alta Dena" and that there is "nothing else more important than [his] job."  (Opp'n Ex. B, Pl's Dep. 10:15-11:14).  This testimony suggests that he is likely to prioritize his individual claims over the class claims, which makes the possibility that he would compromise his class claims in favor of his individual claims more than speculative, especially in the context of, for instance, a global settlement of all claims.  Moreover, because his individual discrimination claims necessarily broaden the scope of discovery – for instance, into the details of his performance during his employment and the "true" reason for his termination – his credibility would be under greater scrutiny at trial than a typical class representative who asserts only wage and hour claims.  This has the real potential to unnecessarily detract attention away from the class's substantive claims.

Plaintiff's offer to stay his individual claims until the resolution of the class claims does not abate our concerns.  Unlike the plaintiff in *Krzesniak v. Cendant Corp.*, 2007 WL 1795703, at *11 (N.D. Cal. June 20, 2007), who offered to dismiss his individual claims if they prevented the court from

---

[1] Plaintiff's argument that he has standing to seek actual damages under § 226(e) is neither here nor there.  That the statute of limitations for actual damages under § 226(a) may be three years, *see Hernandez*, 2012 WL 2373372, at *14, merely precludes us from finding that the claim is time-barred.  It does not change the fact that Plaintiff cannot seek penalties and therefore cannot adequately represent class members who wish to seek penalties under § 226(e).  *Cf.* Newberg on Class Actions § 3:59 (noting that where the statute allows for either actual damages or statutory damages, "courts generally allow the class representative to pursue only statutory damage claims, and to deliberately eschew actual damage claims . . . even if pursuing actual damage claims might be to the advantage of some class members," in part because "class-wide proof is made easier when the damages are set by statute and remain constant across the class").

*P/SEND*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-1804–GHK (CWx) | | Date | May 9, 2013 |
|---|---|---|---|---|
| Title | *Miguel De La Cueva v. Alta Dena Certified Dairy, LLC, et al.* | | | |

finding him an adequate representative, Plaintiff here offers only to stay his individual claims. A stay would not alleviate the potential conflict of interest nor preclude the Parties from entering into a global settlement discussion, wherein Plaintiff could still compromise the class claims in favor of his individual claims. Moreover, because we did not bifurcate discovery, Defendant is simultaneously obtaining evidence relating to both the class and individual claims, making it still possible for Defendant to incorporate relevant evidence from Plaintiff's individual claims to undermine his credibility at trial on the class claims.

Accordingly, Plaintiff is an inadequate representative.

Without citing any authorities, Plaintiff requests that we substitute Juan Perez as the class representative in the event we find Plaintiff inadequate. We decline to do so under the facts of this case. As a preliminary matter, we note that many district courts in this circuit permit substitution only after a class has been certified. *See, e.g., Miller v. Mercedes-Benz USA LLC*, 2009 WL 1393488, at *1-2 (C.D. Cal. May 15, 2009); *Sanchez v. Wal Mart Stores, Inc.*, 2009 WL 2971553, at *3 (E.D. Cal. Sept. 11, 2009); *Velazquez v. GMAC Mortg. Corp.*, 2009 WL 2959838, at *3 (C.D. Cal. Sept. 10, 2009). Moreover, even if we were inclined to permit substitution of another named plaintiff at class certification so long as the other Rule 23 requirements are met,[2] substituting Perez would make this case unmanageable because it would effectively create two distinct, at best peripherally related, actions – i.e., Plaintiff's employment discrimination action plus Perez's wage and hour class action – under the guise of one action. Plaintiff cites no authority, and we found none, which suggests that this type of joinder is appropriate.[3] Accordingly, Plaintiff's request to substitute Perez is denied.[4]

### III. Conclusion

Based on the foregoing, Plaintiff's Motion is **DENIED**. This action shall proceed as Plaintiff's individual action.

---

[2] *See, e.g., Nat'l Federation of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1201 (N.D. Cal. 2007); *Tait v. BSH Home Appliances Corp.*, --- F.R.D. ---, 2012 WL 6600247, at *8 (C.D. Cal. 2012); Manual for Complex Litig., § 21.26 (4th ed.) ("The court may permit intervention by a new representative or may simply designate that person as a representative in the order granting class certification.").

[3] Moreover, we note that inasmuch as Perez is also a former employee who lack standing to seek injunctive relief on behalf of current employees, substituting him will not cure all of Plaintiff's inadequacies.

[4] Because our denial of Plaintiff's substitution request is based on the unique manageability problem presented by the facts of this case, we do not decide (1) whether, in the absence of such problem, we would allow substitution on the class certification motion; or (2) whether Plaintiff has otherwise met the other Rule 23 requirements.

*P/SEND*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-1804–GHK (CWx) | Date | May 9, 2013 |
|---|---|---|---|

| Title | *Miguel De La Cueva v. Alta Dena Certified Dairy, LLC, et al.* |
|---|---|

**IT IS SO ORDERED**.

_____ : _____

Initials of Preparer    IR for  Bea

# Exhibit 8

○ USDOT Number   ○ MC/MX Number   ● Name

Enter Value: DEAN TRANSPORTAT

[ Search ]



*Company Snapshot*

**DEAN TRANSPORTATION INC**
USDOT Number: 714483

ID/Operations | **Inspections/Crashes In US** | **Inspections/Crashes In Canada** | **Safety Rating**

| Other Information for this Carrier |
| --- |
| ♥ **SMS Results** |
| ♥ **Licensing & Insurance** |

**Carriers:** If you would like to update the following ID/Operations information, please complete and submit form **MCS-150** which can be obtained **online** or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's **DataQs** system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the **CSP order page** or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to **SAFER General Help**.

**The information below reflects the content of the FMCSA management information systems as of 04/28/2013.**

| | | | |
| --- | --- | --- | --- |
| **Entity Type:** | Carrier | | |
| **Operating Status:** | AUTHORIZED FOR Property | **Out of Service Date:** | None |
| **Legal Name:** | DEAN TRANSPORTATION INC | | |
| **DBA Name:** | | | |
| **Physical Address:** | 2711 N HASKELL AVE SUITE 3400 DALLAS, TX  75204 | | |
| **Phone:** | (214) 303-3400 | | |
| **Mailing Address:** | 2711 N HASKELL AVE SUITE 3400 DALLAS, TX  75204 | | |
| **USDOT Number:** | 714483 | **State Carrier ID Number:** | |
| **MC/MX/FF Number (s):** | MC-328882 | **DUNS Number:** | -- |
| **Power Units:** | 2,012 | **Drivers:** | 2,436 |
| **MCS-150 Form Date:** | 02/15/2013 | **MCS-150 Mileage (Year):** | 66,347,399 (2012) |

**Operation Classification:**

| | | |
| --- | --- | --- |
| X Auth. For Hire | Priv. Pass.(Non-business) | State Gov't |
| Exempt For Hire | Migrant | Local Gov't |
| Private(Property) | U.S. Mail | Indian Nation |
| Priv. Pass. (Business) | Fed. Gov't | |

**Carrier Operation:**

| | | |
| --- | --- | --- |
| X Interstate | Intrastate Only (HM) | Intrastate Only (Non-HM) |

**Cargo Carried:**

| | | |
| --- | --- | --- |
| X General Freight | Liquids/Gases | Chemicals |
| Household Goods | Intermodal Cont. | Commodities Dry Bulk |
| Metal: sheets, coils, rolls | Passengers | X Refrigerated Food |
| Motor Vehicles | Oilfield Equipment | Beverages |
| Drive/Tow away | Livestock | Paper Products |
| Logs, Poles, Beams, Lumber | Grain, Feed, Hay | Utilities |
| Building Materials | Coal/Coke | Agricultural/Farm Supplies |
| Mobile Homes | Meat | Construction |
| Machinery, Large Objects | Garbage/Refuse | Water Well |
| Fresh Produce | US Mail | **X DAIRY PRODUCTS** |

---

**ID/Operations** | Inspections/Crashes In US | **Inspections/Crashes In Canada** | **Safety Rating**

**US Inspection results for 24 months prior to: 04/28/2013**

Total Inspections: 1063
Total IEP Inspections: 0
**Note:** Total inspections may be less than the sum of vehicle, driver, and hazmat inspections. Go to **Inspections Help** for further information.

**Inspections:**

| Inspection Type | Vehicle | Driver | Hazmat | IEP |
|---|---|---|---|---|
| Inspections | 688 | 1034 | 0 | 0 |
| Out of Service | 48 | 2 | 0 | 0 |
| Out of Service % | 7% | 0.2% | % | 0% |
| Nat'l Average % (2009- 2010) | 20.72% | 5.51% | 4.50% | N/A |

**Crashes reported to FMCSA by states for 24 months prior to: 04/28/2013**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

**Crashes:**

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 2 | 26 | 40 | 68 |

---

**ID/Operations** | **Inspections/Crashes In US** | Inspections/Crashes In Canada | **Safety Rating**

**Canadian Inspection results for 24 months prior to: 04/28/2013**

Total inspections: 0

**Note:** Total inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further information.

**Inspections:**

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

**Crashes results for 24 months prior to: 04/28/2013**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

**Crashes:**

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

---

**ID/Operations** | **Inspections/Crashes In US** | **Inspections/Crashes In Canada** | Safety Rating

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

**Carrier Safety Rating:**

**The rating below is current as of: 04/28/2013**

**Review Information:**

| Rating Date: | 03/09/2004 | Review Date: | 02/25/2004 |
|---|---|---|---|
| Rating: | Satisfactory | Type: | Compliance Review |

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

# Exhibit 9

U.S. Department of Transportation
**Federal Motor Carrier Safety Administration**
**Safety and Fitness Electronic Records (SAFER) System**

## *SAFER Help*

### SAFER Data Field Names

**General Snapshot Information**

The term "company" refers to a "Motor Carrier Industry Entity" which includes carriers, shippers, and registrants.

A snapshot is a condensed view of the company's profile as maintained by the Motor Carrier Management Information System (MCMIS). It includes information on the company's location, identification numbers, type, cargo carried or shipped, inspection summary, crash summary, and safety rating. Descriptions of individual data items are listed below. Users may directly access these descriptions by clicking on any underscored field name in the table. Note that these field names are colored by your browser and will change colors after you have clicked on them the first time. These colors will vary depending on your browser setup. The actual data fields are colored **blue** to distinguish them from the field names.

It is recommended, if possible, that higher screen resolutions (1024 X 768 or 800 X 600) be used to view the snapshot table, otherwise it will be necessary to scroll both vertically and horizontally in order to view all the data fields. Also, because of the way HTML tables are implemented, the columns may "word wrap" at lower resolutions causing the data to be more difficult to comprehend.

Some data is displayed in *tables* of rows and columns. An **X** in front of an item in a table indicates that the item is relevant to this company, while the absence of any character indicates that the item is *not* applicable. Some tables allow characters other than **X** and those *flags* are explained in the individual data item help references below.

**Legal Name**
This is the legal name of the company.

**DBA Name**
This may be a trade name under which the company does business. Any name identifying the entity other than the legal name.

**Physical Address**
Refers to the physical location of the company's principal office. The following data elements are included:

- **STREET**. Identifies the street address where the company's principal place of business is physically located.
- **CITY**. Identifies the city where the company's principal place of business is located.
- **STATE**. Identifies the State where the principal place of business is located. Two-letter postal abbreviation for the state.
- **ZIPCODE**, (EXPANDED ZIPCODE). Zip code which corresponds to the street address of the company's principal place of business (Any valid U.S. or Canadian zipcode or CANADA; MEXICO or CENTRA). Expanded zipcode refers to the last four digits of the zipcode. Example 37815-0310. If the expanded zipcode is known, the field will contain the dash (-). Some Canadian and Mexican addresses contain the word CANADA or MEXICO as part of the zipcode and Central American countries' zipcodes contain CENTRA. The first 5 characters will be stored in the ZIPCODE field and the last character will be stored in the EXPANDED ZIPCODE field.

**Phone**
The company telephone number at the principal place of business.

**Mailing Address**
The address at which a company receives mail.

**USDOT#**
This is the number assigned by MCMIS to a census record. It is sometimes referred to as the USDOT number. Each company should have only one active census number. The census number has no internal coded structure. Numbers are issued sequentially as carriers/shippers/registrants are added to the system.

**State Carrier ID**
Company I.D. number assigned by the state, often used in lieu of the USDOT#, for intrastate carriers/shippers/registrants.

**MC/MX/FF Number(s)**
Carrier number issued by the FMCSA granting authority for interstate operations. Prior to January 1, 1996, the MC number was issued by the Interstate Commerce Commission. Freight Forwarder docket numbers and MX numbers will also be listed in this field.

**DUNS Number**
This is the corporate registration number given by Dun & Bradstreet.

**Entity Type**
Refers to the type of operation in which the motor carrier is engaged. It identifies the entity as a carrier, hazardous materials shipper, both a carrier and a shipper, or registrant.

**Carrier Operations**
Identifies the carrier as being engaged in interstate, intrastate hazardous material, or intrastate non-hazardous material transport activities.

**Shipper Operations**
Identifies the shipper as being engaged in interstate or intrastate hazardous material shipping activities.

**Operation Classification**
Identifies the type of motor carrier. MCMIS recognizes the following classifications for motor carrier type (NOTE: A carrier can have more than one type of classification):

- **Authorized-For-Hire.** A commercial motor carrier whose primary business activity is the transportation of property/passengers by motor vehicle for compensation.
- **Exempt-For-Hire.** A for-hire motor carrier transporting commodities or conducting operations not subject to economic regulation by the FMCSA.
- **Private (property).** A motor carrier whose highway transportation activities are incidental to, and in furtherance of, its primary business activity.
- **Private/Passenger Business.** A private motor carrier engaged in the interstate transportation of passengers which is provided in the furtherance of a commercial enterprise and is not available to the public at large.
- **Private/Passenger Non-Business.** A private motor carrier involved in the interstate transportation of passengers that does not otherwise meet the definition of a private motor carrier of passengers (business) (e.g., church buses).
- **Migrant.** A motor carrier who transports in interstate or foreign commerce at any one time, three or more migrant workers to or from their employment (refers to "contract carrier by motor vehicle").
- **U.S. Mail.** A motor carrier which transports U.S. Mail.
- **Federal Govt.** Transportation of property or passengers by a U.S. Federal Government agency.
- **State Govt.** Transportation of property or passengers by a U.S. State Government agency.
- **Local Govt.** Transportation of property or passengers by a local municipality.
- **Indian Tribe.** Transportation of property or passengers by an Indian tribal government.
- **Other Classification.** A motor carrier which does not fall into one of the classifications above (Description is in "Other" field).

**Power Units**
Identifies the number of Trucks, Tractors, Hazardous Material Tank Trucks, Motor Coaches, School Buses, Mini-Bus/Vans and Limousines owned, term leased or trip leased by the motor carrier.

**Drivers**
Total number of drivers employed by the carrier/shipper.

**MCS-150 Form Date**
Date from the MCS-150 Registration Form.

**MCS-150 Form Mileage**
Mileage from the MCS-150 Registration Form.

**Cargo Carried**
Identifies the type of cargo transported by the carrier/shipper.

**Inspections**
Number of roadside inspections conducted within the past two years. Inspections are listed as total, driver, vehicle, and Hazmat. There are five levels of inspections:

- Level 1 - a complete inspection
- Level 2 - a walk-around inspection
- Level 3 - a driver-only inspection
- Level 4 - an inspection for a special study
- Level 5 - a vehicle-only inspection
- Level 6 - Level 1 inspection plus additional examination of Radioactive Material

The inspection values listed in the table are based on the following totals:

**Vehicle Inspection**
  Levels 1+2+5+6
**Driver Inspection**
  Levels 1+2+3+6
**Hazmat Inspection**
  Levels 1+2+3+4+5+6 (*when Hazmat is present*)

*Note that total inspections may not be the sum of the totals described above.*

The second row of the Inspections table indicates the number of inspections which resulted in an "Out of Service (OOS)" status. The OOS status reflects one or more OOS violations in a single inspection.

The third row is the percentage of the displayed carrier's inspections resulting in an "Out of Service" status.

The fourth row represents the National Average which is the percentage of all inspections conducted in the USA that resulted in an "Out of Service" status for the year 1999.

**Crashes**
Each crash is only recorded once and at its highest level of severity. For example, if an crash involved one fatality, three injuries, and one tow-away, the crash would only be recorded as a single fatal crash. The crash total is therefore the sum of the fatal, injury, and tow categories.

**Inspections/Crashes in Canada**
FMCSA and the CCMTA (Canadian Council of Motor Transport Administration) have a reciprocity agreement to provide the mutual exchange on inspection and crash data. The Inspection/Crashes in Canada section provides a count of vehicle and driver inspections (and Out Of Service Inspections) using the same five levels of inspections. The Canadian inspections do not include data on Hazmat inspections. The Canadian Crash data provides indicators of fatal crashes, injury related crashes,

and crashes with a significant property damage. In the same as crash records reported in the United states, a Canadian reported crash is listed as one of these three categories. The crash total is therefore the sum of the fatal, injury, and property damage categories.

### Carrier Safety Rating

This is a measure of the carrier's compliance with the Federal Motor Carrier Safety Regulations (FMCSR). Motor carriers rated before 1986 were assigned safety ratings based on previous procedures used to determine the carriers compliance with the FMCSR such as a Safety Management Audit, or a Re-investigation conducted on the carriers operation. Beginning in October 1986, motor carriers were assigned a safety rating based on a Safety Review or a Compliance Review. A Safety Review is an overview of a motor carrier's knowledge of the FMCSR. This covers all major areas of the Safety Regulations. Much of the rating is based on an interview with management. The main purpose is to educate a carrier about the FMCSR. A Compliance Review is a statistical sampling or audit of required records to determine a motor carrier's compliance with the FMCSR. An in-depth review of the motor carrier's records is made to check different categories of drivers, vehicles and trips. This review may be limited to specific problems and may include a detailed investigation of a problem area. The compliance status determination is based on FMCSR violations discovered during the review.

Any of the following codes may be found in this field:

- **Satisfactory**; Records indicate no evidence of substantial non-compliance with safety requirements.
- **Conditional**; Records indicate that the carrier was out of compliance with one or more safety requirements.
- **Unsatisfactory**; Records indicate evidence of substantial noncompliance with safety requirements.

EFFECTIVE DATE. The date the Safety/Compliance Review was input into MCMIS thus generating a safety rating.

### Operating Status

- **OUT-OF-SERVICE**: Carrier is under any type of out-of-service order and is not authorized to operate.
- **AUTHORIZED FOR { Passenger, Property, HHG }**: This will list the specific operating authorities the carrier (or broker) is allowed to operate.
- **NOT AUTHORIZED**: Carrier does not have any operating authority and is not authorized to operate.
- **ACTIVE**: Carrier is authorized to operate.

### Out of Service Date

Indicates the date the company was ordered Out of Service. If there are multiple Out of Service orders, it will be the earliest date.

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts